UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN ROCK, TIM STEWARD and KODY COLLINS on behalf of themselves and all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.1:12-cv-1019 JMS-DKL |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION | ) ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BRIEF IN SUPPORT OF NATIONAL COLLEGIATE ATHLETIC ASSOCIATION'S MOTION TO DISMISS**

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Adidas Am. v. NCAA*,
    64 F. Supp. 2d 1097 (D. Kan. 1999). ................................................................................. 8, 10

*Agnew v. NCAA*,
    683 F.3d 328 (7th Cir. 2012) ......................................................... 1, 4, 5, 6, 7, 18, 19, 22, 23

*Agnew v. NCAA*,
    No. 1:11-cv-0293-JMS-MJD, 2011 WL 3878200, at *2 n. 2 (S.D. Ind. Sept. 1, 2011)............ 1

*Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*,
    499 F.3d 663 (7th Cir. 2007) ................................................................................................. 4

*American Needle, Inc. v. Nat'l Football League*,
    -- U.S. --, 130 S. Ct. 2201, 176 L. Ed. 2d 947 (2010)...................................................... 20, 23

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)........................................................ 5

*Banks v. NCAA*,
    977 F.2d 1081 (7th Cir. 1992) ...................................................................................... 6, 11, 15

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544, 558, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ................................................ 5

*Blue Cross & Blue Shield of Wis. v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ................................................................................................. 8

*Brown Shoe Co. v. U.S.*,
    370 U.S. 294, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962)........................................................... 6, 7

*Cal. Dental Ass'n v. F.T.C.*,
    526 U.S. 756 119 S. Ct. 1604, 143 L. Ed. 2d 935 (1999)........................................................... 3

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
    532 F.3d 1111, 1118 (10th Cir. 2008) ................................................................................. 8, 9

*Car Carriers v. Ford Motor Co.*,
    745 F.2d 1101, 1106 (7th Cir. 1984) ..................................................................................... 15

*Denny's Marina, Inc. v. Renfro Prods., Inc.*,
    8 F.3d 1217 (7th Cir. 1993) ................................................................................................... 5

*In re NCAA I-A Walk-On Football Players Litigation,*
    398 F. Supp. 2d 1144 (W.D. Wash. 2005), *class certification denied*, No. C04-1254C, 2006
    WL 1207915 (W.D. Wash. May 3, 2006) ................................................................................. 12

*Justice v. NCAA,*
    577 F. Supp. 356 (D. Ariz. 1983) ........................................................................................... 21

*Kochert v. Greater Lafayette Health Services, Inc.,*
    463 F.3d 710 (7th Cir. 2006) ................................................................................... 24, 25, 26

*Lantec, Inc. v. Novell, Inc.,*
    306 F.3d 1003 (10th Cir. 2002) ............................................................................................. 14

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n,*
    884 F.2d 504 (9th Cir. 1989) ................................................................................................. 16

*Limestone Dev. Corp. v. Vill. Of Lemont, Ill.,*
    520 F.3d 797 (7th Cir. 2008) ................................................................................................... 5

*Loeb Indus., Inc. v. Sumitomo Corp.,*
    306 F.3d 469 (7th Cir. 2002) ................................................................................................. 24

*Lupia v. Stella D'Oro Biscuit Co.,*
    586 F.2d 1163, 1167 (7th Cir. 1978) ....................................................................................... 5

*Matter of Cassidy,*
    892 F.2d 637 (7th Cir. 1990) ................................................................................................... 7

*McCormack v. NCAA,*
    845 F.2d 1338 (5th Cir. 1988) ................................................................................. 18, 20, 21, 22

*McLaughlin Equip. Co., Inc. v. Servaas,*
    No. IP98-0127-C-T/K, 2004 WL 1629603 (S.D. Ind. Feb. 18, 2004) ..................................... 14

*Menasha Corp. v. News Am. Marketing In-Store, Inc.,*
    354 F.3d 661 (7th Cir. 2004) ................................................................................................... 5

*Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club,*
    325 F.3d 712 (6th Cir. 2003) ................................................................................................... 5

*NCAA v. Bd. of Regents of Univ. of Okla.,*
    468 U.S. 85, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984) ........................................... 18, 20, 21, 22

*Newcal Indus., Inc. v. Ikon Office Solution,*
    513 F.3d 1038 (9th Cir. 2008) ............................................................................................ 6, 11

*Payton v. Cnty. of Kane,*
    308 F.3d 673 (7th Cir. 2002) ................................................................................................. 24

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430, 436, 436-37 (3d Cir. 1997) ................................................................. 6, 11

*Republic Tobacco, Inc. v. N. Atl. Trading Co., Inc.*,
    381 F.3d 717 (7th Cir. 2004) ................................................................................... 14

*Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*,
    40 F.3d 247 (7th Cir. 1994) ................................................................................... 8, 9

*Smith v. NCAA*,
    139 F.3d 180 (3d Cir. 1998)................................................................................... 18

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320, 81 S. Ct. 623, 5 L. Ed. 2d 580 (1961) ............................................. 14

*Tanaka v. Univ. of S. Calif.*,
    252 F.3d 1059 (9th Cir. 2001) ........................................................................ 6, 8, 10

*Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150*,
    433 F.3d 1024 (7th Cir. 2006) ................................................................................. 24

*U.S. v. Crawley*,
    837 F.2d 291 (7th Cir. 1988) ................................................................................... 7

*Wallace v. IBM Corp.*,
    467 F.3d 1104 (7th Cir. 2006) ................................................................................. 16

*White v. NCAA*,
    CV 06-999-RGK (C.D. Cal. Sept. 20, 2006) ......................................................... 12

*Worldwide Basketball and Sports Tours, Inc. v. NCAA*,
    388 F.3d 955 (6th Cir. 2004) ................................................................................... 7

# INTRODUCTION

In June 2012, the Seventh Circuit affirmed this Court's dismissal of an amended complaint challenging two NCAA rules: (1) the bylaws standardizing athletics scholarships (known as "grants in aid," or "GIA") as awardable in one-year renewable terms, and (2) the bylaws standardizing the number of athletics GIAs schools in a given division or subdivision can award in each sport for a given season. *Agnew v. NCAA*, 683 F.3d 328, 333 (7th Cir. 2012). The *Agnew* panel agreed with this Court that plaintiffs had failed to plead a relevant market. The Seventh Circuit also cautioned that, while the Sherman Act applies to the NCAA in general terms, most NCAA bylaws are pro-competitive, rather than anti-competitive:

> None of this is to suggest that all NCAA bylaws, or even *any* NCAA bylaws, are violative of the Sherman Act. On the contrary, *Board of Regents* implies that the Sherman Act does apply to NCAA regulations, but most regulations will be a "justifiable means of fostering competition among amateur athletic teams," and therefore procompetitive. 468 U.S. at 117, 104 S. Ct. 2948. In fact, the Supreme Court seemed to create a presumption in favor of certain NCAA rules…

*Agnew*, 683 F.3d at 341 (emphasis in original).

