UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN ROCK, TIM STEWARD and KODY COLLINS on behalf of themselves and all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.1:12-cv-1019 JMS-DKL |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION | ) ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT NATIONAL COLLEGIATE ATHLETIC ASSOCIATION'S REPLY
BRIEF IN SUPPORT OF MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

I.   PLAINTIFFS' RELEVANT MARKET ALLEGATIONS ARE INSUFFICIENT ........ 2

   A.  *Agnew II* Did Not Establish Plaintiffs' Claimed Market ........................................ 4

   B.  *Todd* v. *Exxon* Did Not Establish Plaintiffs' Claimed Market ............................... 5

       1. Plaintiffs, Unlike the *Todd* Plaintiff, Have Not Pled Sufficient Facts
          To Establish the Boundaries of their Alleged "Market" .................................. 6

       2. *Todd* Does Not Apply to Plaintiffs' Two-Sided Market Allegations .............. 10

   C.  Plaintiffs Failed To Explain Exclusion of Substitutes On All "Sides" of Their
       Purported Market(s) ................................................................................................ 11

       1. Plaintiffs Failed to Allege Facts to Eliminate Substitutes for NCAA
          Member Institutions ....................................................................................... 11

       2. Plaintiffs Failed to Allege Facts to Eliminate Substitutes for Current
          NCAA Student-Athletes .................................................................................. 13

II.  PLAINTIFFS FAILED TO ALLEGE ANTICOMPETITIVE EFFECTS .................... 15

III. PLAINTIFFS FAILED TO ALLEGE FACTS SHOWING THAT THEY
     HAVE SUFFERED A COGNIZABLE INJURY ............................................................ 17

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

## CASES

*42nd Parallel North v. E Street Denim Co.*,
    286 F.3d 401 (7th Cir. 2002) ........................................................................................... 2, 11

*Adidas Am., Inc. v. NCAA*,
    64 F. Supp. 2d 1097 (D. Kan. 1999) ...................................................................................... 14

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
    683 F.3d 328, 345 (7th Cir. 2012) ................................................................................. passim

*Am. Online, Inc. v. GreatDeals.Net3*
    49 F. Supp. 2d 851 (E.D. Va. 1999) ......................................................................................... 3

*Andela v. Am. Ass'n for Cancer Research*,
    389 F. App'x 137 (3d Cir. 2010) ............................................................................................. 2

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................... 20

*B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*,
    909 F. Supp. 162 (S.D.N.Y.1995) ............................................................................................ 3

*Banks v. NCAA*,
    977 F.2d 1081 (7th Cir. 1992) .............................................................................................. 15

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (207) ........................................................................................................... 6, 19

*Bhan v. NME Hosp., Inc.*,
    669 F. Supp. 998 (E.D. Cal. 1987),  aff'd, 929 F.2d 1404 (9th Cir. 1991)............................. 18

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ................................................................................................. 11

*Brown Shoe Co. v. U.S.*,
    370 U.S. 294 (1962).................................................................................................................. 2

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
    532 F.3d 1111 (10th Cir. 2008) ............................................................................................... 2

*Car Carriers, Inc. v. Ford Motor Co.*,
    745 F.2d 1101 (7th Cir. 1984) ............................................................................................... 11

*Chapman v. N.Y. State Div. for Youth*,
    546 F.3d 230 (2d Cir. 2008)..................................................................................................... 3

*City of New York v. Group Health Inc.*,
   649 F.3d 151 (2d Cir. 2011)...........................................................................4

*Commercial Data Servers, Inc. v. IBM*,
   166 F. Supp. 2d 891 (S.D.N.Y. 2001).............................................................3

*Conley v. Gibson*,
   355 U.S. 41 (1957)..........................................................................................6

*Conte v. Newsday, Inc.*,
   703 F. Supp. 2d 126 (E.D.N.Y. 2010) ...........................................................3

*E. & G. Gabriel v. Gabriel Bros., Inc.*,
   No. 93 Civ. 0894, 1994 WL 369147 (PKL) (S.D.N.Y. July 13, 1994) ...................14

*Elliott v. United Ctr.*,
   126 F.3d 1003 (7th Cir. 1997) ........................................................................2

*Gianna Enters. v. Miss World (Jersey) Ltd.*,
   551 F. Supp. 1348 (S.D.N.Y. 1982)...............................................................14

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,
   433 F. App'x 598 (9th Cir. 2011) *cert. denied*,
   132 S. Ct. 852, 181 L. Ed. 2d 550 (U.S. 2011) ..............................................4

*Hack v. President and Fellows of Yale College*,
   237 F.3d 81 (2d Cir. 2000)..........................................................................2, 3

*Hawaii v. Standard Oil Co. of Cal.*,
   405 U.S. 251 (1972)......................................................................................17

*Hennessy Indus. Inc. v. FMC Corp.*,
   779 F.2d 402 (7th Cir. 1985) ........................................................................15

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
   626 F.3d 1327 (11th Cir. 2010) ......................................................................2

*McCauley v. City of Chicago*,
   671 F.3d 611 (7th Cir. 2011) ..........................................................................5

*Menasha Corp. v. News Am. Marketing In-Store, Inc.*,
   354 F.3d 661 (7th Cir. 2004) ........................................................................15

*Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*,
   325 F.3d 712 (6th Cir. 2003) ..........................................................................2

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir.1997)............................................................................4

*Re-Alco Indus. v. Nat'l Ctr. for Health Educ., Inc.,*
     812 F. Supp. 387 (S.D.N.Y.1993) ........................................... 3

*Reiter v. Sonotone,*
     442 U.S. 330 (1979) ........................................................ 17

*Rohlfing v. Manor Care, Inc.,*
     172 F.R.D. 330 (N.D. Ill. 1997) ............................................. 2

*Sheridan v. Marathon Petroleum Co. LLC,*
     530 F.3d 590 (7th Cir. 2008) ............................................... 3

*Tal v. Hogan,*
     453 F.3d 1244 (10th Cir. 2006) ............................................ 18

*Tanaka v. Univ. of S. Cal.,*
     252 F.3d 1059 (9th Cir. 2001) ........................................... 3, 14

