UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JOHN ROCK, *et al.*,                )
    *Plaintiffs*,                )
                   )
    *vs.*                )     1:12-cv-1019-JMS-DKL
                   )
NATIONAL COLLEGIATE ATHLETIC ASSOCIA-    )
TION,                )
    *Defendant*.                )

### **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

As the poignant refrain from a popular duet cover laments, here we go again.  Ray Charles & Norah Jones, "Here We Go Again," *Genius Loves Company*, Concord Records (2004).  In July 2012, Plaintiffs John Rock, Tim Steward, and Kody Collins filed this antitrust action against Defendant National Collegiate Athletic Association (the "NCAA"), challenging two bylaws that were at issue in *Agnew v. National Collegiate Athletic Association*, 2011 U.S. Dist. LEXIS 98744 (S.D. Ind. 2011), *affirmed by Agnew v. National Collegiate Athletic Association*, 683 F.3d 328 (7th Cir. 2012).[1]  In addition to the bylaws at issue in *Agnew*—the prohibition on multi-year athletics-based scholarships and the cap on the number and amount of athletics-based scholarships—Plaintiffs also challenge an NCAA bylaw prohibiting athletics-based scholarships at Division III schools.  [Dkt. 20 at 14-23.]  Plaintiffs argue that these bylaws unlawfully restrain trade among NCAA member institutions for the labor of student-athletes.  [*Id.*]  The NCAA has moved to dismiss Plaintiffs' action.  [Dkt. 21.]

---

[1] This case involves many of the same counsel that represented the parties in *Agnew*.

# I.
## STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  For the purposes of that rule, the Court will ignore conclusory legal allegations.  *Iqbal*, 556 U.S. at 678 ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.").  The Court will, however, give the complaint the benefit of reasonable inferences from all non-conclusory allegations.  *See id.*

# II.
## BACKGROUND

### A.  Scope of Plaintiffs' Allegations

Plaintiffs' complaint is styled as a class action and asserts certain "class allegations" in addition to the allegations specific to the named Plaintiffs, [*see, e.g.*, dkt. 20 at 32-34], but Plaintiffs have not filed a motion to certify a class.  Because the named Plaintiffs are the only parties with "legally protected interests in the litigation[,]" *Agnew*, 683 F.3d at 333 n.2, the Court will focus on the allegations specific to them.

It is undisputed that different NCAA bylaws govern Division I, II, and III member institutions.  There is also no dispute that Mr. Rock received an athletics-based scholarship to play football at a Division I Football Championship Subdivision ("FCS") school, [dkts. 20 at 24 ¶ 74; 22 at 28 n. 25], and that Mr. Steward and Mr. Collins attended Division III schools to play their respective sports, basketball and hockey, [*id.* at 27 ¶ 84, 28 at ¶ 89].  The NCAA argues that because the Court can only analyze the claims the plaintiffs have standing to bring as individuals,

"[n]one of the plaintiffs can challenge Division I FBS rules, Division II rules, or rules that govern sports other than FCS football, Division III basketball or Division III hockey." [Dkt. 22 at 28 n. 25.] Plaintiffs do not respond to this argument; therefore, the Court construes Plaintiffs' silence as an acceptance of its merit. Accordingly, the Court will not construe the complaint as stating any claim regarding rules that did not apply to the named Plaintiffs.

### B. Reasonable Inferences from Non-Conclusory Allegations

Plaintiffs' complaint reads more like a press release than a legal filing. Given the applicable standard of review, the Court ignores Plaintiffs' conclusory legal allegations and needless case citations and will only detail the reasonable inferences it can make from the necessary factual allegations to determine if Plaintiffs have stated a plausible claim for relief.

Mr. Rock is a United States citizen domiciled in Ohio. [Dkt. 20 at 5 ¶ 8.] Coming out of high school in 2008, Mr. Rock was offered athletics-based scholarships to play football at numerous Division I member institutions, including Gardner-Webb University ("Gardner-Webb") in North Carolina. [*Id.*] He ultimately chose Gardner-Webb "based on the pledge of the head coach that his athletics-based scholarship would be renewed annually so long as he did well academically and remained eligible for NCAA competition." [*Id.*] On January 26, 2011, Gardner-Webb named a new head football coach. [*Id.* at ¶ 9.] Mr. Rock was informed in writing in July 2011 that he would no longer receive a football scholarship at Gardner-Webb, and his appeal of that decision was denied. [*Id.*] Mr. Rock paid tuition and room and board to graduate in May 2012 with a degree in political science. [*Id.*]

Mr. Steward is a United States citizen domiciled in Ohio. [Dkt. 20 at 5 ¶ 10.] He was recruited by several colleges to play basketball and ultimately decided to attend Kean University in New Jersey, a Division III member institution. [*Id.*] Before his freshman year, Mr. Steward ap-

plied for and received a scholarship given to incoming students who meet certain academic crite-

ria and demonstrate "extraordinary extracurricular achievement."  [*Id.*]  In November 2011, prior

to the start of his sophomore basketball season, Mr. Steward was told by athletic department ad-

ministrators that he could no longer play basketball while accepting the scholarship because the

NCAA "had determined that the school was violating the NCAA's prohibition on the award of

athletics-based financial aid by Division III institutions."  [*Id.* at 6 ¶ 11.]  Mr. Steward sat out his

sophomore season but forfeited the scholarship his junior year to play basketball.  [*Id.*]  Mr.