Plaintiffs John Rock, Tim Steward and Kody Collins, through the same counsel as Agnew, now claim that a  number of NCAA bylaws, across all three NCAA playing divisions, violate the Sherman Act: the rules setting the one-year GIA term,[1] the rules standardizing the number of GIAs awarded in various sports,[2] and the Division III bylaw prohibiting athletics-based financial aid.[3] Their allegations are just as flawed as Agnew's were. Although plaintiffs

---

[1] The bylaws standardizing the term of financial aid (which only apply in Divisions I and II) are found at Bylaw 15.3.3.1.

[2] The bylaws standardizing the number of GIAs that can be awarded in a given sport (which only apply in Divisions I and II) are found in Bylaw 15.5.

[3] Division III Bylaw 15.4.1 precludes the awarding of athletics-based aid. The *Agnew* plaintiffs' also purported to challenge Division III financial rules, but failed to defend those claims in the motion to dismiss briefing. *Agnew v. NCAA*, No. 1:11-cv-0293-JMS-MJD, 2011 WL 3878200,

have, this time, at least attempted to plead a relevant market, they have failed to do so adequately; their conclusory allegation that the relevant market is the nationwide market for the "labor of student athletes" who want to play on "athletic teams of NCAA member institutions," Dkt. 20 at ¶27, is insufficient as a matter of law.

Plaintiffs' proposed market is simultaneously too broad and too narrow.  It is too broad because plaintiffs claim that opportunities to play any NCAA sport, at any school and in any division, are substitutes for one another.  And it is too narrow because plaintiffs claim that the opportunity to play a sport outside of the NCAA – say, for a professional league, or for a college that competes outside of the NCAA – is never regarded as a substitute for the opportunity to play NCAA athletics.  Plaintiffs have not alleged facts to support either contention, and both defy common sense.

A simple example demonstrates the problem.   Plaintiffs' market definition implies that a high school senior who wants to play intercollegiate lacrosse while pursuing his degree would consider attending Notre Dame, which plays intercollegiate lacrosse as a member of NCAA Division I, but would reject out of hand the possibility of attending Indiana or Purdue, which play intercollegiate lacrosse as members of the Men's Collegiate Lacrosse Association ("MCLA"),[4] or the University of Cincinnati, which plays intercollegiate lacrosse as a member of the National College Lacrosse League.[5]  At the same time, plaintiffs' market definition implies

---

at *2 n. 2 (S.D. Ind. Sept. 1, 2011) (Magnus-Stinson, J.).  The one-year bylaws, frequency rules, and the number of GIA bylaws, squad size rules, apply only to Division I and Division II since Division III does not award GIAs.

[4] As this example demonstrates, it is possible for NCAA member schools to play certain of their intercollegiate sports as members of an association other than the NCAA.

[5] Division I Men's Lacrosse Ratings, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, http://www.ncaa.com/rankings/lacrosse-men/d1 (last visited September 11, 2012); 2012

that our lacrosse player would be so focused on playing NCAA intercollegiate athletics – in any NCAA-sponsored sport – that he would regard an opportunity to, say, run on Notre Dame's Division I cross country team to be an acceptable substitute for playing on its lacrosse team, even as he still rejected the opportunity to play for the Indiana, Purdue, or Cincinnati lacrosse teams.

Plaintiffs' proposed relevant market makes no sense, and is not sufficient even at the pleadings stage.[6] If plaintiffs intended to pursue such an implausible market definition, they were required to allege facts to support it, and they have done nothing of the kind.

---

Standings, MEN'S COLLEGIATE LACROSSE ASSOCIATION, http://mcla.us/standings/2012/ (last visited September 11, 2012); NATIONAL COLLEGIATE LACROSSE LEAGUE, http://www.ncllax.com/index.php (last visited September 11, 2012).

Similarly, men's basketball players can choose between the NCAA (at Division I, II or III) or the National Association of Intercollegiate Athletics ("NAIA"), where they would not be subject to NCAA rules.

Ice hockey players can compete in the NCAA (at Division I, II or III), in the American Collegiate Hockey Association (which has roughly 450 teams in three divisions), or the National Association of Intercollegiate Hockey (which has roughly 22 members). *See* About the ACHA, AMERICAN COLLEGIATE HOCKEY ASSOCIATION, http://achahockey.org/page.php?page_id=2156 (last visited September 11, 2012); Conferences, NATIONAL ASSOCIATION OF INTERCOLLEGIATE HOCKEY, http://www.naihockey.com/ (last visited September 11, 2012).

The Court can take judicial notice of the existence of the other athletic associations referenced herein as their existence is "not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Ev. 201(b). The NCAA uses these citations not as evidence that the other associations are part of the relevant market – though they certainly are. Rather, the plaintiffs were required to deal with the very existence of the other associations in alleging their market. Their failure to do so would leave "an observer with even a rudimentary understanding of economics" without the necessary allegations to assess their relevant market. *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770, 119 S. Ct. 1604, 143 L. Ed. 2d 935 (1999).

[6] Plaintiffs' proposition that a male football player is a substitute for a female field hockey player or that a Division III soccer player is a substitute for a Division I basketball player while lacrosse or hockey at an NCAA school is not a substitute for lacrosse or hockey on some non-NCAA team is facially inconceivable. The NBA is a substitute for some while the University of Chicago with club teams is a substitute for others. Plaintiffs stand mute on these essential issues.

Plaintiffs also have failed to allege facts sufficient to support their claim that the challenged NCAA rules have an anticompetitive effect on competition as a whole in any "market," as opposed to an effect on plaintiffs themselves.  In addition, they failed to allege facts sufficient to overcome the presumption, recognized and affirmed by the Seventh Circuit in *Agnew*, that most NCAA rules are procompetitive.  Plaintiffs have alleged no facts sufficient to demonstrate that the Division I financial aid rules and Division III eligibility rules they now attack—some of the key bylaws that define the NCAA's brand as intercollegiate, rather than professional, sports—are not entitled to that presumption.

It was plaintiffs' obligation to allege facts sufficient to support a claim of injury to competition in properly defined relevant market.  Instead: (1) plaintiffs fail to properly allege a relevant market; (2) they fail to allege injury to competition; (3) they fail to properly allege that the NCAA's procompetitive presumption does not apply; and (4) they fail to allege that they have suffered antitrust injury required for standing.  Plaintiffs' amended complaint must be dismissed with prejudice and without leave to refile.

## LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint.  Although all well-pled facts in a complaint must be accepted as true, and all permissible inferences drawn in the plaintiff's favor, complaints should be dismissed where they lack sufficient factual allegations to render the claims therein plausible.  As the Seventh Circuit stated in *Agnew*:

> We have explained, however, that a complaint may be "so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under [the Federal Rules of Civil Procedure]," in which case a dismissal of the complaint is proper.  *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007).  The Supreme Court has described this notice-pleading standard as requiring a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

4

> plausible on its face'." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949,
> 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. 1955).

*Agnew*, 683 F.3d at 334.  Moreover, "while factual allegations must be accepted as true, legal

conclusions may not be considered." *Id.*  The scrutiny required by *Twombly*, *Iqbal* and *Agnew* is

particularly appropriate in antitrust cases, where "the costs of modern federal antitrust litigation

and the increasing caseload of the federal courts counsels against sending parties into discovery

when there is no reasonable likelihood that the plaintiffs can construct a claim from the events

related in the complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558, 127 S. Ct. 1955,

167 L. Ed. 2d 929 (2007) (quoting *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th

Cir. 1984)) (alteration deleted); *see also Limestone Dev. Corp. v. Vill. Of Lemont, Ill.*, 520 F.3d

797, 803 (7th Cir. 2008); *Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 1167 (7th Cir. 1978).