*Theatre Party Assocs., Inc., v. Shubert Org., Inc.,*
     695 F. Supp. 150 (S.D.N.Y.1988) ........................................... 3

*Thomason v. Nachtrieb,*
     888 F.2d 1202 (7th Cir. 1989) ............................................ 12

*Todd v. Exxon,*
     275 F.3d 191 (2d Cir. 2001) ........................................... passim

*TV Commc'ns Network, Inc. v. Turner Network Television, Inc.,*
     964 F.2d 1022 (10th Cir.1992) ............................................. 3

*U.S. Gen., Inc. v. Draper City,*
     No. 2:05-cv-917 TS, 2006 WL 1594184 (D. Utah June 7, 2006) ............... 3

*U.S. v. Rockford Mem'l Corp.,*
     898 F.2d 1278 (7th Cir. 1990) ............................................ 11

*Vogel v. Am. Soc. of Appraisers,*
     744 F.2d 598 (7th Cir. 1984) .............................................. 2

*Welch v. Eli Lilly & Co.,*
     1:06-CV-0641-RLY-JMS, 2009 WL 734711
     (S.D. Ind. Mar. 18, 2009) (Young, J.) ..................................... 5

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*
     549 U.S. 312 (2007) ....................................................... 2

# INTRODUCTION

Plaintiffs' opposition, like their complaint, confirms their refusal to take their pleading obligations seriously. Plaintiffs postulate a relevant market based on the plainly implausible – and nowhere factually supported – notion that everyone who plays a NCAA intercollegiate sport is in one undifferentiated "labor" market, even those who play sports without any expectation or receipt of athletics-based financial aid.  At the same time, their market arbitrarily excludes from its confines student-athletes who play the same intercollegiate sport, at the same school, but under the auspices of another governing body.  It also arbitrarily excludes athletes who play the same sports for schools that belong to other intercollegiate associations, or for professional or semi-professional leagues.  Plaintiffs allege no facts to support any of this, as they tacitly admit in their opposition.  Instead, they claim that they are excused from such allegations by the decisions in *Agnew v. NCAA*, 683 F.3d 328 (7th Cir. 2012) ("*Agnew II*") and *Todd v. Exxon*, 275 F.3d 191 (2d Cir. 2001).

*Agnew II* does not help plaintiffs.  *Agnew II* did not hold, as plaintiffs claim, that there is a generic market for student-athlete "labor" that is, conveniently, precisely coterminous with NCAA-sponsored sports. Nor did it hold that plaintiffs need only utter the phrase "student-athlete labor market" in order to discharge their obligation to plead a cognizable relevant market. *Agnew II* said only that it could be ***possible*** for plaintiffs to allege facts sufficient to support a cognizable market; it did not relieve them of their obligation actually to do so. Plaintiffs have not done so.

*Todd* does not help plaintiffs either. That case stands only for the unremarkable notion that, in an alleged "monopsony" case, plaintiffs can plead a cognizable labor market by alleging

detailed facts demonstrating that employees have specialized skills which limit their practical employment options.[1]  Plaintiffs have done nothing of the sort here.

Plaintiffs' allegations regarding injury to competition, and the injuries supposedly suffered by the individual plaintiffs, are equally insufficient to support plaintiffs' claims.

## I.   PLAINTIFFS' RELEVANT MARKET ALLEGATIONS ARE INSUFFICIENT

It was plaintiffs' burden to allege facts sufficient to define a legally cognizable relevant market.  *Agnew II*, 683 F.3d at 337-38, 338 n.4, 345.[2]  These factual allegations must be sufficient to demonstrate that the boundaries of plaintiffs' proposed market are defined by "the interchangeability of use or the cross-elasticity of demand between the product [in question] and substitutes for it."  *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962).  Moreover, these allegations must define a market that is ***plausible***.  *Todd*, 275 F.3d at 200 ("To survive a Rule 12(b)(6) motion to dismiss an allege product market … must be plausible"); *see also Hack v. President and Fellows of Yale College*, 237 F.3d 81, 86 (2d Cir. 2000); *Elliott v. United Ctr.*, 126 F.3d 1003, 1005 (7th Cir. 1997).  A proposed relevant market that excludes obvious substitutes, or includes products that clearly are ***not*** substitutes for one another, is deficient as a matter of law.  *42nd Parallel North v. E Street Denim Co.*, 286 F.3d 401, 406 (7th Cir. 2002) (dismissing complaint where geographic market was "absurdly small"); *Rohlfing v. Manor Care, Inc.*, 172

---

[1]     Plaintiffs' suggestion that monopsony claims allow for less robust pleadings is incorrect. Dkt. 33 at 14-17.  As the Supreme Court held in *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 321-22 (2007), monopoly and monopsony are "analytically similar" and have a "close theoretical connection."  Proper market allegations are thus as necessary in monopsony cases as they are in monopoly cases.  *Vogel v. Am. Soc. of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984) (Posner, J.) ("monopoly and monopsony are symmetrical distortions of competition from an economic standpoint.").

[2]     See also *Andela v. Am. Ass'n For Cancer Research*, 389 F. App'x 137, 141 (3d Cir. 2010); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010); *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719-20 (6th Cir. 2003); *Todd*, 275 F.3d at 200.

F.R.D. 330, 347 n.23 (N.D. Ill. 1997) (" [w]here the relevant market proposed by the plaintiff is not even *alleged* to encompass all interchangeable substitute products, the market is legally (rather than factually) insufficient, and a motion to dismiss is appropriate.").[3]

It is not enough to simply assert, as plaintiffs do here, Dkt. 33 at 13, that a product is "unique." *Tanaka v. Univ. of S. Calif.*, 252 F.3d 1059, 1063-64 (9th Cir. 2001) (allegations that UCLA's women's soccer program was "unique" were conclusory and insufficient to support relevant market); *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 595 (7th Cir. 2008) ("'Marathon' is not a market; it is a trademark; and a trademark does not confer a monopoly; all it does is prevent a competitor from attaching the same name to his product.").[4]  Nor is it enough