Steward took out private loans to pay his tuition.  [*Id.*]

Mr. Collins is a Canadian citizen.  [Dkt. 20 at 6 ¶ 13.]  He was recruited to play hockey

and chose the University of New England after it pledged over $14,000 in financial aid as a di-

versity scholarship.  [*Id.*]  After receiving that financial aid his freshman year, Mr. Collins was

informed before his sophomore year that due to his NCAA athletic participation, he could no

longer receive the diversity scholarship money.  [*Id.* at ¶ 14.]  Mr. Collins sat out his sophomore

season and then transferred to the University of Southern Maine to play hockey, where he paid

additional tuition and room and board at that school.  [*Id.* at ¶ 15, 29 ¶ 93.]

The NCAA includes 1,096 active member schools organized into three divisions.  [*Id.* at

7 ¶ 17.]  Three NCAA bylaws are at issue in this action.  First, Plaintiffs challenge the NCAA

bylaw that prohibited[2] awarding athletics-based financial aid in excess of one academic year.

[Dkt. 20 at 15 ¶ 46 (quoting NCAA Bylaw 15.3.3.1 ("One-Year Period:  If a student's athletics

ability is considered in any degree in awarding financial aid, such aid shall neither be awarded

---

[2] The operative complaint acknowledges that this bylaw has been rescinded.  [Dkt. 20 at 16 ¶ 50.]  Because Mr. Rock seeks damages for actions taken before the bylaw was rescinded, its re-peal does not render this case nonjusticiable.  *See Agnew*, 683 F.3d at 332 ("Since plaintiffs seek damages for prior actions taken by the NCAA and its member schools, the repeal of the multi-year scholarship prohibition does not render this case nonjusticiable.").

for a period in excess of one academic year nor for a period less than one academic year.")).]

Second, Plaintiffs challenge the NCAA bylaws that cap the total amount of athletics-based

scholarships member institutions can grant to student-athletes in a given sport.  [*Id.* at 19 ¶ 53

(citing, for example, NCAA Bylaw 15.5.5.1, which prohibits a Division I institution from offer-

ing more than 13 full athletics-based scholarships in basketball).]  Third, Plaintiffs challenge the

prohibition on athletics-based scholarships for Division III schools.  [*Id.* at 21-22 ¶ 63 (quoting

NCAA Bylaw 15.01.3, which prohibits any "award [of] financial aid to any student on the basis

of athletics leadership, ability, participation or performance").]

Plaintiffs argue that the NCAA bylaws at issue are not necessary to protect the amateur

status of student-athletes and, instead, "artificially restrict the number and amount of scholar-

ships," which Plaintiffs allege resulted in them receiving less for their labor than they would re-

ceive in a competitive market.  [*Id.* at 3 ¶ 3, 4-5 ¶ 7.]  In support of their claim that these regula-

tions violate Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiffs allege the following relevant

market:

> The relevant market is the nationwide market for the labor of student athletes.  In
> this labor market, student athletes compete for spots on athletic teams of NCAA
> member institutions and NCAA member institutions compete for the best colle-
> giate student athletes by paying in-kind benefits, namely athletics-based scholar-
> ships, academic programs, access to training facilities, and instruction from prem-
> ier coaches.

[Dkt. 20 at 9 ¶ 27.]

### C.   Key Teachings of *Agnew v. NCAA*

As the Court noted at the outset, Plaintiffs challenge two NCAA bylaws that were at issue

in *Agnew v. National Collegiate Athletic Association*, 2011 U.S. Dist. LEXIS 98744 (S.D. Ind.

2011), *affirmed by Agnew v. National Collegiate Athletic Association*, 683 F.3d 328 (7th Cir.

2012).  Accordingly, the Seventh Circuit's opinion in *Agnew* is helpful for analyzing Plaintiffs'

allegations in light of the NCAA's motion to dismiss.  Although each party stretches *Agnew* to support its position, Plaintiffs especially do so.  Therefore, a brief summary of *Agnew* and the main holdings on which the Court relies is necessary.

Joseph Agnew and Patrick Courtney, former college football players at Division I schools, filed a putative class action challenging various NCAA bylaws after they each suffered career-ending injuries and their one-year athletics-based scholarships were not renewed.  *Agnew*, 683 F.3d at 332.  The NCAA filed a motion to dismiss, which this Court granted.  *Id.*  The Seventh Circuit affirmed that dismissal after analyzing the applicability of the Sherman Act to the NCAA rules at issue therein and, ultimately, concluding that "plaintiffs' complaint did not sufficiently identify a commercial market—an obvious necessity for Sherman Act violations."  *Id.*

Several important points from *Agnew* guide the Court's resolution of the instant motion. First, because the purpose of the Sherman Act is to protect consumers from injury that results from diminished competition, "the plaintiff must allege, not only an injury to himself, but an injury to the market as well."  *Agnew*, 683 F.3d at 334-35 (citations omitted).  There needs to be a relevant commercial market on which actions have an anticompetitive effect because "without a commercial market, the goals of the Sherman Act have no place."  *Id.* at 337; *see also id.* at 338 ("[T]he Sherman Act was intended for, and thus only applies to, commercial transactions.").  To succeed in their challenge to the NCAA bylaws, Plaintiffs' complaint must identify a "cognizable market" on which the NCAA's actions could have had anticompetitive effects.  *Id.* at 337-38. "[I]t is incumbent on the plaintiff to describe the rough contours of the relevant commercial market in which anticompetitive effects may be felt . . . ."  *Id.* at 345.