The *Agnew* panel further held that a relevant market must be pled "properly," and that a

complaint must also allege facts showing "a resultant unreasonable restraint of trade in [that]

relevant market.'" *Agnew*, 683 F.3d at 335 (quoting *Denny's Marina, Inc. v. Renfro Prods., Inc.*,

8 F.3d 1217, 1220 (7th Cir. 1993)).  The conclusory allegations of the amended complaint fail to

do so.  They do not contain any, much less sufficient, factual matter to state a claim under the

clear instructions of *Agnew*.  The amended complaint should be dismissed.

## ARGUMENT

## I.   Plaintiffs Have Failed To Allege A Properly Defined And Legally Cognizable Relevant Market

Antitrust claims fail when plaintiffs fail to plead and prove actual economic analysis;

"armchair economics" will not suffice.  *Menasha Corp. v. News Am. Marketing In-Store, Inc.*,

354 F.3d 661, 664-66 (7th Cir. 2004).  Plaintiffs have failed to carry their burden of alleging a

properly defined and legally cognizable relevant market.  *Nat'l Hockey League Players Ass'n v.*

*Plymouth Whalers Hockey Club*, 325 F.3d 712 (6th Cir. 2003) (citing *Tanaka v. Univ. of S.*

5

*Calif.*, 252 F.3d 1059, 1063 (9th Cir. 2001)).  A complaint must be dismissed under Rule 12(b)(6) if its relevant market definition is facially unsustainable.  *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436, 436-37 (3d Cir. 1997)).  Relevant markets are defined by substitutability: "the interchangeability of use or the cross-elasticity of demand between the production [in question] and substitutes for it."  *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962).

In *Agnew*, Plaintiffs determined (eventually) to forego attempting to define any relevant market at all.  The *Agnew* panel noted that counsel were "mistaken in their belief that a relevant market need not be identified at all in this case."  *Agnew*, 683 F.3d at 335.  "The entire point of the Sherman Act is to protect competition in the commercial arena; without a commercial market, the goals of the Sherman Act have no place."  *Id.* at 337 (citing *Banks v. NCAA*, 977 F.2d 1081, 1087 (7th Cir. 1992)).  "It is the existence of a commercial market that implicates the Sherman Act in the first instance."  *Id.*

Despite these clear instructions and repeated practice rounds, counsel's new attempt at market definition is only the unsupported legal conclusion that the relevant market is the supposed "nationwide market for the labor of student athletes"  in which "student athletes compete for spots on athletics teams of NCAA member institutions and NCAA member institutions compete for the best collegiate student athletes by paying in-kind benefits, namely, athletics-based scholarships, academic programs, access to training facilities, and instruction from premier coaches."  Dkt. 20 at ¶ 27.  Plaintiffs fail to allege any facts regarding substitutability of student-athlete "labor" across all three divisions of the NCAA, and fail to allege facts regarding substitutability of other "purchasers" of such labor apart from NCAA

member institutions. This proposed product market definition thus fails to meet plaintiffs'

obligation to define the market in terms of interchangeability of use or the cross-elasticity of

demand, and is therefore defective as a matter of law.  *See Brown Shoe Co.*, 370 U.S. at 325.

     *Agnew* does not support this market definition.  Contrary to plaintiffs' assertion, Dkt. 20

at ¶ 30, *Agnew* did not hold that there is a generic market for "NCAA student-athlete labor," not

did it hold that such a market allegation need not be accompanied by supporting factual

allegations.  Rather, it stated (in dicta) that "a market of some sort is at play" and "[t]he *proper*

*identification* of a labor market for student-athletes … would meet plaintiffs' burden of

describing a cognizable market under the Sherman Act."[7]  *Agnew*, 683 F.3d at 338, 346

(emphasis added).  The recognition that some such market *could* exist does not relieve plaintiffs

of the burden of pleading *facts* that, if true, would show that the market actually *does* exist.[8]

That is precisely what they have failed to do.

     **A.**    **Plaintiffs' proposed "labor market" ignores close substitutes because it is artificially and impermissibly limited to NCAA opportunities**

     The first problem with plaintiffs' proposed "NCAA student-athlete labor" market is that

it is too narrow: plaintiffs have failed to allege facts demonstrating that prospective students do

not regard the opportunity to attend non-NCAA schools, or play sports outside of the NCAA, as

substitutes for the opportunity to play NCAA sports.  "In defining a market, one must consider

---

[7] As the *Agnew* plaintiffs had consciously decided not to make any market allegations of any type, the question of whether a given labor market was a cognizable relevant market was not properly before the court.  *Agnew*, 683 F.3d at 347 ("Plaintiffs appear to have made the strategic decision to forgo identifying a specific relevant market.").  The panel's discussion of a hypothetical labor market was therefore dicta, as it was not necessary to the outcome of the case, and is not entitled to the full weight usually given judicial decisions. *Matter of Cassidy*, 892 F.2d 637, 640 (7th Cir. 1990) (citing *U.S. v. Crawley*, 837 F.2d 291 (7th Cir. 1988)).

[8] *Agnew* is thus similar to the Sixth Circuit's holding in *Worldwide* that a plaintiff must properly define the market when the conduct concerns a "market that is neither obvious nor undisputed." *Worldwide Basketball and Sports Tours, Inc. v. NCAA*, 388 F.3d 955, 961 (6th Cir. 2004).

substitution both by buyer and by sellers." *Blue Cross & Blue Shield of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1410 (7th Cir. 1995) (citing IIA Phillip E. Areeda, John L. Solow & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 530a (1995)).  The amended complaint contains no factual allegations sufficient to demonstrate that NCAA member schools are so distinct from other opportunities to play a given sport (in school or otherwise), and so similar to each other in the opportunities offered, that NCAA schools could comprise their own relevant market for student-athlete "labor."

Plaintiffs summarily claim that their labor market is limited to student-athletes competing for spots on varsity sports teams at NCAA member institutions and NCAA member institutions competing for those student-athletes.  Dkt. 20 at ¶ 27.  But there are literally tens of thousands of other athletic opportunities, professional and amateur, and across many sports, for skilled athletes (including those offering a combination of educational and athletics opportunities), and plaintiffs have alleged no facts to explain why these opportunities are not a part of the claimed "labor market."  Courts have repeatedly held that markets that do not include all substitutes are not properly defined and cannot support an antitrust claim.  *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008); *Tanaka*, 252 F.3d at 1063-64; *Adidas Am. v. NCAA*, 64 F. Supp. 2d 1097, 1103 (D. Kan. 1999).

Plaintiffs ignore, for example, other intercollegiate athletics associations, like the National Association of Intercollegiate Athletics with its roughly 300 member schools and 60,000 student-athletes,[9] and the National Junior College Athletic Association, with its roughly

---

[9] About the NAIA, NATIONAL ASSOCIATION OF INTERCOLLEGIATE ATHLETICS, http://www.naia.org/ViewArticle.dbml?DB_OEM_ID=27900&ATCLID=205323019 (last visited September 11, 2012).