---

[3]      *See also Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (plaintiff who proposes a relevant market for "restraint training services for private child care providers" must explain why restraint training for child care providers was different than training for other organizations); *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir.1992) (affirming district court's dismissal of claim for failure to plead a relevant market; proposed relevant market consisting of only one specific television channel defined too narrowly); *U.S. Gen., Inc. v. Draper City*, No. 2:05-cv-917 TS, 2006 WL 1594184, at *3 (D. Utah June 7, 2006) ("Plaintiffs have attempted to create a relevant market without providing any justification for it.  Like the one television channel in *TV Communications*, the single development on Traverse Mountain is too narrowly defined to constitute a relevant market and appears to be an attempt by Plaintiffs to create a relevant market to cover only the practice complained of."); *Commercial Data Servers, Inc. v. IBM*, 166 F. Supp. 2d 891, 897 (S.D.N.Y. 2001) (proposed market for "S/390 compatible mainframes" insufficient when no allegations why non-mainframe computers should be excluded or why market is limited to those compatible with IBM's licensed "S/390" operating system); *Am. Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851 (E.D. Va. 1999) (plaintiff failed to allege relevant market for email advertising when there were no allegations to exclude reasonable alternatives to email advertising);  *Re-Alco Indus. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391-92 (S.D.N.Y.1993) (dismissal for failure plead a valid relevant market; plaintiff failed to explain why specific health education product was not part of the larger market for health education materials); *Theatre Party Assocs., Inc., v. Shubert Org., Inc.*, 695 F. Supp. 150, 153-54 (S.D.N.Y.1988) (dismissing complaint after concluding plaintiff "narrowly defined the market in an attempt to conform the alleged market to the facts of the present case.").

[4]      *See also Hack*, 237 F.3d at 86; *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 142 (E.D.N.Y. 2010) (simply alleging that "print advertising sales on Long Island" are "unique" is insufficient); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 171 (S.D.N.Y.1995) ("Merely asserting that a commodity is in some way unique is insufficient to

to allege that the commodity in question is preferred by a particular plaintiff or group of plaintiffs. *Tanaka*, 252 F.3d at 1064; *Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, 433 F. App'x 598, 599 (9th Cir. 2011) *cert. denied,* 132 S. Ct. 852, 181 L. Ed. 2d 550 (U.S. 2011). Instead, plaintiffs must allege facts showing that their proposed relevant market contains "commodities reasonably interchangeable by consumers for the same purposes."  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir.1997); *see also City of New York v. Group Health Inc.*, 649 F.3d 151, 156 (2d Cir. 2011) (dismissing complaint because alleged market was "defined by [plaintiff's] preferences, not according to the rule of reasonable interchangeability and cross-elasticity of demand.").

The complaint does not include factual allegations sufficient to support the implausible relevant market for generic "NCAA student-athlete labor." Dkt. 22 at 5-15.  Tellingly, plaintiffs do not really disagree.  Instead of demonstrating that their factual allegations are adequate, plaintiffs focus on arguing that their market is sufficient because (a) *Agnew II* supposedly held that there is a generic "student-athlete labor" market; (b) *Todd* approved market allegations supposedly similar to plaintiffs' allegations; and (c) conclusory allegations are sufficient on a motion to dismiss.  Dkt. 33 at 10-19.  None of these arguments holds water.

### A.    *Agnew II* Did Not Establish Plaintiffs' Claimed Market

Plaintiffs first argue that *Agnew II* somehow held that a relevant market for generic "student-athlete labor" exists as a matter of law, and that they therefore are not required to allege facts to support it.  Dkt. 33 at 10-11. Plaintiffs are wrong.[5]  *Agnew II* said that it might be

---

plead a relevant market.  Rather, an antitrust complaint must explain why the market it alleges is the relevant, economically significant product market.").

[5]      They are also wrong that *Agnew II* "overruled" *Banks* (Dkt. 33 at 8-9).  *Agnew II* cited *Banks* with approval throughout the opinion.  683 F.3d at 335, 337, 343, 345.  *Agnew II* merely limited as dicta *Banks*'s statement that "the market for scholarship athletes cannot be considered a labor market."  *Agnew II*, 683 F.3d at 340, 346.  That part of *Agnew II* is inapposite to the

possible to characterize certain interactions between colleges and student-athletes as taking place in a commercial market.  *Agnew II*, 683 F.3d at 338 ("[i]t is undeniable that a market *of some sort* is at play in this case.") (emphasis added).  Importantly, however, *Agnew II* did *not* actually define any relevant market, refusing to do so because no market was "actually identified" in the *Agnew* complaint.  *Id.* at 345.  Plaintiffs' argument that *Agnew II* defined *any* relevant market – let alone adopted a relevant market for generic NCAA "student-athlete labor" –  is preposterous.

Nor did *Agnew II* excuse plaintiffs from alleging facts sufficient to support their implausible market for generic "student-athlete labor."  Just the opposite: *Agnew II* affirmed this Court's order of dismissal because the *Agnew* plaintiffs' allegations only "suggest[ed] the existence of a market," and left "the confines of that market far too unclear" to allow the Sherman Act claim to proceed.  *Agnew II*, 683 F.3d at 346.  *Agnew II* affirmatively requires plaintiffs to plead *facts* sufficient to support their market allegations; it did not relieve their obligation to do so.[6]

Equally preposterous is plaintiffs' claim that *Agnew II* ruled, as a matter of law, that the NCAA schools only recruit in the United States.  Dkt. 22 at 14-15; Dkt. 33 at 19-20.  One of the plaintiffs himself is Canadian, Dkt. 20 at ¶ 13, and plaintiffs have made no allegations to explain why this "market" is not international.

---

instant motion:  the NCAA has not argued that it is entitled to dismissal because it is impossible as a matter of law to sufficiently plead a "labor" market associated with student-athlete labor.

[6]    *Agnew II*, 683 F.3d at 334 ("While factual allegations must be accepted as true, legal conclusions may not be considered."); *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) ("[L]egal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth."); *Welch v. Eli Lilly & Co.*, 1:06-CV-0641-RLY-JMS, 2009 WL 734711, at *5 (S.D. Ind. Mar. 18, 2009) (Young, J.) ("[T]he allegation's characterization of the claim . . . is a legal conclusion that is not entitled to deference on a motion to dismiss.").