Second, in the context of Division I football, the Seventh Circuit found it "undeniable that a market of some sort is at play in this case.  A transaction clearly occurs between a student-

athlete and a university:  the student-athlete uses his athletic abilities on behalf of the university

in exchange for an athletic and academic education, room, and board."  *Id.* at 338.  Therefore,

although "nothing resembling a discussion of a relevant market for student-athlete labor" could

be found in plaintiffs' complaint in *Agnew*, "[t]he *proper identification* of a labor market for stu-

dent-athletes . . . would meet plaintiffs' burden of describing a cognizable market under the

Sherman Act."  *Id.* at 346 (emphasis added).

Third, the NCAA's one-year scholarship limit and the cap on the number of scholarships

are financial aid rules, not eligibility rules.  *Id.* at 344.  As financial aid rules, those bylaws "are

not inherently or obviously necessary for the preservation of amateurism, the student-athlete, or

the general product of college football."  *Id.*  Accordingly, unlike eligibility rules, financial aid

rules are not deserving of a procompetitive presumption.[3]  *Id.* at 344-45.  This lack of a procom-

petitive presumption, however, "does not equal a finding that they are anticompetitive; it simply

means that they cannot be deemed procompetitive at the motion-to-dismiss stage."  *Id.* at 345.

Additionally, "this does not necessarily mean that any challenge of any NCAA bylaw will sur-

vive the motion-to-dismiss stage.  Many NCAA bylaws can be deemed procompetitive 'in the

---

[3]  The NCAA admits that *Agnew* found the rules at issue therein to be financial aid rules not enti-
tled to a presumption of reasonableness, [dkt. 22 at 26], but still argues that the distinction made
by the Seventh Circuit is not "so clear cut[,]" [*id.* at 27 n.4].  Because it is bound by Seventh Cir-
cuit precedent holding that the one-year scholarship limit and the cap on scholarships are finan-
cial aid rules not entitled to a procompetitive presumption of reasonableness, the Court rejects
the NCAA's argument that Plaintiffs had to allege facts rebutting that presumption.  [*Id.* at 22-
23, 25-27.]  Even if the Seventh Circuit's discussion on that issue were dicta, as the NCAA has
argued, this Court is bound to follow informed, as opposed to casual, statements by that court as
a considered expression of the issues before it.  *See United States v. Bloom*, 149 F.3d 649, 652-
53 (7th Cir. 1998) ("The question had been briefed by the parties, so the statement was informed
rather than casual; it is a considered expression by the Court . . . .  It would ill serve the interests
of litigants and the judicial system as a whole to row against the tide of such statements.") (cita-
tions omitted).  The Court will address the NCAA's argument regarding the proper characteriza-
tion of the Division III prohibition on athletics-based scholarships separately, as that bylaw was
not at issue in *Agnew*.  [*Id.* at 23-25.]

twinkling of an eye.'" *Id.* at 347 n.8 (quoting *Nat. Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85 (1984)).

Finally, in an attempt to construe *Agnew* as broadly as possible, Plaintiffs ignore the fact that *Agnew* only presented claims by Division I college football players.   Context matters. "[F]ederal courts do not give advisory opinions on claims not before them."  *On-Site Screening, Inc. v. United States*, 687 F.3d 896, 900 (7th Cir. 2012) (citing *Rodas v. Seidlin*, 656 F.3d 610, 630 (7th Cir. 2011) ("Federal courts are not in that business.")).   The Seventh Circuit used the word "football" forty-seven times in its opinion and limited key pronouncements to the facts before it.  *See, e.g.*, *Agnew*, 683 F.3d at 338 ("It is undeniable that a market of some sort is at play *in this case*.") (emphasis added); *see also id.* at 343 ("A certain amount of collusion *in college football* is permitted because it is necessary for the product to exist.") (emphasis added); *id.* at 344 ("Nor is there an obvious effect on the ability of *college football* to survive without the By-laws in question.") (emphasis added).  Accordingly, *Agnew*'s holding that the "*proper identification* of a labor market for student-athletes" would meet plaintiffs' burden of describing a cognizable market under the Sherman Act must be read in the context of Division I college football. *Id.* at 346 (emphasis added), (also discussing the National Football League in same paragraph).

### III.
### DISCUSSION

The NCAA asks the Court to dismiss Plaintiffs' complaint for four reasons.  First, the NCAA challenges Plaintiffs' antitrust standing to bring these claims.  [Dkt. 22 at 27-30.]  Second, the NCAA argues that Plaintiffs' proposed relevant market for the "nationwide market for the labor of student athletes" is not legally cognizable.  [*Id.* at 9.]  Third, the NCAA argues that Plaintiffs failed to allege anticompetitive effects on the market.  [*Id.* at 19-22.]  Fourth, the NCAA argues that the bylaw prohibiting Division III member institutions from awarding athlet-

ics-based financial aid is entitled to a procompetitive presumption of reasonableness.  [*Id.* at 23-25.]

## A.  Antitrust Standing

The NCAA contends that each of the named Plaintiffs has "failed to clear the first hurdle of antitrust standing:  they have failed to allege facts demonstrating a causal connection between the alleged antitrust violation and their alleged injury."  [Dkt. 22 at 28.]  Plaintiffs dispute the NCAA's contention.  [Dkt. 33 at 32-35.]