525 member schools and 60,000 student-athletes competing in 28 different sports,[10] or the National Christian College Athletic Association with approximately 100 Christian colleges and 20 national championships.[11]  As discussed earlier, plaintiffs ignore the opportunity, present in some sports, to attend a NCAA member school that competes in intercollegiate leagues other than the NCAA.  And plaintiffs ignore professional and semi-professional sports leagues, including the National Football League, National Basketball Association, Major League Baseball, National Hockey League, Major League Soccer, Women's National Basketball Association, Major League Lacrosse, NBA Development League, and Minor League Baseball.  They make no effort to explain why the hundreds of amateur, junior, professional and semi-professional leagues, both in the United States and abroad, do not provide competing opportunities to young, talented athletes, and make no allegations regarding why opportunities provided by USA Hockey's various development leagues, the Amateur Athletic Union, international universities, Olympic training facilities, and tens of thousands of club teams (including club teams at NCAA member institutions) are not part of this so-called "market."

A properly defined relevant market would reflect the total demand for athlete "labor," not just the demand of NCAA members for participation on their teams.  *Campfield*, 532 F.3d at 1118 (finding that windshield repair market was broader than State Farm insureds, including other automobile insurance companies or uninsured car owners).  To defend such an artificially circumscribed market, courts have found that plaintiffs must plead "exceptional market conditions."  *Id.* at 1119; *see also Sanjuan*, 40 F.3d at 251 (putative market consisting of board

---

[10] Marketing Opportunities, NATIONAL JUNIOR COLLEGE ATHLETIC ASSOCIATION, http://www.njcaa.org/marketing.cfm (last visited September 11, 2012).

[11] Faith Based Competition, NATIONAL CHRISTIAN COLLEGE ATHLETIC ASSOCIATION, http://www.thenccaa.org/sports/2012/5/7/faith_based.aspx (last visited September 11, 2012).

certified physicians did not make sense where non-board certified physicians were sellers in the market); *Tanaka*, 252 F.3d at 1063-64 (finding conclusory allegation without explanation that USC women's soccer program constituted a relevant market was insufficient); *Adidas Am.*, 64 F. Supp. 2d at 1103 (finding plaintiff failed to define relevant market where it did not explain or even address why sponsorship agreements with professional sports teams or athletes were not reasonably interchangeable with NCAA promotion rights or sponsorship agreements).

Plaintiffs make only one weak attempt to explain their own exceptional market conditions, stating:

> There are zero practical alternatives that can provide the unique combination of attributes offered by NCAA member institutions: (i) the ability to exchange athletics services for the payment of the cost of an education plus room and board, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches that will best be able to launch players to professional careers, and (v) national publicity through national championships and nationwide broadcasting contracts.

Dkt. 20 at ¶ 19. But this description not only fails to properly distinguish many of the substitute opportunities listed above, it also eliminates much of plaintiffs' claimed market: plaintiffs have offered no factual allegations to support their assertion that all NCAA athletic programs, in all sports and in all divisions, offer athletics-based financial aid, or coaching that will "launch players to professional careers," or national publicity. The amended complaint contains no facts to support plaintiffs' facially implausible contention that, for example, NCAA Division III men's basketball coaches are uniformly better "able to launch players to professional careers" compared to their colleagues in the NBA Development League, or other amateur and minor leagues. Nor have plaintiffs alleged facts demonstrating that the facilities, or publicity, or coaching in NCAA sports differ qualitatively from what is available in close substitutes like minor league baseball or hockey. The amended complaint pleads conclusions and generalizations, and contains no allegations on substitutability or cross-elasticity of demand, as

the cases require. *Newcal Indus., Inc.*, 513 F.3d at 1045 ("the market must encompass the product at issue as well as all economic substitutes for the product"); *Queen City Pizza, Inc.*, 124 F.3d at 436-37.

Indeed, plaintiffs' attempt to limit the market to NCAA schools is contradicted by their own allegations. As plaintiffs concede, Division III member institutions do not offer "the ability to exchange athletics services for the payment of the cost of an education plus room and board," yet plaintiffs include those institutions and student-athletes in their labor market.[12] *See* Dkt. 20 at ¶¶ 63-69.

Plaintiffs thus offer only a gerrymandered market, illogical on its face, excluding athletics opportunities that clearly compete with and are substitutes for NCAA opportunities.[13] They have alleged no facts to support their claimed market, and their latest complaint must be dismissed. *Banks*, 977 F.2d at 1094.

### B. Plaintiffs' proposed market includes impossible substitutes because it is artificially and impermissibly expanded to include all NCAA student-athletes

The second problem with plaintiffs' "NCAA student-athlete labor" market is that it is too broad: plaintiffs claim that all NCAA student-athletes, and all NCAA member institutions, across all three divisions, all participate in the same market for generic "student-athlete labor." Dkt. 20

---

[12] The bylaws standardizing GIAs to renewable one-year terms and standardizing the number of GIAs awarded by sport do not apply in Division III, where athletic scholarships are not awarded. Division III schools are undeniably substitutes for prospective student-athletes, particularly for those who may not like the rules at issue here.

[13] While some prospects are doubtless athletes first, most others are students first and athletes second. For these students, a quality education is the closest substitute, with or without "big time" or even varsity athletics. The Ivy League, the Patriot League, and all of Division III offer no scholarships. Other schools, such as University of Chicago, McGill University, MIT and many more, play only club sports but are still attractive substitutes for many, including some fine athletes.

at ¶ 27.   This impermissibly ignores several obvious differences between the types of athletic opportunities offered by NCAA schools.[14]

*Sport and sex.*   In the most obvious instance, all NCAA student-athletes do not compete for spots on generic "athletics teams of NCAA member institutions."  Dkt. 20 at ¶ 27.  Instead, they compete for spots on specific teams, which play specific sports, usually segregated by sex. Prospective student-athletes who wish to play men's basketball compete against other prospective men's basketball student-athletes.  Women's volleyball student-athletes compete against other women's volleyball student-athletes.  A football student-athlete would not find a spot on the men's swim team or the women's lacrosse team an adequate substitute for a position on the football team.  Nor would a women's gymnastics coach fill a spot on his or her team with a men's lacrosse player.[15]  Plaintiffs' generic "student-athlete labor" market must be rejected due to its failure to accord with these basic, real-world facts.[16]

---

[14] It is worth noting that, several years ago, this same group of lawyers sued the NCAA on behalf of Division IA football players only, alleging that the opportunity to play Division IA football constituted its own, unique relevant market because such student-athletes had "no other viable options."  *In re NCAA I-A Walk-On Football Players Litig.*, 398 F. Supp. 2d 1144, 1150 (W.D. Wash. 2005), *class certification denied*, No. C04-1254C, 2006 WL 1207915 (W.D. Wash. May 3, 2006).  The NCAA disagreed with the market allegations in *Walk-Ons*, and still does, but the fact that these lawyers made them underlines the need for factual support for their current, generic "NCAA student-athlete labor" market.

[15] Plaintiffs seemingly attempt to get around this problem by claiming that some athletes are recruited by coaches in different sports.  Dkt. 20 at ¶ 33.  This does not mean that there is one market for all student-athlete labor but rather that plaintiffs' market is impermissible.  There are undoubtedly some individuals equally qualified to attend both law school and medical school, but that does not mean that all law schools and all medical schools compete in one labor market for "professional graduate studies."