### B. *Todd v. Exxon* Did Not Establish Plaintiffs' Claimed Market

Plaintiffs rely heavily on the Second Circuit's decision *Todd v. Exxon*, 275 F.3d 328 (2d Cir. 2001), but *Todd*'s analysis is inapt here for at least two reasons.  Dkt. 33 at 15-16.  First, *Todd* upheld the market allegations made there because the *Todd* plaintiff alleged ***detailed facts*** sufficient to support the proposed market.  *Todd*, 275 F.3d at 201-206.[7]  Plaintiffs here have failed to do so.  Second, the *Todd* plaintiff alleged a genuine employment market, in which employers hired and paid employees to do their jobs.  Here, plaintiffs' have attempted to assert a very complicated, two-sided market, in which the "buyers" of "labor"—NCAA member schools—are also the sellers of educational services, and the "sellers" of labor—student-athletes—are the "buyers" of educational services.  Am. Comp. at ¶ 27.  *Todd*'s analysis cannot be applied mechanistically to the very different facts, and purported market, alleged in plaintiffs' complaint.  We explain these points in greater detail below.

### 1. Plaintiffs, Unlike the *Todd* Plaintiff, Have Not Pled Sufficient Facts To Establish the Boundaries of their Alleged "Market"

The employment market alleged in Todd was limited to "the services of experienced, salaried, non-union, managerial, professional and technical (MPT) employees in the oil and petrochemical industry. " *Todd*, 275 F.3d at 191.  The district court rejected this market as impermissibly ignoring potential substitutes for both (1) MPT employees and (2) employers outside of the petrochemical industry.  *Id.* at 201.   The Second Circuit disagreed, finding that

---

[7]     Moreover, *Todd v. Exxon* was decided in 2001—years before the Supreme Court's *Twombly* opinion was issued, and the Court in *Todd* applied the Fed. R. Civ. P. 12(c) standard explicated in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that the *Twombly* Court overruled. *See Todd*, 275 F.3d at 197-98 (quoting *Conley* and stating "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."); *cf. Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007) ("*Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival.").

plaintiffs' factual allegations were sufficient to support the proposed market. *Id*. at 201-206. Plaintiffs now argue that *Todd*'s market analysis renders sufficient their conclusory assertion that the relevant market in this case simultaneously excludes all opportunities to play sports organized by governing bodies other than the NCAA while somehow including all NCAA sports, across all Divisions. Dkt. 33 at 15-16. But *Todd*'s analysis does not help plaintiffs because they have made ***no*** factual allegations to support the implausible, indeed illogical, boundaries of their alleged "labor" market.

> ***Plaintiffs have failed to allege facts to exclude non-NCAA athletes as "sellers" in the "market."*** The *Todd* plaintiffs alleged facts sufficient to demonstrate that MPT employees outside the petrochemical industry were not adequate substitutes for MPT employees in that industry, because the latter had specialized knowledge that the former lacked. *Todd*, 275 F.3d at 203-204. Plaintiffs have made no similar allegations here. Dkt. 22 at 9-11. Plaintiffs have alleged no facts to establish that "NCAA student-athletes" somehow have ***NCAA-specific*** skill sets (as opposed to basketball-specific skill sets, lacrosse-specific skill sets, etc.) that make them more valuable to NCAA member schools than they would be to any other potential "employer" of athletics labor.[8] For example, the complaint contains no facts to explain why the "athletic labor" of a men's basketball player attending a junior college, or a NAIA school, is not an adequate substitute for the "athletic labor" of men's basketball players attending NCAA schools.

> ***Plaintiffs have failed to allege facts sufficient to exclude non-NCAA athletic programs as "buyers" in the "market."*** The *Todd* plaintiffs alleged facts sufficient to demonstrate that

---

[8]     Indeed, plaintiffs' own allegations belie such "specialization," because plaintiffs' own market allegation—which lumps all "suppliers" of student-athlete labor in all sports together— includes without explanation divisions and sports in which there are no or very little athletics aid awarded, in which there is no or very little wide-spread exposure, and no or very little prospect of receiving exceptional coaching.

they had industry-specific knowledge which made other petrochemical companies the only

viable substitute "buyers" in their market.  *Todd*, 275 F.3d at 203-204.  Plaintiffs' attempt to

make similar allegations here are woefully inadequate.  Plaintiffs' claim that there are no

substitutes for the "unique" mix of educational and athletic opportunities offered by NCAA

athletic programs,[9] *see* Dkt. 33 at 4, 15, is wholly conclusory and unsupported by factual

allegations.  There are no factual allegations to demonstrate that the educational and athletic

opportunities offered by playing lacrosse for, say, Indiana's MCLA-sponsored lacrosse program

are not substitutes for the opportunities offered by Notre Dame's NCAA-sponsored program.

*See* Dkt. 22 at 2-3 & n.5.  Nor are there factual allegations demonstrating that the opportunities

offered by NAIA schools, or junior colleges, are not substitutes for opportunities offered by

Division II or III schools.   Moreover, plaintiffs' rote and conclusory reference to superior

facilities or coaching at NCAA athletic programs, Dkt. 33 at 4, 15, reduces to the claim that

literally *every* NCAA athletic program, in *every* Division, at *every* school, and in *every* sport is

so decisively superior to its non-NCAA competitors that the latter can never be substitutes for

the former.  The complaint does not allege a single fact to support that dubious claim.  Nor does

the complaint contain factual allegations to demonstrate why a men's football player would

prefer to "sell" his "athletic labor" to a NCAA school that ***does not have a football team*** than to

---

[9]        Many, if not most, NCAA schools have both intramural and club sports in many sports,
including both sports that are also sponsored in NCAA competition at that school and in sports
that are not.  For example, the University of Michigan offers a varsity men's hockey team in
NCAA Division I,  http://www.mgoblue.com/sports/m-hockey/mich-m-hockey-body.html and a
club team in the American Collegiate Hockey Association Division II,
http://umclubhockey.com/site.php?page=about.  Notre Dame offers a varsity men's soccer team
in NCAA Division I, http://www.und.com/sports/m-soccer/nd-m-soccer-body.html, a men's club
team in the Midwest Alliance Soccer Conference, http://recsports.nd.edu/programs/club-
sports/men-s-club-sports/mens-soccer/, and intermural men's soccer,
http://recsports.nd.edu/programs/intramurals/sports/soccer/.

a NAIA school, or junior college, that does.  Plaintiffs' implausible, indeed nonsensical, market allegations are simply not good enough.