15 U.S.C. § 15(a) provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . ."  But "not all persons who have suffered an injury flowing from [an] antitrust violation have standing to sue."  *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006).  Instead, "only those parties who can most efficiently vindicate the purposes of the antitrust laws have antitrust standing to maintain a private action."  *Id.*  Specifically, a plaintiff "does not have standing to sue . . . if [his] injuries were indirect and speculative."  *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 394 (7th Cir. 1993).

### 1)  Mr. Rock

With regard to Mr. Rock, the NCAA argues that based on his allegations, he was injured by his school's decision to hire a new head football coach who chose not to renew his scholarship, not by the Division I bylaws that he challenges.  [Dkt. 22 at 29.]  As the Plaintiffs point out, however, the core of Mr. Rock's claim is that without the NCAA Division I bylaws at issue, his school "would not have made any decision about whether to 'renew' aid for a fourth year because [Mr.] Rock would have received a multiyear scholarship covering the entire time of attendance."  [Dkt. 33 at 32.]  Specifically, Mr. Rock alleges that his original football coach prom-

ised him a four-year scholarship as long as he did well academically and remained eligible. [Dkt. 20 at 24 ¶ 71.]  The Court concludes that Mr. Rock's allegations are sufficient to establish standing at this stage of the proceedings because he alleges that without the applicable bylaws, he would have had a four-year scholarship at the outset of his college career and would not have incurred expenses such as tuition.

### 2)  Mr. Steward

Turning to Mr. Steward, the NCAA argues that he was not harmed by the Division III prohibition on athletics-based financial aid because he admits that he received such aid for at least one year in contravention of that rule.  [Dkt. 22 at 29-30.]  As the NCAA points out, Mr. Steward does not allege that the NCAA rules dictated that he give up his financial aid—instead, he was able to choose whether to keep competing or give up the aid.  [*Id.* at 30.]

While this is true, as Plaintiffs point out, without the Division III prohibition on athletics-based financial aid, Mr. Steward would not have had to give up his scholarship to keep playing basketball.  Specifically, Mr. Steward alleges that after sitting out one year to retain the scholarship, he "gave up the scholarship and was forced to take out thousands of dollars in private loans in order to pay the balance of his out-of-state tuition bills."  [Dkt. 20 at 28 ¶ 88.]  While Mr. Steward did not suffer the requisite antitrust injury the year he sat out and kept the scholarship, he does allege direct injury for the tuition he paid the following year when he gave up the scholarship as a result of the Division III prohibition so that he could play basketball.  This gives him standing to challenge the rule.

### 3)  Mr. Collins

Mr. Collins' standing is a much closer call.  The parties present the same arguments they did with regard to Mr. Steward, but there is a crucial difference.  Mr. Collins alleges that after he

was informed that his scholarship violated the Division III prohibition on athletics-based finan-

cial aid, he "begrudgingly left the team and eventually transferred to [another school] to resume

his hockey career."  [Dkt. 20 at 6 ¶ 15.]  But Mr. Collins does not contend that the transfer,

which he asserts was what "forced him to pay thousands of dollars in additional tuition and room

and board at his new school," [*id.*], was the direct result of the Division III rule he challenges.  In

other words, he makes no allegation that the challenged rule forced him to transfer schools to

incur the economic injury of which he now complains.  Because Mr. Collins' alleged antitrust

injury is too indirect and speculative, the Court concludes that he does not have standing to chal-

lenge the Division III prohibition on athletics-based financial aid.  Accordingly, the Court dis-

misses Mr. Collins' claims.

### B.  Market Allegations[4]

#### 1)  Proposed Relevant Market

The NCAA argues that Plaintiffs' proposed "nationwide market for the labor of student

athletes" is not properly defined or legally cognizable because it is simultaneously too narrow

and too broad.  According to the NCAA, Plaintiffs' proposed market is too narrow because it ig-

nores non-NCAA substitutes and Plaintiffs have alleged no facts to explain why those opportuni-

ties are not part of the alleged labor market for student-athletes.  [Dkt. 22 at 11-12.]  The NCAA

further argues that Plaintiffs' proposed market is too broad because it implausibly claims that all

NCAA student-athletes and all NCAA member institutions participate in the same market for

generic student-athlete labor.  [*Id.* at 15.]  For example, the NCAA points out that sports are usu-

ally separated by gender and student-athletes only compete against other student-athletes seeking

---

[4] The Court upholds the Division III bylaw prohibiting athletics-based financial aid as a matter of
law in the next section.  Accordingly, the Court will only analyze the market allegations as they
relate to the Division I rules at issue.

to participate in their desired sport.  [*Id.* at 16.]  In other words, a football student-athlete would not find a spot on the men's swim team or the women's lacrosse team an adequate substitute for a spot on the football team.  [*Id.*]

In response to the NCAA's argument, Plaintiffs contend that their proposed market is the "same market the Seventh Circuit already recognized" as plausible in *Agnew*.  [Dkt. 33 at 15.] Plaintiffs argue that their market definition is not impermissibly narrow because at the motion to dismiss stage, they only have to define the "rough contours" of the market.  [*Id.* at 17.]  Plaintiffs also argue that their market definition is not impermissibly broad because it is proper to focus on the interchangeability of the buyers (NCAA member institutions), not the commonality of inter-changeability of sellers (student-athletes).  [*Id.* at 19.]  In sum, Plaintiffs point to Paragraph 19 of their complaint to emphasize the unique attributes they claim NCAA member institutions pro-vide, for which there are no plausible substitutes:

> Because the NCAA and NCAA member institutions control college sports, any individual who wishes to provide athletic services in exchange for the payment of tuition for an undergraduate academic and athletic education must by necessity at-tend an NCAA member institution.  There are zero practical alternatives that can provide the unique combination of attributes offered by NCAA member institu-tions:  (i) the ability to exchange athletics services for attributes offered by NCAA member institutions, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches that will best be able to launch players to professional careers, and (v) national publicity through national cham-pionships and nationwide broadcasting contracts.