[16] Plaintiffs cite *White v. NCAA*, CV 06-999-RGK (C.D. Cal. Sept. 20, 2006) in support of their market definition, but it does not help them.  *White* found that the plaintiffs there had properly alleged "Major College Football" as a relevant market.  Dkt. 20 at ¶ 29.  Even if one thinks *White* was correctly decided – and the NCAA does not – it provides no support for plaintiffs' very different alleged market for generic "NCAA student-athlete labor."

***Diverse goals.***  Student-athletes come to the NCAA for both educational and athletic opportunities, each striking their own balance between the two.  There are multiple opportunities to both play sports and attend college, at colleges who are NCAA members and members of other intercollegiate athletic associations, or in junior colleges (from which NCAA athletes transfer, into all three NCAA divisions, at a significant rate).  In addition, however, for some student-athletes, whose focus might be on athletics rather than academics, the next best substitute for NCAA participation is professional sports (at varying levels – NBA basketball for one athlete, or minor league basketball for another) or junior development leagues, such as the Northern Pacific Hockey League.  For others, the next best substitute is attending college for a good education (as one Harvard student put it "To me, it was a 40-year life decision, not a four-year decision")[17] while participating in intramural, club or no sports.  Plaintiffs' relevant market would include both the future NBA star and the future PhD, without providing any guidance on how to explain or organize their contradictory goals.  For this reason as well, their generic "NCAA student-athlete labor" market should be rejected.

### C.    Scholarships are not payment for athletic labor

Plaintiffs allege that athletics-based scholarships are payment for student-athlete labor, Dkt. 20 at ¶ 27, yet affirmatively plead that the Division III plaintiffs did or could have continued to receive their scholarships without participating in NCAA athletics.  *Id.* at ¶¶ 87-88, 91-93. These allegations demonstrate that the relationship between NCAA member institutions and their

---

[17] Bill Pennington, *Financial Aid Changes Game as Ivy Sports Teams Flourish*, N.Y. Times, Dec. 22, 2011, at A1, *available at* http://www.nytimes.com/2011/12/23/sports/financial-aid-changes-game-as-sports-teams-in-ivies-rise.html?pagewanted=all (discussing student's decision to pay $20,000 per year to attend Harvard rather than accept a full GIA to play basketball elsewhere).

student-athletes is not a labor market, or at least that this market is much more complicated than what plaintiffs have alleged.  Given these complications, plaintiffs have failed to allege a cognizable relevant market.

> ### D.  Plaintiffs' geographic market is unsupported and underinclusive

Plaintiffs also have failed to allege a cognizable relevant geographic market.  "Identifying a relevant geographic market requires both 'careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies.'"  *Republic Tobacco, Inc. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 738 (7th Cir. 2004) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S. Ct. 623, 5 L. Ed. 2d 580 (1961)). "[T]he geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product."  *McLaughlin Equip. Co., Inc. v. Servaas*, No. IP98-0127-C-T/K, 2004 WL 1629603, at *8 (S.D. Ind. Feb. 18, 2004) (citing *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025-26 (10th Cir. 2002)).  Plaintiffs' geographic market or markets must therefore consider substitutes: the geographic locations from which prospective student-athletes come, as well as all the realistic geographic alternatives for prospective student-athletes.

Plaintiffs claim that their "NCAA student-athlete labor" market is national in scope.  Dkt. 20 at ¶ 27.  But the amended complaint itself recognizes that any "student-athlete labor market" that might exist is likely international.  Many international student-athletes come to the United States to attend college and play a sport, in all three NCAA Divisions.  *Id.* at ¶ 102.  Indeed, one of the plaintiffs is a Canadian hockey player.  *Id.* at ¶ 13.  Canadian hockey players obviously have opportunities to attend college and play hockey in Canada as well as in the United States,

just as the prospective student-athletes all over the world can play basketball, volleyball or baseball in a number of countries worldwide.[18]

Plaintiffs have alleged no facts to support their conclusory allegations that the relevant geographic market in this case is properly coterminous with the United States, no more and no less, and have therefore failed to define a cognizable geographic market as well. Their ongoing "strategic decision" to plead only conclusions, untethered to facts or concepts of substitutability, is inexcusable after five attempts and two prior court opinions rejecting their gamesmanship. The amended complaint should be dismissed.

## II.      Plaintiffs Have Failed To Allege Any Anticompetitive Effect

Plaintiffs' claims also fail because they have alleged no facts to support their apparent claim that the NCAA Bylaws challenged here--Divisions I and II Bylaw 15.3.3.1, which set the standard GIA term as renewable year by year; Divisions I and II Bylaw 15.5, which list the various standard sport-by-sport GIA limits (which vary by sport and Division); and  Division III Bylaw 15.4.1 (precluding athletic-based financial aid)--have caused injury to competition as a whole in any well-defined relevant market.  There are simply no factual allegations sufficient to demonstrate that these bylaws had an adverse, market-wide impact on the price or output of any commercial product.   This absence is fatal to plaintiffs' claims.  *Banks*, 977 F.2d at 1087-89; *Car Carriers*, 745 F.2d at 1107-1108.

Plaintiffs'   conclusory claims about the NCAA's financial aid bylaws' purported anticompetitive effects are uniformly lacking in supporting factual allegations.  *See* Dkt. 20 at ¶¶

---

[18] At the other end of the spectrum, the opportunities for less elite athletes are local, not international.  Most stay close to home, yet the amended complaint ignores these inconvenient complexities.  For a discussion of the impact of geography on student-athlete recruiting choices, see Yair Eilat, et al., An Econometric Analysis of the Matching Between Football Student-Athletes and Colleges, *available at* http://fs.ncaa.org/Docs/DI_MC_BOD/DI_BOD/2009/April/04B.pdf.

3 ("in a competitive market [NCAA members] would be forced to dramatically increase the

overall supply of athletics-based scholarships and the amount of those scholarships"); 69 ("In a

competitive market, Division III member institutions would have awarded millions in athletics-

based scholarships at Division III institutions over the class period"); 96 ("The NCAA's wholly

artificial caps … reduce[] the overall supply of athletics-based scholarships available to student-

athletes"); 97 ("the NCAA's prohibition on multiyear athletics-based scholarships has injured

thousands of student-athletes by causing them to pay millions more in tuition when their

athletics-based scholarships are reduced or not renewed"); 102 ("the NCAA's unlawful conduct

results in lower prices being paid for student-athletes' labor than would be paid in a competitive

market").  Conclusory allegations that competition has been restrained are not sufficient to allege

injury to competition, even at the pleading stage.  *Wallace v. IBM Corp.*, 467 F.3d 1104, 1107

(7th Cir. 2006) (dismissing complaint where plaintiff labeled "people who accept the [General

Public License ("GPL")] as 'conspirators'" and called the "GPL 'price fixing'" without factual

allegations in support); *see also Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504,

507-508 (9th Cir. 1989).

  Conclusory allegations, however, are all that plaintiffs have provided.  They allege no

facts, for example, to support their claim that, in the absence of Division III Bylaw 15.4.1,

Division III schools would pay millions in financial aid to student-athletes.  Dkt. 20 at ¶ 69.