Plaintiffs' claims on this point are also undermined by plaintiffs' inconsistent claims regarding the prospect of professional play.  Plaintiffs claim that NCAA athletic programs are in their own market because they offer better training, and prospects, for professional play.  Am. Comp. at ¶ 19.  That is an admission that at least some "sellers" in their proposed "market" are interested in selling their "services" to professional, rather than amateur, teams.  Given that admission, plaintiffs need to allege facts demonstrating that professional and semi-professional leagues are not substitute "buyers" for NCAA athletic programs.  They have failed to do so.  Dkt. 22 at 8-11.

***Plaintiffs have failed to allege facts sufficient to demonstrate that all NCAA athletic programs are "substitute buyers" in one market.***  Finally, the *Todd* plaintiffs demonstrated that multiple categories of employees – lawyers, accountants, engineers, etc. – could be combined in one market because they all possessed petrochemical-specific experience and knowledge that limited them to the ***same pool*** of potential employers.  *Todd*, 275 F.3d at 201-202.  As the NCAA pointed out in its opening brief, plaintiffs have failed to do so here.  Dkt. 22 at 11-13.  The complaint contains no facts to refute the obvious point that the identity of "substitute buyers" are likely to vary from sport to sport, and in many (perhaps all) cases will not encompass the entire NCAA (but will include non-NCAA athletic programs).  It strains credulity for plaintiffs to argue, for example, that the pool of "substitute buyers" for the "athletic services" of a women's soccer player includes all NCAA schools, even those schools ***that do not have a NCAA women's soccer program***, while at the same time excluding other colleges that do play women's soccer as part of the NAIA or other sports leagues.

9

The *Todd* plaintiffs alleged detailed, comprehensive facts to support their market definition; plaintiffs here have not.  *Todd* does not save plaintiffs' deficient allegations; rather, it highlights their inadequacy.

### 2. *Todd* Does Not Apply to Plaintiffs' Two-Sided Market Allegations

Moreover, *Todd*'s application to the market alleged in this case is inapt.   Plaintiffs posit a supposed market that is far more complicated than the simple employment market alleged in *Todd*.  The "market" supposedly at play in this case is alleged to be one in which **two** distinct transactions are happening simultaneously: NCAA schools are "selling" educational services to plaintiffs, and plaintiffs are "selling" "athletic services" to NCAA schools. Dkt. 20 at ¶ 27. Plaintiffs' market analysis (and reliance on *Todd*) addresses only the second of these two transactions, the alleged "sale" of "athletic labor."  Plaintiffs completely, and improperly, ignore whether the market in which schools are the "sellers," and student-athletes the "buyers," of educational services can properly be limited to NCAA schools.  *Todd*'s "monopsony" analysis provides no analytical assistance on this point, and it is fatal to plaintiffs' market definition.  Dkt. 22 at 9-11.   For this reason as well, *Todd* is inapposite.

A further complicating factor is that plaintiffs' alleged "market" includes multiple "transactions" between NCAA member institutions and student-athletes that, plaintiffs admit, are not "commercial" transactions ***at all.***  Plaintiffs' market allegations depend entirely on the assumption that every student-athlete who plays NCAA-sanctioned intercollegiate sports is "selling" his or her athletic "labor" to their school – even those student-athletes who play sports at their school with no expectation of ever receiving a scholarship.[10]  The undeniable presence of student-athletes who are not "selling" anything to the schools for whom they play sports—like

---

[10]     This radical assertion could be applied with equal force to the student-athletes playing intramural and club sports, which begs the question as to why those student-athletes would not be included as "labor" in plaintiffs' purported relevant market.

two of the named plaintiffs here, *see* Section III—fatally undermines plaintiffs' glib allegation of a generic, NCAA-wide "athletic labor" market.  Plaintiffs' proposed "labor" market simultaneously includes "unpaid" student-athletes when those athletes play their sport under NCAA rules (like Division III student-athletes, and Division I and II "walk-ons"), and excludes "unpaid" athletes playing the same sports, ***often at the same schools***, simply because those athletes play their sports under another sports body's rules.  Nothing in the complaint, and certainly nothing in *Todd*, supports or justifies plaintiffs' gerrymandered "labor" market.

### C.   Plaintiffs Failed To Explain Exclusion of Substitutes On All "Sides" of Their Purported Market(s)

As the NCAA pointed out in its opening brief, plaintiffs have failed to explain why multiple potential real world substitutes, in both the "educational" and "labor" halves of their "market," are properly excluded from that market.[11] *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1410 (7th Cir. 1995) (Posner, J.) ("In defining a market, one must consider substitution by both buyers and sellers"); *U.S. v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1284 (7th Cir. 1990) (Posner, J.).  Plaintiffs have made two arguments in response: (1) that their scant allegations are sufficient and (2) even if (some) substitutes referenced by the NCAA were included in plaintiffs' markets, the NCAA would still have market power.  Dkt. 33 at 11-13.  Neither of those arguments is persuasive.

---

[11]      Plaintiffs' argument that the Court must stay within the four corners of the complaint when considering whether plaintiffs have left obvious substitutes out of their market is wrong. "In considering a motion to dismiss, the court is not required to don blinders and ignore commercial reality."  *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir. 1984); *see also 42nd Parallel N.*, 286 F.3d at 406 ("We also cannot close our eyes" to absurd market allegations).

### 1. Plaintiffs Failed to Allege Facts To Eliminate Substitutes for NCAA Member Institutions

Plaintiffs have failed to include allegations to justify their claim that NCAA member schools, and only NCAA member schools, provide competing opportunities to NCAA student-athletes, either to play their chosen (or other) sports, or to attend an institution of higher education, or both.  Plaintiffs' only arguable attempt to do so is contained within Paragraph 19 of their Complaint:

> There are zero practical alternatives that can provide the unique combination of attributes offered by NCAA member institutions: (i) the ability to exchange athletic services for payment of the cost of an education plus room and board, (ii) high-quality academic education services, (iii) top-of-the-line training facilities, (iv) high-quality coaches who will best be able to launch players to professional careers if they so choose, and (v) national publicity through national championships and nationwide broadcasting contracts.