[Dkt. 20 at 7-8 ¶ 19.]

A successful claim under Section 1 of the Sherman Act requires proof of three elements: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury.  *Denny's Marina v. Renfro Prods.*, 8 F.3d 1217, 1220 (7th Cir. 1993).  "Most § 1 cases focus not on whether a relevant market exists, but

on the other aspect of the second required showing—whether a restraint of trade in a given market was actually unreasonable." *Agnew*, 683 F.3d at 335.

*Agnew* teaches that Plaintiffs' complaint must identify a "cognizable market" on which the NCAA's actions could have had anticompetitive effects. 683 F.3d at 337-38. "[I]t is incumbent on the plaintiff to describe the rough contours of the relevant commercial market in which anticompetitive effects may be felt . . . ." *Id.* at 345. A plaintiff may not evade the pleading requirements merely by asserting bare legal conclusions; instead, the facts must outline a violation of the Sherman Act—the plaintiff "'will get nowhere merely by dressing them up in the language of antitrust.'" *Banks v. National Collegiate Athletic Association*, 977 F.2d 1081, 1093 (7th Cir. 1992) (quoting *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). "In defining a market, one must consider substitution both by buyers and by sellers." *Blue Cross & Blue Shield Un. of Wisc. v. Marshfield Clinic*, 65 F.3d 1406, 1410 (7th Cir. 1995) (citing IIA Phillip E. Areeda, *et al.*, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 530a (1995)).

Partially quoting *Agnew* in both their complaint and response brief, Plaintiffs argue that this is a monopsony case—*i.e.*, a buyer's market. [Dkt. 33 at 6-7 (quoting 683 F.3d at 337 n.3)).] But what *Agnew* said was that this "*appears to be* a clear monopsony case, since the NCAA is the only purchaser of student athletic labor." 683 F.3d at 337 n.3 (emphasis added). Immediately before that statement the Seventh Circuit noted that Plaintiffs "adamantly [sought] to avoid the topic of market power[,]" which leads the Court to conclude that its monopsony reference was a casual statement not based on briefing by the parties. *C.f. Bloom*, 149 F.3d at 652-53. And again, *Agnew*'s context was that of Division I college football and no other sport.

Moreover, Plaintiffs' own market definition defies its monopsony argument because they propose a two-sided transaction in which student-athletes sell their labor by competing for spots on athletic teams of NCAA member institutions and NCAA member institutions compete to buy that labor by paying in-kind benefits (athletics-based scholarships, academic programs, access to training facilities, and instruction from premier coaches).[5]  [Dkt. 20 at 9 ¶ 27.]  While Plaintiffs argue that NCAA institutions are unique because allegedly there are no "plausible substitutes" for "the unique combinations of attributes" they offer—including the ability to get athletics-based scholarships and obtain high quality academic educational services—Plaintiffs' proposed market is impermissibly narrow because it ignores the existence of other associations that offer athletic scholarships and the opportunity to obtain a high-quality education.  For example, the National Association of Intercollegiate Athletics ("NAIA") proclaims that its members offer more than $450,000,000 in athletic scholarships to its student-athletes. NAIA Website, http://www.naia.org/ViewArticle.dbml?DB_OEM_ID=27900&ATCLID=205322931 (last visited February 28, 2013).  Marian University, located here in Indianapolis, is an NAIA school that fields a football team and offers the opportunity for high-quality education.  Plaintiffs fail to ex-

---

[5] Plaintiffs cite *Todd v. Exxon Corporation* to support their argument that the Court should only focus on the interchangeability of the buyers of labor (the NCAA institutions), not on the commonality and interchangeability of the sellers of labor (the student-athletes).  [Dkt. 33 at 7 (citing 275 F.3d 191, 199 (2d Cir. 2001)).]  The Court finds that focus too narrow, and has considered the interchangeability of both buyers and sellers, consistent with *Marshfield Clinic*.  65 F.3d at 1410.  Moreover, *Todd* emphasizes that to survive a motion to dismiss, an alleged product market "must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand"—and "it must be plausible."  275 F.3d at 200.  Plaintiffs' proposed market fails, even in light of *Todd*.

plain why NAIA schools such as Marian cannot be adequate substitutes in their proposed labor market, which includes all NCAA schools.[6]

As for substitution by the buyers, Plaintiffs' proposed market fails because NCAA schools are not necessarily adequate substitutes for each other.  For example, NCAA schools offering top-tier Division I football programs may be comparable substitutes, but it is implausible to suggests that lower-tier Division I football schools offer the same high level of in-kind benefits (premier coaching, facilities, and national publicity) that Plaintiffs allege are present at all NCAA schools across their market.  Even that hypothetical gives Plaintiffs' proposed market too much credit because it is limited to a specific division and sport, unlike that which Plaintiffs propose.  Likewise, it is implausible for Plaintiffs to suggest that a school without a football team is an adequate substitute for a school with a football team, from the perspective of a student-athlete who wants to play football.  In sum, Plaintiffs' decision to lump all NCAA schools into the same market regardless of material distinctions in division, sport offered by gender, or athletic success proves that their proposed market is not legally cognizable.