Division III schools currently have the ability to join Divisions I or II or the NAIA[19] if they want

to provide athletics-based aid, and Division III schools could undoubtedly continue to fill their

rosters with enough student-athletes who would continue to be willing to participate for the sake

---

[19] Financial Aid, NATIONAL ASSOCIATION OF INTERCOLLEGIATE ATHLETICS,
http://www.naia.org/ViewArticle.dbml?DB_OEM_ID=27900&ATCLID=205322931 (last
visited September 11, 2012).

of participation since those student-athletes can seek a GIA or compensation in the pros or semi-pros now.[20]

Similarly, plaintiffs fail to explain how the elimination of either the standard one-year term rule, or the sport-by-sport GIA limitations, would lead to the creation of more scholarships for student-athletes.  Dkt. 20 at ¶ 97.  Even if one student-athlete were able to secure a four year GIA, Plaintiffs have provided no allegations to support a claim that such an award would not reduce awards to others, which is necessary to assert that there would be a net gain in aid awarded.  Would multi-year GIAs for the football team at a Division I BCS school mean smaller or fewer GIAs for its men's track team?  Would more basketball GIAs for men mean fewer for women?  Would more football grants at Ohio State mean fewer at University of Toledo?  Would bigger grants for star quarterbacks mean fewer or smaller grants for reserves or punters?  A football student-athlete's four year grant could allow for its cancellation if the student-athlete were injured or if a new coach came to town.  If so, output of scholarships might go down, not up.  The distribution of scholarships among individuals may or may not change.[21]

---

[20] *See* Dkt. 20 at ¶¶ 84-88 (Plaintiff Stewart allegedly chose to play basketball rather than receive a $16,000 annual scholarship at his Division III institution).

[21] The one year rule has no obvious effect on the output of anything, but, at most, affects the distribution of the available GIAs among the potential recipients.  If Student A gets four years, Student B may get no years and vice versa.  The limit on the number of GIAs, aside from enhancing competitive balance, is a basic rule of any sport, no different than the rules as to the number of players per side, allowable substitution, squad size, red-shirting, and the like.

With respect to the panel decision in *Agnew*, the one year rule is every  bit as much an "eligibility" rule as a "financial aid" rule.  The number of scholarships per team rule is most clearly akin to squad size, number of players on the field, and substitution rules, all of which are clearly intended to keep the games fair and balanced for the welfare and enjoyment of players and spectators alike.  These rules "allow for the survival of the product" and "allow for an even playing field."

Plaintiffs have, impermissibly, failed to allege facts answering any of these questions. For this reason as well, the amended complaint should be dismissed.

## III.   NCAA Amateurism Bylaws Are Presumed Reasonable As A Matter Of Law And Plaintiffs Have Alleged No Facts To Rebut That Presumption

Even if Plaintiffs had properly defined a market and alleged market-wide anticompetitive effects therein, their claims must still be dismissed because they reduce to the notion, rejected in *Agnew*, that the NCAA's financial aid rules – as applied to NCAA student-athletes alone – are somehow inherently suspect under the antitrust laws.  That is, emphatically, not the law.  Courts have long recognized that NCAA rules regarding eligibility, financial aid and amateurism are entitled to a presumption of reasonableness, because those rules are necessary to allow NCAA members to produce the unique "product" of amateur intercollegiate competition.  Almost thirty years ago, the Supreme Court held that "[i]t is reasonable to assume that most of the regulatory controls of the NCAA are . . . procompetitive because they enhance public interest in intercollegiate athletics," and specifically cited NCAA rules that prevented athletes from being paid as an example of those clearly procompetitive rules.  *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 117, 101-02, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984).  In the following years, courts have repeatedly rejected antitrust challenges to NCAA amateurism and eligibility rules as a matter of law.  *See, e.g., Smith v. NCAA*, 139 F.3d 180, 185-87 (3d Cir. 1998) (holding that NCAA eligibility rules are reasonable as a matter of law because they "allow for survival of the product, amateur sports, and allow for an even playing field"); *McCormack v. NCAA*, 845 F.2d 1338, 1344-45 (5th Cir. 1988) (holding that NCAA amateurism and eligibility rules are reasonable as a matter of law because they create the unique product of college football and preserve "a mixture containing some amateur elements").

Surveying this unbroken line of authority, the Agnew panel declared that "most if not all" NCAA eligibility rules are procompetitive as a matter of law:

> A certain amount of collusion in college football is permitted because it is necessary for the product to exist.  Accordingly, when an NCAA bylaw is clearly

meant to help maintain the "revered tradition of amateurism in college sports" or the "preservation of the student-athlete in higher education," the bylaw will be presumed procompetitive, since we must give the NCAA "ample latitude to play that role" . . .

Most—if not all—eligibility rules . . . fall comfortably within the presumption of procompetitiveness afforded to certain NCAA regulations, as both parties agree. Beyond the obvious fact that the Supreme Court explicitly mentioned eligibility rules as a type that "fit[s] into the same mold" as other procompetitive rules, they are clearly necessary to preserve amateurism and the student-athlete in college football. Indeed, they define what it means to be an amateur or a student-athlete, and are therefore essential to the very existence of the product of college football. . . There may be no such thing as a student-athlete, for instance, if it was not for the NCAA rules requiring class attendance, and thus no detailed analysis would be necessary to deem such rules procompetitive. *The same goes for bylaws eliminating the eligibility of players who receive cash payments beyond the costs attendant to receiving an education—a rule that clearly protects amateurism.*

*Agnew*, 683 F.3d at 342-43 (emphasis added; internal citations omitted).

**Division III Bylaw 15.4.1.**   In light of the above, plaintiffs' challenge to Division III Bylaw 15.4.1 unquestionably fails as a matter of law.   The NCAA is entitled, under settled Supreme Court precedent and *Agnew*, to promulgate and enforce rules that protect amateurism – including models of amateurism that do (Divisions I and II) and do not (Division III) include the provision of athletics-based financial aid.   There is no support for plaintiffs' contention that the Sherman Act requires schools to provide athletics-based financial aid.

As the Supreme Court explained in its seminal decision on this subject, NCAA rules that preserve amateurism, govern financial aid, and preserve the "character" of college sports promote, rather than injure, competition:

[T]he NCAA seeks to market a particular brand of football – college football. ... *In order to preserve the character and quality of the "product," athletes must not be paid, must be required to attend class, and the like.*   And the integrity of the "product" cannot be guaranteed except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed.   Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable.   In performing this role, its actions widen consumer choice – not only the choices available to sports

> fans but also those available to athletes – and hence can be viewed as
> procompetitive.

*Bd. of Regents*, 468 U.S. at 101-02 (emphasis added); *see also id.* at 117 ("It is reasonable to

assume that most of the regulatory controls of the NCAA are justifiable means of fostering

competition among amateur athletic teams and therefore procompetitive because they enhance

public interest in intercollegiate athletics.")

The Supreme Court reaffirmed *Board of Regents* in its recent decision in *American*

*Needle*, finding that "when restraints on competition are essential if the product is to be available

at all," "the agreement is likely to survive the Rule of Reason." *American Needle, Inc. v. Nat'l*

*Football League*, -- U.S. --, 130 S. Ct. 2201, 2216, 176 L. Ed. 2d 947 (2010).  Indeed, the Court

suggested that "the interest in maintaining a competitive balance," or in producing and

scheduling games, typically will be sufficient to defend sports league rules from antitrust attack

as a matter of law.  *Id.* at 2216-17.