Dkt. 20 at ¶19; Dkt. 33 at 4.[12]  This allegation—apart from being conclusory and thus not entitled to deference—is not supported by any factual allegation that all NCAA playing opportunities, in all sports across all divisions, have those attributes and, more importantly, that other potential substitutes do not.  For example:

- Plaintiffs' complaint fails to include any allegations as to why NCAA student-athletes could not "exchange" athletics "services" for tuition and room and board at non-NCAA colleges and junior colleges.  Dkt. 22 at 8-9.

- Plaintiffs' complaint fails to include any allegations to support a claim that student-athletes attending school at both NCAA and non-NCAA colleges playing club sports

---

[12]    Plaintiffs also assert that their failure to make factual allegations explaining the boundaries of their markets in their complaint does not matter, because if you calculate opportunities offered when including (only some of) the examples of excluded viable substitutes noted by the NCAA, the NCAA would still have a large market share.  Dkt. 33 at 12.  That is inapposite.  It is not the NCAA's burden to define a market in this case, nor to disprove its market power.  Plaintiffs' effort to "fix" their non-existent market definition by conceding that only some of the NCAA's noted substitutes might be properly included does not alleviate their failure to distinguish what are and are not real world substitutes in their complaint.  *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989) *(*citing *Car Carriers*, 745 F.2d at 1107) ("It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss, nor can it be amended by the briefs on appeal."); *Agnew II*, 683 F.3d at 348.

(which frequently compete at a very high level) could not receive a combination of "high-quality educational services" and "top-of-the-line training facilities"—or even that all NCAA member schools in all sports have top-of-the-line training facilities. *Id.*

- Plaintiffs' complaint fails to include allegations as to why non-collegiate amateur sports leagues and minor and major league professional leagues and opportunities, Dkt. 22 at 9, do not provide those training facilities, or "high-quality coaches who will best be able to launch players to professional careers if they so choose"—or, again, even that all NCAA member schools in all sports have those kinds of coaches or facilities. *Id.* at 10.

- Plaintiffs' complaint fails to include allegations as to why other college leagues, minor leagues or professional leagues do not offer "publicity" through national championships and television contracts, or to allege, again, that all or even most NCAA member schools, conferences and divisions can offer such a benefit. Cf. *id.* at 9-10.

Plaintiffs' conclusory allegations, which are contrary to commercial reality and fail to explain the exclusion of numerous athletics and educational opportunities for student-athletes, many of which differ by sport, are insufficient to establish a "buyer's side" employment market limited to NCAA member institutions.

### 2. Plaintiffs Failed to Allege Facts To Eliminate Substitutes for Current NCAA Student-Athletes

Similarly, plaintiffs have utterly failed to make any allegations regarding substitutes for current NCAA student-athletes competing for "opportunities" at NCAA member institutions. There is nothing in plaintiffs' complaint to justify an assertion that there is such demand for NCAA student-athletes (across all divisions, and in all sports) that in the absence of NCAA rules to the contrary, all NCAA student-athletes in all sports would receive multi-year full ride athletics grants-in-aid. Dkt. 22 at 16-18. Plaintiffs' market definition fails to account for the various sources of supply of "NCAA student-athletes"—i.e., all junior and senior high school students (nationally and internationally, as plaintiffs make no effort to allege any facts that would support limiting the "pool" of available labor to prospects in the United States),[13] athletes

---

[13]   USA Today reported that "more than 16,000" international student-athletes participated in NCAA athletics in the 2006-2007 season. Steve Wieberg, *Influx of foreigners presents new*

competing in junior and other amateur leagues who still satisfy eligibility rules in their sport,

professional athletes in other sports, student-athletes at NCAA schools playing club or intramural

sports, student-athletes at non-NCAA schools and junior colleges, etc.[14]

A market that ignores substitutes, as plaintiffs' market does, cannot be plausible.[15]  In

*Tanaka*, 252 F.3d at 1063-64, the Ninth Circuit concluded that the plaintiff had not defined a

product market because her allegations that the relevant market was the UCLA's women's

soccer program because it was "unique" were conclusory, and her personal preference to go to

school in Los Angeles was irrelevant.  *Id.* at 1064.  Similarly, *Adidas America, Inc. v. NCAA*, 64

F. Supp. 2d 1097, 1103 (D. Kan. 1999), rejected a relevant market for "the sale of NCAA

promotional rights"  because the plaintiffs "failed to explain or even address why other similar

forms of advertising with teams or individuals competing in the National Football League, the

National Basketball Association, the Women's National Basketball Association, Major League

Baseball, Major League Soccer, or the Olympics, are not reasonably interchangeable with

---

*challenges for NCAA*, USA TODAY, Oct. 1, 2008, *available at*
http://usatoday30.usatoday.com/sports/college/2008-10-01-foreign-influx_N.htm.  In some
sports, like women's ice hockey and women's tennis, international student-athletes made up
more than 50% of all participants.  *Id.*  Plaintiff Kody Collins is himself an international student-
athlete participating in men's ice hockey, Dkt. 20 at ¶ 13, as are 31% of the Division I men's ice
hockey student-athletes.

[14]     Additionally, plaintiffs have failed to allege the boundaries of the market in which NCAA
schools "sell" educational services to students.  Certainly NCAA member schools sell
educational services to more than just student-athletes.

[15]     Courts also reject proposed relevant markets that contain varied items with no cross-
elasticity of demand.  *See  E. & G. Gabriel v. Gabriel Bros., Inc.*, No. 93 Civ. 0894 (PKL), 1994
WL 369147, at *2-4 (S.D.N.Y. July 13, 1994) (dismissing claim where plaintiffs alleged market
for "name-branded deep discounted merchandise" because "Hammers are obviously not
reasonable substitutes for children's pajamas; they are not used for similar purposes, nor will the
price of hammers affect the price of pajamas.").

NCAA promotion rights or sponsorship agreements." [16]  Plaintiffs' conclusory market should be dismissed for the same reasons.