Turning to substitution by student-athletes selling their labor, Plaintiffs' market is impermissibly broad in that it includes all student-athletes in the same labor market without accounting for germane differences such as gender and sport played.  Plaintiffs' proposed market claims that student-athletes "compete for spots on athletic teams of NCAA member institutions[,]" [dkt. 20 at 9 ¶ 27], but this ignores the realities of the transaction.  For example, a male football player is not a substitute for a female gymnast, and they do not compete with each other for an athletics-based scholarship on the same team.  Even at the motion to dismiss stage, the

---

[6] The Court disagrees with the NCAA's assertion that professional sports are a plausible substitute for its member institutions because there has been no assertion that professional sports offer an opportunity for a participant to obtain education services, which is a key part of Plaintiffs' market allegations.

Court will not "don blinders" and "ignore commercial reality" when analyzing Plaintiffs' market allegations.  *Car Carriers*, 745 F.3d at 1110.

For these reasons, the Court agrees with the NCAA that Plaintiffs' "proposed nationwide market for the labor of student athletes" is not legally cognizable.  Plaintiffs read *Agnew* too broadly and ignore the key words that "[t]he *proper identification* of a labor market for student-athletes . . . would meet plaintiffs' burden of describing a cognizable market under the Sherman Act."[7]  683 F.3d at 346 (emphasis added).  In holding that a labor market of some sort was at play in *Agnew*, the Seventh Circuit intended for future plaintiffs to do more than just write the words "nationwide labor market for student athletes" on paper.  Plaintiffs make no effort to properly identify the labor market at issue, plead its rough contours, or account for the commercial reality of the transaction, and it is not the Court's duty to do so.  Accordingly, the Court **GRANTS** the NCAA's motion to dismiss.

Mr. Rock may move to amend his complaint pursuant to Federal Rule of Civil Procedure 15(a)(2) within **28 days** if he can show good cause for doing so.  Should he choose to move to amend, the Court **ORDERS** a review of Federal Rule of Civil Procedure 8(a), which requires a pleading to contain "a short and plain statement of the claim . . . ."  Mr. Rock's amended complaint should not make conclusory legal allegations or cite cases but, instead, should provide a short and plain statement detailing the necessary factual allegations supporting a plausible claim

---

[7] The Court rejects the NCAA's invitation not to follow *Agnew*'s "discussion of a hypothetical labor market [as] dicta."  [Dkt. 22 at 11 n.7]  Just as the Seventh Circuit "must follow decisions of the Supreme Court," this Court "must follow decisions of [the Seventh Circuit]."  *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004); *see also Bloom*, 149 F.3d at 652-53 (binding lower courts to follow considered expressions of superior courts).  While the Court ultimately concludes that Plaintiffs have not pled a cognizable labor market, *Agnew* suggests that, at least in the context of Division I college football, it is possible to do so.

for relief.  Failure to do so will result in the Court denying the motion to amend and closing this case.

### 2)  Proposed Geographic Market

The Court will briefly address the remaining arguments, in light of its decision that Plaintiffs' complaint must be dismissed for failing to plead a legally cognizable relevant market.

The NCAA argues that Plaintiffs have also failed to allege a cognizable geographic market.  [Dkt. 22 at 18.]  Plaintiffs allege that the market is national in scope, [dkt. 20 at 9 ¶27 ("the *nationwide* market for the labor of student athletes") (emphasis added)], but the NCAA points out that international students attend NCAA member institutions, including one of the named Plaintiffs in this case, [dkt. 22 at 18].

When the Rule of Reason applies, as the Seventh Circuit has held it does here, the plaintiff must show that the challenged restraint has an adverse impact on competition in the relevant market, which includes defining a geographic market.[8]  *Bi-Rite Oil Co. v. Indiana Farm Bureau Coop. Ass'n*, 908 F.2d 200, 203 (7th Cir. 1990).  Identifying a geographic market requires both "careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies."  *Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 738 (7th Cir. 2004).

It is academic to discuss Plaintiffs' proposed geographic market at this time because it relates to their proposed relevant market, which the Court has already concluded is implausible.

---

[8] Although the Court need not conduct the applicable analysis at this stage in the proceedings, for purposes of context, the Rule of Reason tests whether a restraint merely regulates and perhaps thereby promotes competition or whether it may instead suppress or even destroy competition. *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201, 2216 n. 10 (2010) (citation omitted).  To analyze that question the Court must typically consider "the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint is imposed; the nature of the restraint and its effect, actual or probable."  *Id.*

At the motion to dismiss stage, however, reasonable inferences will be made in favor of the Plaintiffs' allegations.  The NCAA does not dispute that its member institutions are only located in the United States, and yet there is evidence regarding the participation of international student-athletes in the market.  That said, should Plaintiffs show good cause to amend their complaint, they should take care to select a geographic market in which the seller operates and to which the purchaser can practicably turn for supplies in their proposed relevant market.

### 3)  Anticompetitive Effect Allegations

The NCAA argues that Plaintiffs have failed to allege any facts supporting their claim that the bylaws at issue have caused injury to competition as a whole.  [Dkt. 22 at 19-21.]  The NCAA contends that Plaintiffs' allegations are conclusory and fail to explain how eliminating either the one-year-term rule or the cap on the number of scholarships would lead to the creation of more scholarships.  [*Id.* at 21.]