Courts repeatedly have rejected antitrust challenges to the NCAA's financial aid and

amateurism rules in the wake of Board of Regents and its insight that those rules are presumed to

promote competition.  Indeed, in *McCormack*, the Fifth Circuit rejected the same argument that

plaintiffs make here, i.e., that NCAA rules prohibiting competition among member schools to

offer ever-higher levels of "compensation" to student-athletes somehow violate the Sherman Act.

The *McCormack* plaintiffs were Southern Methodist University football players who sued when

the NCAA suspended SMU's football program for an entire season because SMU had allowed

its football players to receive money in excess of the limits established by the NCAA's financial

aid rules. The players claimed that the "restrictions on compensation to football players

constitute[d] illegal price-fixing" and thus violated Section 1.  *McCormack*, 845 F.2d 1340; *cf.*

Dkt. 20 at ¶ 1.  The district court dismissed the complaint and the Fifth Circuit affirmed, holding

that the NCAA may legally prohibit its member institutions from competing with one another to

offer "compensation" to student-athletes.  The court noted that it had "little difficulty in

concluding that the challenged restrictions are reasonable" and that the Supreme Court had

"indicated strongly in *Board of Regents* that such was the case." *McCormack*, 845 F.2d at

1344.[22]  It therefore held:

> that the football players' "price-fixing" claims failed as a matter of law: The
> NCAA markets college football as a product distinct from professional football.
> The eligibility rules create the product and allow its survival in the face of
> commercializing pressures. The goal of the NCAA is to integrate athletics with
> academics. Its requirements reasonably further this goal.

*McCormack*, 845 F.2d at 1344-45.  The court also rejected the argument that by allowing

student-athletes to receive some "compensation" in the form of scholarships, the NCAA had

forfeited any claim to preserving amateurism:  "That the NCAA has not distilled amateurism to

its purest form does not means its attempts to maintain a mixture containing some amateur

elements are unreasonable … the motion to dismiss was properly granted." *Id.* at 1345.  By the

same token, plaintiffs cannot challenge Division III Bylaw 15.4 merely because Divisions I and

II have reached different conclusions about the propriety of athletics-based financial aid.

     ***Division I and II Bylaws 15.3.3.1 and 15.5.***  Plaintiffs' challenges to Division I and II

Bylaws 15.3.3.1 and 15.5 are also legally infirm.  The cases discussed above establish a

presumption that the NCAA's eligibility and financial aid rules are procompetitive, because they

allow the NCAA to create its unique "product" of intercollegiate athletic competition. *See Bd. of*

*Regents*, 468 U.S. at 101-02.  It is insufficient, as a matter of law, for a plaintiff to base a Section

---

[22] *See also Justice v. NCAA*, 577 F. Supp. 356, 382 (D. Ariz. 1983).  *Justice* rejected the
argument, brought by four members of the University of Arizona football team, that NCAA
sanctions amounted to a group boycott.  The sanctions had been imposed because representatives
of the coaching staff had violated NCAA restrictions on the benefits the football players could
receive. *Justice*, 577 F. Supp. at 362.  The court upheld the sanctions, and by necessity the
underlying limits on student-athlete compensation, because it was well established that NCAA
amateurism and eligibility rules do not violate the Sherman Act. *Id.* at 382-83.

1 claim on the simple allegation that NCAA rules prohibit NCAA member institutions from competing with one another to offer "compensation" to student-athletes, or that the NCAA has failed to distill amateurism to its purest form. *McCormack*, 845 F.2d at 1344-45.

Yet that is all plaintiffs have alleged here. They claim that the NCAA has "unlawfully conspired to maintain the price of student-athletes' labor at artificially low levels by agreeing never to offer student-athletes athletics-based scholarships of a duration in excess of one year" and "to artificially restrict the total number and amount of available athletics-based scholarships by imposing artificial caps on the number and amount of athletics-based scholarships that its member institutions can offer," Dkt. 20 at ¶¶ 1, 2, which is the same kind of price-fixing theory alleged and rejected in *McCormack*. They claim that the NCAA's interpretation of amateurism is flawed and therefore incapable of being procompetitive, *id.* at ¶¶ 40-41, an idea also rejected by the Fifth Circuit in *McCormack*. Moreover, plaintiffs' claims that the NCAA's bylaws do not enhance competitive balance are undercut by their own admission that the "NCAA's wholly artificial caps on the number and distribution of athletics-based discounts" force top tier athletes "to sign with lower-caliber programs," *id.* at ¶ 96, which is precisely how competitive balance is achieved.[23]

It is true that the *Agnew* panel stated that the one year and number of scholarships per team rules were not "eligibility" rules and were therefore not entitled to a presumption of reasonableness. *Agnew*, 683 F.3d at 343. While we do not ask this Court to deviate from

---

[23] A sports league's product is more desirable when competitive balance exists, i.e., when the athletic competition among the teams that comprise the league is close and hotly contested because the teams themselves are more or less evenly matched. This necessarily requires that "top tier athletes" sometimes participate in allegedly "lower-caliber programs." The Supreme Court has recognized that "the interest in maintaining competitive balance among athletic teams is legitimate and important." *Am. Needle*, 130 S. Ct. at 2217 (citing *Bd. of Regents*, 468 U.S. at 117) (internal quotations omitted).

*Agnew*'s ruling,[24] we respectfully submit that the *Agnew* panel's review was necessarily limited to its consideration of Division I football, and was not intended – nor can be applied – to cover all sports in all three NCAA divisions, or even all sports in Divisions I and II.  Plaintiffs' challenge, as noted above, is premised on the clearly incorrect concept that the antitrust laws mandate full-fledged commercial competition in an unsubstantiated, generic "labor" market for the athletic services of students.  *Agnew* emphatically did not support that result, but stands for the contrary principle.

In order to state a cognizable antitrust claim, plaintiffs were required to allege facts demonstrating that these bylaws injure commercial competition in a relevant market to such an extent that plaintiffs could plausibly show it to be a likely violation.  *Iqbal*, 129 S. Ct. at 1949 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."); *see also Am. Needle,* 130 S. Ct. at 2216 (noting that rules adopted by sports leagues are "likely to survive the Rule of Reason.").  Plaintiffs have not come close to doing so.