## II.   PLAINTIFFS FAILED TO ALLEGE ANTICOMPETITIVE EFFECTS

Plaintiffs' amended complaint also fails as a matter of law because it does not contain factual allegations demonstrating a negative effect on competition for the price or output of labor or compensation within a defined market.  *Agnew II*, 683 F.3d at 335.  The complaint "fails to delineate much less explain" how the challenged NCAA rules supposedly injure competition as a whole in a relevant market. *Banks v. NCAA*, 977 F.2d 1081, 1087 (7th Cir. 1992); *see* Dkt. 22 at 15-18.  While the plaintiffs now attempt to clarify and augment the factual allegations in their briefing, the test is what a plaintiff alleges in the complaint.  *Hennessy Indus. Inc. v. FMC Corp.*, 779 F.2d 402, 404 (7th Cir. 1985).  Plaintiffs do not allege enough.  Their citations to boilerplate claims that elimination of NCAA rules would "dramatically increase the overall supply of athletics-based scholarships and amount of those scholarships," Dkt. 33 at 20-21 (citing Dkt. 20 at ¶¶ 3, 103), are the exact type of conclusory allegations that courts routinely find insufficient. It is equally plausible that those rule enhance or have no effect on output and that output might decline if those rules were eliminated.

*Division III.*  Plaintiffs admit that Division III schools have the option and ability to leave Division III and provide athletics-based aid to their student-athletes but claim that Division III schools "do *not* want to provide" such aid.  Dkt. 33 at 22.  But nowhere does the amended

---

[16]    See *Gianna Enters. v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982), where the plaintiff proposed a relevant market for "international beauty pageants" but failed to allege any facts to explain why state or national pageants should be excluded from the market or why pageants constituted a separate market from other competitions for positions in the modeling, advertising or entertainment world.  The court found that it "cannot accept the market boundaries offered by plaintiff without at least a theoretically rational explanation for excluding the publicity potential offered by lesser pageants or different media."  *See also Menasha Corp. v. News Am. Marketing In-Store, Inc.*, 354 F.3d 661, 665-66 (7th Cir. 2004).

complaint explain how eliminating Division III rules that bar athletics-based financial aid would actually force unwilling schools to award athletics-based financial aid.  Plaintiffs simply assert that "Division III member institutions would have awarded millions in athletics-based scholarships" without alleging a single fact to explain why.[17]

Additionally, in response to the NCAA's demonstration that its amateurism bylaws are reasonable as a matter of law, Dkt. 22 at 18-23, plaintiffs' only response is that *Agnew II* has "expressly rejected" this presumption.  Dkt. 33 at 24-27.  This is not correct; the portion of *Agnew II* cited by plaintiffs did not discuss the Division III amateurism rules.  Moreover, Division III bylaws that preserve amateurism without athletics-based aid are the sort of rule clearly protected by the Supreme Court's decision in *Board of Regents*.  *Agnew II*, 683 F.3d at 341.

*Multiyear scholarships and scholarship caps in Divisions I and II.*  Plaintiffs claim, without citation to their amended complaint, that if the challenged Division I and II rules were eliminated, "the amount of total scholarships would rise because of the intense competitive pressures on schools to recruit student-athletes."  Dkt. 33 at 22.  But plaintiffs have pled no facts to demonstrate this "intense competition" in the vast majority of their purported relevant market. Their opposition refers to millions of dollars spent on recruiting, Dkt. 33 at 20, but the cited amended complaint paragraphs refer only to three Division I men's basketball teams and one Division I FBS football team.  Dkt. 20 at ¶¶ 31-32.  There are no allegations about the competitive pressures for any other sport or Division.  It is scarcely a stretch to suppose that a Division II athletic department does not spend hundreds of thousands of dollars to fill its rosters

---

[17]     Plaintiffs inconsistently also claim that Division III schools actually do award athletics-based financial aid to their student-athletes.  Dkt. 20 at ¶¶ 65-68.  Plaintiffs have therefore alleged that there are no anticompetitive effects from the Division III rule banning athletics-based financial aid, as they claim the rule has *no* effect.

for volleyball, swimming or lacrosse.  If a few schools dominated every sport, other schools would likely drop the sport or play under a different sanctioning body's rules.[18]  For this reason as well, the complaint should be dismissed.

### III.  PLAINTIFFS FAILED TO ALLEGE FACTS SHOWING THAT THEY HAVE SUFFERED A COGNIZABLE INJURY

Finally, the complaint should be dismissed because no plaintiff has alleged facts sufficient to demonstrate that he suffered a cognizable injury as a result of the challenged NCAA rules.  Dkt. 22 at 23-26.

***Plaintiff Kody Collins***.  Collins has affirmatively alleged that, when supposedly told by his school that he would have to "forfeit either scholarship money or [his] spot on the team," Dkt. 20 at ¶ 91, he ***retained his scholarship***.  *Id.* at ¶ 93.[19]  Plaintiffs claim that Collins has nonetheless alleged a cognizable antitrust injury because he was not permitted to "participate in the sport [he] loved," arguing that the antitrust laws guarantee Collins the right to both "play *and* receive financial aid."  Dkt. 33 at 29-30 (emphasis in original).  But being denied an opportunity to play Division III hockey – the ***only*** injury alleged by Collins – is not a cognizable antitrust injury, as a matter of law.  It is black letter law that private antitrust plaintiffs must allege an injury to their "business or property," which is limited to "commercial interests or enterprises." *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 264 (1972).   Personal injuries cannot form the basis of a private antitrust claim.  *Reiter v. Sonotone*, 442 U.S. 330, 339 (1979) (the phrase "business or property" "exclude[s] personal injuries suffered").  This means that antitrust

---

[18]     Additionally, Division I and II financial aid bylaws also implicate amateurism concerns and are protected therefore by *Board of Regents*, which could not be limited by *Agnew II*.  Dkt. 22 at 21-23.

[19]     Plaintiffs disingenuously suggest that the NCAA has "admitted" that plaintiffs Steward and Collins received athletics-based financial aid.  Dkt. 33 at 29.  The NCAA has admitted no such thing; its brief simply assumes that plaintiffs' allegations are true, as required by Rule 12(b)(6).

plaintiffs must allege facts showing that they have suffered some kind of pecuniary injury, such as paying more for services rendered, as a result of the alleged wrongdoing; non-pecuniary injuries cannot form the basis of an antitrust claim, even if those injuries were allegedly caused by a restraint of trade.  *Tal v. Hogan*, 453 F.3d 1244, 1253-54 (10th Cir. 2006) (injury to "reputation, dignity and emotional damages are not the type of injuries redressable by the antitrust laws"); *Bhan v. NME Hosps., Inc.,* 669 F. Supp. 998, 1012-13 (E.D. Cal. 1987) *aff'd*, 929 F.2d 1404 (9th Cir. 1991) (alleged loss of friends and reputation not sufficient to support an antitrust claim).