Plaintiffs argue that they have alleged plausible anticompetitive effects on marketwide competition.  Specifically, they allege that the "total scholarships would rise because of the intense competitive pressures on schools to recruit student-athletes."  [Dkt. 33 at 27.]  Alternatively, Plaintiffs argue that even if the NCAA's rules merely redistribute the allocation of scholarships, that is an anticompetitive effect that antitrust laws were designed to address.  [*Id.* at 28.]

Plaintiffs do not cite to any allegations in their complaint contending that "total scholarships would rise because of the intense competitive pressures on schools to recruit student-athletes" if the bylaws at issue were eliminated.  [*Id.* at 27.]  Moreover, they have failed to plead facts demonstrating that this is true for all NCAA schools or sports.  As the NCAA points out, the paragraphs of Plaintiffs' complaint discussing the amount of money and time spent recruiting "highly skilled athletes" references three Division I men's basketball teams and one Division I

FBS football team.  [Dkt. 35 at 21.]  The named Plaintiffs did not participate in any of these, and there are no factual allegations supporting a reasonable inference that this level of competition occurs across divisions and in all sports.  Accordingly, the Court concludes that Plaintiffs have failed to adequately allege anticompetitive effects in their market as pled.

### C.  Division III Prohibition on Athletics-Based Scholarships

The NCAA argues that the Division III prohibition on athletics-based scholarships must be upheld as procompetitive as a matter of law, primarily based on the United States Supreme Court's decision in *Board of Regents*.  [Dkt. 22 at 22-25.]  Specifically, the NCAA contends that nothing in the Sherman Act requires schools to provide athletics-based financial aid, and that the Division III prohibition on athletics-based financial aid promotes amateurism.  [*Id.*]

Plaintiffs—through Division III athlete Mr. Steward—argue that in a competitive market, Division III schools would offer athletics-based scholarships.  [Dkt. 33 at 18.]  They argue that Division III institutions have "entered into an unlawful agreement" not to provide athletics-based scholarships because they "would rather have the athlete labor for free."  [*Id.* at 27.]  Plaintiffs allege "that, of course, is the anticompetitive effect:  in a competitive market, Division III schools would vastly increase the total amount of athletics-based financial aid."  [*Id.* (citing dkt. 20 at 23 ¶ 69) ("In a competitive market, Division III member institutions would have awarded millions in athletics-based scholarships to students at Division III institutions over the class period.").]

The Division III prohibition on athletics-based scholarships was not at issue in *Agnew*, and the Court agrees with the NCAA that the Supreme Court's decision in *Board of Regents* is instructive.  At issue in *Board of Regents* was whether the NCAA's control over the number of football games a university could televise violated Section 1 of the Sherman Act.  468 U.S. at 85.

The Supreme Court recognized that the horizontal restraint at issue typically would be presumed unreasonable and illegal *per se* without inquiry into the particular market context; however, "what is critical is that this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all." *Id.* at 101.  Therefore, the Supreme Court applied the Rule of Reason analysis "to form a judgment about the competitive significance of the restraint."[9]  *Id.* at 103.  A conclusion that a restraint is unreasonable may be based on either the nature or character of the contracts or the surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices.  *Id.*

In *Board of Regents*, the Supreme Court ultimately concluded that, despite the NCAA's proffered justifications, the NCAA had engaged in unjustified anticompetitive conduct by restraining the number of football games universities could televise.  The Supreme Court emphasized, however, that its holding was not a prohibition on the majority of the NCAA's regulations because the NCAA must implement rules to preserve the character and quality of its product:

> What the NCAA and its member institutions market in this case is competition itself -- contests between competing institutions.  Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed.  A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is encouraged or proscribed, all must be agreed upon, and all restrain the manner in which institutions compete. . . .  In order to preserve the character and quality of the "product," athletes must not be paid, must be required to attend class, and the like.  And the integrity of the "product" cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed.  Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable.  In performing this role, its actions widen consumer choice -- not only the choices available to sports fans but also those available to athletes -- and hence can be viewed as procompetitive.

---

[9] In *American Needle*, the Supreme Court reaffirmed the application of the Rule of Reason to restraints on competition that are essential if the product is to be available at all. 130 S. Ct. 2216 (citing *Board of Regents*, 468 U.S. at 101).

*Id.* at 101-102.

As a general matter, the Court doubts that the Division III prohibition on athletics-based financial aid results in the necessary commercial transaction for the Sherman Act to apply. The Sherman Act "was intended for, and thus only applies to, commercial transactions." *Agnew*, 683 F.3d at 338 (citing *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 492-93 (1940)). In *Agnew*— where Division III athletics were not at issue—the Seventh Circuit relied on the "exchange of free or reduced-rate education for athletic participation" as support for the commercial nature of the transaction. 683 F.3d at 338, 340 ("full scholarships in exchange for athletic services . . . are not non-commercial"). But that exchange does not occur in the Division III context because Division III student-athletes participate knowing that they will not receive free or reduced-rate education in return for their services because of the bylaw at issue. Without the necessary commercial exchange, the Sherman Act does not apply as a matter of law.