## IV.   Plaintiffs Lack Antitrust Standing

Finally, the amended complaint should be dismissed because plaintiffs failed to allege facts sufficient to show that they have standing to challenge the NCAA's alleged "wrongdoing."  All private antitrust plaintiffs must allege facts sufficient to show that they have suffered antitrust

---

[24] The NCAA does not believe that the distinction made by the *Agnew* panel is so clear cut.  A student-athlete who violates the NCAA's financial aid rules is ineligible; an eligible student-athlete must obey the NCAA's financial aid rules.  What is important is whether the rules "enhance public interest in intercollegiate athletics."  *Bd. of Regents*, 468 U.S. at 117.  Likewise, as the Supreme Court held in *American Needle*, that interest is maintained when competition is fair and equitable.  *Am. Needle*, 130 S. Ct. at 2217.  The NCAA continues to assert that rules which maintain the unique character of collegiate sports, avoid professionalization, and promote competitive balance between and among competitors, as the standardized one-year GIA term rule and the sport-by-sport GIA limits obviously do, are presumptively procompetitive.

injury, and therefore have antitrust standing.  *Kochert v. Greater Lafayette Health Services, Inc.*, 463 F.3d 710, 716 (7th Cir. 2006) (plaintiffs must allege that the "claimed injuries are 'of a type the antitrust laws were intended to prevent' and 'reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation.'") (quoting *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150*, 433 F.3d 1024, 1031 (7th Cir. 2006)).  When determining whether a plaintiff has antitrust standing, the court must consider "(1) the causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) the presence of improper motive; (3) the directness between the injury and the market restraint; (4) the speculative nature of the damages; and (5) the risk of duplicative recoveries or complex damages apportionment."  *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 484 (7th Cir. 2002).

Plaintiffs have failed to clear the first hurdle of antitrust standing: they have failed to allege facts demonstrating a causal connection between the alleged antitrust violation and their alleged injury.[25]

### A.    Plaintiff Rock lacks antitrust standing

Rock has alleged no injury from the NCAA's rules.  He alleges that he received an athletics-based scholarship for three years at Gardner-Webb, a Division I Football Championship Subdivision school, and that his scholarship was not renewed for a fourth year because of a

---

[25] The fact that Rock has brought a putative class action does not expand his standing.  He can only bring claims that he himself has standing to bring as an individual.  *Payton v. Cnty. of Kane*, 308 F.3d 673, 682 (7th Cir. 2002) ("a named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs; it bears repeating that a person cannot predicate standing on injury which he does not share").  Rock is a Division I FCS football player.  (Gardner-Webb is an FCS school.  Dkt. 20 at ¶ 74.)  The other two named plaintiffs are Division III men's basketball and hockey players.

None of the plaintiffs can challenge Division I FBS rules, Division II rules, or rules that govern sports other than FCS football, Division III basketball or Division III hockey.

conflict with his new football coach.  Dkt. 20 at ¶¶ 71-82.  The amended complaint then states:

"In a competitive market, Mr. Rock would have received additional scholarship offers.  Mr.

Rock was deprived of these choices by the NCAA's artificial and anticompetitive restrictions on

the number of scholarships that NCAA member institutions are permitted to offer."  Dkt. 20 at

83.

 These conclusory allegations are not enough to establish Rock's standing.  Rock has not

alleged any facts to connect any challenged NCAA bylaw, or any other NCAA rule, to Gardner-

Webb's decision not to renew his athletics grant-in-aid for a fourth year, nor has he alleged that

but for the NCAA's rules, Gardner-Webb would have made a different decision.  On the

contrary, Rock admits that he lost his scholarship not because NCAA rules prevented his school

from providing it, but because his school (after it hired a new coach) no longer wanted to provide

it.  In order for this to give rise to a claim against the NCAA, Rock had to allege facts showing

that, but for NCAA rules, he would have received a guaranteed, multi-year scholarship that

would have continued even after Gardiner-Webb's coaching staff no longer wanted Rock on the

team.  There are no such facts alleged in the amended complaint. Rock has failed to allege a

causal connection between the alleged antitrust violation and his own injury and so lacks

antitrust standing.  *Kochert*, 463 F.3d at 718 (affirming dismissal of plaintiff's complaint when

she did not allege that the allegedly anticompetitive conduct was the "but for" cause of her

injury).

  **B.**  **Plaintiffs Steward and Collins lack antitrust standing**

 Steward and Collins both attended Division III member institutions, where they were

subject to Division III Bylaw 15.01.3, which prohibits an award of financial aid "on the basis of

athletics leadership, ability, participation or performance."  Dkt. 20 at ¶ 87.  However, after

Steward's and Collins's freshman years, both were informed that they had been receiving

athletics-based financial aid in violation of Division III Bylaw 15.01.3 and were given a choice between continuing to receive the aid or continuing to participate in Division III athletics at their respective member institutions.  *Id.* at ¶¶ 87, 91.  Steward chose to forgo his scholarship in order to continue playing Division III basketball, *id.* at ¶ 88; Collins chose to forgo competing in Division III hockey in order to retain his scholarship, *id.* at ¶ 93.

Both Steward and Collins allege that they received athletics-based financial aid while competing in Division III athletics; that is, they allege that they were not harmed by the Division III bylaw challenged in this case.  Moreover, neither plaintiff alleges that NCAA rules dictated that he give up his financial aid once the violation came to light.  Each was able to choose whether to continue participating in Division III sports or whether to continue to receive the athletics-based financial aid.  Again, each plaintiff has failed to allege a causal connection between the alleged antitrust violation and his own injury and so lacks antitrust standing. *Kochert*, 463 F.3d at 718.

## V.     Conclusion

For the reasons stated above, the NCAA respectfully requests that the Court dismiss plaintiffs' amended complaint with prejudice.

Dated:  September 13, 2012

Respectfully submitted,

 Schiff Hardin LLP

/s/ Gregory L. Curtner
Gregory L. Curtner
Robert J. Wierenga
Kimberly K. Kefalas
Suzanne Wahl (*pro hac vice* forthcoming)
Jessica Sprovtsoff (*pro hac vice* forthcoming)
350 S. Main St., Suite 210

26

Ann Arbor, MI  48104
734-222-1500 (Phone)
734-222-1501 (Fax)
gcurtner@schiffhardin.com
rwierenga@schiffhardin.com
kkefalas@schiffhardin.com

Kathy L. Osborn (21927-53)
Faegre Baker & Daniels LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN  46204
313-237-0300 (Phone)
317-237-1000 (Fax)
kathy.osborn@faegrebd.com

*Attorneys for Defendant NCAA*

27

<u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that on September 13, 2012a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

**Elizabeth A. Fegan**
HAGENS BERMAN SOBOL SHAPIRO, LLP
1144 W. Lake Street, Suite 400
Oak Park, IL 60301
708-628-4949
Fax: 708-628-4950
Email: beth@hbsslaw.com

**Joseph N. Williams**
PRICE WAICUKAUSKI & RILEY
301 Massachusetts Avenue
Indianapolis, IN 46204
317-633-8787
Email: jwilliams@price-law.com

**Steve W. Berman**
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Ave. Suite 3300
Seattle, WA 98101
(206) 623-7292
Fax: (206) 623-0594
Email: steve@hbsslaw.com

**Stuart McKinley Paynter**
The Paynter Law Firm PLLC
1200 G Street N.W., Suite 800
Washington, DC 20005
(202) 626-4486
Fax: (866) 734-0622
Email: stuart@smplegal.com

**William N. Riley**
PRICE WAICUKAUSKI & RILEY
301 Massachusetts Avenue
Indianapolis, IN 46204
(317) 633-8787
Fax: (317) 633-8797
Email: wriley@price-law.com

/s/ Gregory L. Curtner
Gregory L. Curtner
350 S. Main St., Suite 210
Ann Arbor, MI  48104
734-222-1500 (Phone)
734-222-1501 (Fax)
mailto:
gcurtner@schiffhardin.com

40984-40984-0023

AA\200036829.1

29