Collins' claimed injury of being denied the opportunity to play Division III hockey is clearly non-pecuniary.  He has not alleged that NCAA rules caused him to pay more than he otherwise would for his education, or suffered any other kind of pecuniary, legally cognizable harm.[20]  Instead, he has alleged only that NCAA rules prevented him from participating in NCAA-sanctioned hockey games.  Merely being excluded from participation in certain hockey games is not the kind of pecuniary harm that can give rise to an antitrust claim.  *Tal*, 453 F.3d at 1253-54; *Bhan*, 669 F. Supp. at 1012-13.

**Plaintiff Tim Steward.**  Steward's claim suffers from the same shortcoming.  Like Collins, Steward has affirmatively alleged that NCAA rules did ***not*** cause his school to withdraw his scholarship; he claims that he voluntarily surrendered his scholarship so he could keep playing basketball.  Dkt. 20 at ¶ 88.  Like Collins, Steward argues that he has nonetheless suffered antitrust injury because the antitrust laws guarantee him the right to "play *and* receive

---

[20]      Although Collins alleges that he transferred to a different school the following year, and was required to pay tuition at that school, the Complaint alleges no facts to suggest that NCAA rules forced him to transfer.  Dkt. 20 at ¶ 93.  Nor has he alleged that he would have lost his diversity scholarship if he had stayed at his original school.

financial aid."  Dkt. 33 at 29-30.  And like Collins, he has alleged nothing but a personal, non-pecuniary injury that fails, as a matter of law, to support his antitrust claims.

     ***Plaintiff John Rock.***  Rock's claims suffer from a different, but equally fatal, problem. He admits that he has not alleged facts showing that it was NCAA rules, rather than Gardner-Webb's independent decision, that caused him to lose his scholarship.  He claims that this doesn't matter because his claim is different: he posits a but-for world in which he (and every other NCAA student-athlete, apparently) would receive a "multi-year" scholarship.  Dkt. 33 at 28.  The problem is this generic allegation does not fit with the rest of Rock's allegations.  As plaintiffs tell it, the gist of Rock's claim is that Gardner-Webb ***agreed*** to give him multi-year aid when it recruited him, but then failed to live up to its promises.  Dkt. 33 at 28.  The only way he could have avoided this injury in a but-for world without NCAA rules is if he received a ***guaranteed*** "multi-year" scholarship, i.e., one that could not be revoked under any circumstances.  He has alleged no facts whatsoever to support the claim that Gardner-Webb would have offered him a guaranteed, non-revocable "multi-year" scholarship in a but-for world without the NCAA rules he is challenging.  Without those facts, he has failed to satisfy *Twombly*'s requirement of pleading an antitrust claim that is plausible, not merely possible. *Twombly*, 550 U.S. at 557 ("without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief").

     The same is true for Rock's fact-free argument that he has been injured by the NCAA's scholarship caps.  Dkt. 33 at 28-29.  Rock has alleged no facts to support his claim that it was the NCAA's scholarship rules that prevented other colleges from making him scholarship offers, let alone that he suffered any pecuniary harm as a result of not receiving those offers.  Again, *Twombly* prevents this Court from merely taking a plaintiff's word for it that he has been injured.

*Twombly*, 550 U.S. at 556.  And *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) bars accepting as true legal conclusions and "[t]hreadbare recitals of the elements of a cause of action."

Finally, no plaintiff has alleged facts that he was ever subject to, or injured by, NCAA Division II rules.   Their claims should therefore be dismissed to the extent they are attempting to challenge those rules.

**CONCLUSION**

*Twombly* requires pleaded facts to support plausibility claims.  *Iqbal* precludes avoiding that obligation by pleading a legal conclusion.  Plaintiffs continue to ignore both strictures. *Agnew II* does not say what the market is; only that some sort of market may be involved in sports involving college students.  *Todd* does not excuse these duties and could not in any event. Market theories must be based in pleaded facts that determine which substitutes are to be included and which excluded.  Likewise, competitive effects must be pled with facts, not conclusions.  The Amended Complaint should be dismissed.

Dated: October 29, 2012

Respectfully submitted,

Schiff Hardin LLP

/s/ *Gregory L. Curtner*
Gregory L. Curtner
350 S. Main St., Suite 210
Ann Arbor, MI  48104
734-222-1500 (Phone)
gcurtner@schiffhardin.com

Kathy L. Osborn (21927-53)
Faegre Baker & Daniels LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN  46204
313-237-0300 (Phone)
kathy.osborn@faegrebd.com

*Attorneys for Defendant NCAA*

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on October 29, 2012 a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

**Elizabeth A. Fegan**
HAGENS BERMAN SOBOL SHAPIRO, LLP
1144 W. Lake Street, Suite 400
Oak Park, IL 60301
708-628-4949
Email: beth@hbsslaw.com

**Joseph N. Williams**
PRICE WAICUKAUSKI & RILEY
301 Massachusetts Avenue
Indianapolis, IN 46204
317-633-8787
Email: jwilliams@price-law.com

**Steve W. Berman**
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Ave. Suite 3300
Seattle, WA 98101
(206) 623-7292
Email: steve@hbsslaw.com

**Stuart McKinley Paynter**
The Paynter Law Firm PLLC
1200 G Street N.W., Suite 800
Washington, DC 20005
(202) 626-4486
Email: stuart@smplegal.com

**William N. Riley**
PRICE WAICUKAUSKI & RILEY
301 Massachusetts Avenue
Indianapolis, IN 46204
(317) 633-8787
Email: wriley@price-law.com

                       /s/ Gregory L. Curtner
                       Gregory L. Curtner
                       Attorneys for NCAA
                       gcurtner@schiffhardin.com

40984-0023
AA\200038894.1

21