Even if participation in Division III sports could be deemed commercial,[10] the Court concludes that the Division III prohibition on athletics-based aid is procompetitive as a matter of law. Plaintiffs admit that schools participating in Division III sports have the ability to join Division I, II, or a non-NCAA conference if they want to provide athletics-based aid to their student-athletes. [Dkt. 33 at 27.] Thus, the bylaw at issue does not prohibit these schools from ever offering athletics-based aid; it only prohibits them from doing so if they participate in Division III athletics. Plaintiffs do not explain how eliminating that bylaw would force Division III schools to actually award such aid, as opposed to leaving the NCAA altogether. Likewise, Plaintiffs ignore that the bylaw provides an opportunity for Division III schools and student-athletes to com-

---

[10] For example, Plaintiffs allege that some Division III student-athletes, such as Mr. Steward and Mr. Collins, initially receive athletics-based financial aid and are later informed that they are in violation of the bylaw at issue.

pete in NCAA-sanctioned sports without the restrictions that accompany athletics-based financial aid. Because the bylaw at issue actually widens consumer choice in the marketplace, it can be viewed as procompetitive as a matter of law. *See Board of Regents*, 468 U.S. at 102 ("Thus, the NCAA plays a vital role in enabling college football to preserve its character . . . . In performing this role, its actions widen consumer choice -- not only the choices available to sports fans but also those available to athletes -- and hence can be viewed as procompetitive.").

As the Seventh Circuit recognized in *Agnew*, the Court is permitted to "find certain NCAA bylaws that 'fit into the same mold' as those discussed in *Board of Regents* to be pro-competitive 'in the twinkling of an eye'—that is, at the motion-to-dismiss stage." 683 F.3d at 341 (quoting 468 U.S. at 110 n.39) (other citations omitted). The Court finds the Division III prohibition on athletics-based aid to fit that mold. Not only does it widen consumer choice, it distills amateurism to an even purer form because the student-athletes do not receive free or reduced tuition in exchange for their participation. Accordingly, the bylaw is "clearly meant to help maintain the revered tradition of amateurism in college sports" and "will be presumed pro-competitive, since [the Court] must give the NCAA 'ample latitude to play that role.'" *Agnew*, 683 F.3d at 342-43 (quoting *Board of Regents*, 468 U.S. at 120). For these reasons, the Court concludes that the Division III prohibition on athletics-based financial aid is presumptively pro-competitive as a matter of law and grants the NCAA's motion to dismiss that claim with prejudice.[11]

---

[11] Even if Mr. Collins did have antitrust standing to challenge the Division III prohibition on athletics-based financial aid, his claim would fail for the same reasons as Mr. Steward's challenge.

# IV.
## CONCLUSION

Mr. Collins is dismissed from this action for failing to allege direct antitrust injury.  Although the Court concludes that Mr. Rock and Mr. Steward have standing to pursue their claims, the Court **GRANTS** the NCAA's motion to dismiss.  [Dkt. 21.]  Plaintiffs' allegations regarding the Division III prohibition on athletics-based financial aid are **DISMISSED WITH PREJUDICE**.  Plaintiffs' remaining allegations are **DISMISSED WITHOUT PREJUDICE**.  No partial final judgment shall issue at this time.

Whereas the *Agnew* plaintiffs opted for a "nothing" approach by refusing to plead a relevant market, the strategy here appears to be taking the "all" approach by including all NCAA institutions and sports.  As plaintiffs' counsel stated to this Court in *Agnew*, "[p]leading [a] market in antitrust cases is a complicated and often time-consuming matter."  [*Agnew v. NCAA*, Cause No. 1:11-cv-293-JMS-MJD, dkt. 116 at 39.]  If counsel wants this claim to proceed, the moment has come to spend the time and undertake the potentially complicated task of the "proper identification" of a relevant market.  *Agnew,* 683 F.3d at 346.

Mr. Rock may move to amend his complaint pursuant to Federal Rule of Civil Procedure 15(a)(2) within **28 days** if he can show good cause for doing so.  Should he choose to move to amend, the Court **ORDERS** a review of Federal Rule of Civil Procedure 8(a), which requires a pleading to contain "a short and plain statement of the claim . . . ."  Mr. Rock's amended complaint should not make conclusory legal allegations or cite cases but, instead, should provide a short and plain statement detailing the necessary factual allegations supporting a plausible claim for relief.  Failure to do so will result in the Court denying the motion to amend and closing this case.

03/01/2013

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only**:

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
steve@hbsslaw.com

Gregory L. Curtner
SCHIFF HARDIN, LLP - Michigan
gcurtner@schiffhardin.com

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO, LLP
beth@hbsslaw.com

Kimberly K. Kefalas
SCHIFF HARDIN, LLP - Michigan
kkefalas@schiffhardin.com

Kathy Lynn Osborn
FAEGRE BAKER DANIELS LLP - Indianapolis
kathy.osborn@faegrebd.com

Stuart McKinley Paynter
The Paynter Law Firm PLLC
stuart@smplegal.com

William N. Riley
PRICE WAICUKAUSKI & RILEY
wriley@price-law.com

Jessica A. Sprovstoff
SCHIFF HARDIN, LLP - Michigan
jsprovtsoff@schiffhardin.com

Suzanne L. Wahl
SCHIFF HARDIN, LLP - Michigan
swahl@schiffhardin.com

Robert James Wierenga
SCHIFF HARDIN, LLP - Michigan
rwierenga@schiffhardin.com

Joseph N. Williams
PRICE WAICUKAUSKI & RILEY
jwilliams@price-law.com