UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JOHN ROCK,                                  )
          *Plaintiff*,                       )
                                            )
     *vs.*                                   )          1:12-cv-1019-JMS-DKL
                                            )
NATIONAL COLLEGIATE ATHLETIC ASSOCIA-       )
TION,                                       )
          *Defendant*.                       )

## ORDER DENYING MOTION TO DISMISS

As Schoolhouse Rock teaches, three is a magic number.  Bob Dorough, "Three Is a Mag-

ic Number," *Schoolhouse Rock*, ep. 1 (1973); *see also* Blind Melon, "Three is a Magic Number"

(Atlantic Records 1996).  Presently pending before the Court is Defendant National Collegiate

Athletic Association's ("NCAA") Motion to Dismiss, [dkt. 47], arguing that Plaintiff John

Rock's Second Amended Complaint, [dkt. 46], is insufficient as a matter of law.  This is the third

time that this Court has ruled on the sufficiency of a plaintiff's complaint challenging two

NCAA bylaws at issue—the prohibition on multi-year scholarships and the cap on the number of

allowable scholarships.  This is the first time, however, that the Court concludes that the com-

plaint at issue pleads the rough contours of a relevant market that is plausible on its face and in

which anticompetitive effects of the challenged regulations could be felt.  This ruling should not

be read too broadly.  The burdens at the subsequent stages of litigation are significantly higher

than they are in opposing a motion to dismiss, and Mr. Rock may struggle to identify admissible

evidence to support some of the allegations that the Court was required to accept as true for pur-

poses of ruling on the NCAA's motion.  Nevertheless, because Mr. Rock has alleged sufficient

factual allegations to support an antitrust claim that is plausible on its face, the Court denies the

NCAA's motion to dismiss.

# I.
## STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  For the purposes of that rule, the Court will ignore conclusory legal allegations.  *Iqbal*, 556 U.S. at 678 ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.").  The Court will, however, give the complaint the benefit of reasonable inferences from all non-conclusory allegations.  *See id.*

# II.
## BACKGROUND

Mr. Rock's Second Amended Complaint is styled as a class action and asserts certain "class allegations" in addition to the allegations specific to him, [dkt. 46 at 21-24], but he has not filed a motion to certify a class.  Because Mr. Rock is the only party with "legally protected interests in the litigation[,]" *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 333 n.2 (7th Cir. 2012), the Court will focus on the allegations specific to him.

### A.  Reasonable Inferences from Non-Conclusory Allegations

The Court draws the following reasonable inferences from the non-conclusory allegations in Mr. Rock's Second Amended Complaint.

The NCAA includes 1,102 active member schools.  [Dkt. 46 at 5 ¶ 10.]  These schools are organized into three divisions, aptly named Divisions I, II, and III.  [*Id.*]  Division I football is further divided into two subdivisions—the Football Bowl Subdivision ("FBS"), which was

formerly known as Division 1-A, and the Football Championship Subdivision ("FCS"), which was formerly known as Division 1-AA.  [*Id.* at 7 ¶ 17.]

Mr. Rock challenges two NCAA bylaws in his Second Amended Complaint.  First, he challenges the bylaw that prohibited[1] awarding athletics-based financial aid in excess of one academic year.  [*Id.* at 13 ¶ 54 (quoting Bylaw 15.3.3.1 ("One-Year Period:  If a student's athletics ability is considered in any degree in awarding financial aid, such aid shall neither be awarded for a period in excess of one academic year nor for a period less than one academic year.")).]  Second, Mr. Rock challenges the NCAA bylaws that cap the total amount of athletics-based scholarships that member institutions can grant to student-athletes in football.  [*Id.* at 16 ¶¶ 61-62.]  The NCAA rules currently permit FBS teams to award 85 full scholarships and permit FCS teams to award 63 full scholarships.  [*Id.* at ¶ 18.]  Division II football programs can award 36 full scholarships, and Division III programs are prohibited from awarding athletics based financial aid.  [*Id.* at ¶¶ 22, 24.]  A typical NCAA football team has 100 players.  [*Id.* at ¶ 22.]

Mr. Rock is a United States citizen domiciled in Ohio.  [Dkt. 46 at 4 ¶ 7.]  Mr. Rock played football in high school, switching between the positions of running back, wide receiver, and quarterback.  [*Id.* at 17 ¶ 68.]  He was recruited by several colleges to play football, including both FBS and FCS schools.  [*Id.* at 17-18 ¶ 69.]  However, only four FCS schools, including Gardner-Webb University ("Gardner-Webb") in North Carolina, extended official football scholarship offers to Mr. Rock for 2008.  [*Id.* at ¶¶ 69, 72.]  Mr. Rock also received partial scholarship

---

[1] This bylaw has been rescinded.  [Dkt. 46 at 13 ¶ 54.]  Because Mr. Rock seeks damages for actions taken before the bylaw was rescinded, its repeal does not render this case nonjusticiable.  *See Agnew*, 683 F.3d at 332 ("Since plaintiffs seek damages for prior actions taken by the NCAA and its member schools, the repeal of the multi-year scholarship prohibition does not render this case nonjusticiable.").

offers from Division II and National Association of Intercollegiate Athletics ("NAIA") schools but did not seriously consider them.  [*Id.* at 10 ¶ 40.]

The Gardner-Webb head football coach, Steve Patton, "pledged to Mr. Rock that his scholarship would be renewed annually so long as he did well academically and remained eligible for NCAA competition."  [*Id.* at 17-18 ¶ 69.]  Additionally, Mr. Patton "verbally promised that his scholarship would still be honored in the event the current coaching staff departed for any reason."  [*Id.* at 18 ¶ 69.]  Ultimately, in 2008, Mr. Rock committed to attend Gardner-Webb and play football.  [*Id.* at ¶ 71.]

By Mr. Rock's junior year at Gardner-Webb, he was a team captain and the starting quarterback.  [*Id.* at 19 ¶ 74.]  On January 26, 2011, Gardner-Webb named a new head football coach.  [*Id.* at 20 at ¶ 78.]  Mr. Rock was informed in writing in July 2011 that he would no longer receive his athletic scholarship.  [*Id.* at ¶ 80.]  Mr. Rock paid tuition and room and board out-of-pocket to graduate from Gardner-Webb in May 2012 with a degree in political science.  [*Id.*]

Mr. Rock alleges that in a competitive market not subject to the NCAA's prohibition on multi-year scholarships and the cap on the total number of scholarships per team, he would have received additional or enhanced scholarship offers, including a multi-year scholarship.  [*Id.* at 21 ¶¶ 81-83.]  Mr. Rock alleges that the challenged bylaws have no effect on amateurism and cannot be justified by competitive balance concerns.  [*Id.* at 13 ¶ 55, 16 ¶¶ 63, 64.]

### B.  Procedural History

Mr. Rock filed his initial complaint against the NCAA on July 25, 2012.[2]  [Dkt. 1.]  He

filed a substantially similar Amended Complaint before the NCAA answered, [dkt. 20], and the

NCAA moved to dismiss the Amended Complaint in response, [dkt. 21].  In that complaint, Mr.

Rock alleged a relevant market consisting of "the nationwide market for the labor of student ath-

letes," [dkt. 20 at 9 ¶ 27], regardless of NCAA division or sport.  The Court granted the NCAA's

motion to dismiss, in relevant part, after concluding that Mr. Rock had failed to allege a legally

cognizable relevant market.  [Dkt. 38 at 11-16.]  The Court dismissed Mr. Rock's claims without

prejudice, but cautioned him that if he wanted this case to proceed, he must move to amend his

complaint and "spend the time and undertake the potentially complicated task of the proper iden-

tification of a relevant market."  [*Id.* at 23.]

Mr. Rock subsequently moved to amend his complaint, [dkt. 39], which the NCAA op-

posed, [dkt. 42].  The Court granted Mr. Rock's motion and docketed the Second Amended

Complaint as the operative complaint in this matter.  [Dkts. 45; 46.]

In his Second Amended Complaint, Mr. Rock alleges that the NCAA and its member in-

stitutions have violated Section 1 of the Sherman Act by agreeing to restrict the number of schol-

arships on a team and prohibiting multi-year scholarships.  [*Id.* at 25-26 (citing 15 U.S.C. § 1).]

He proposes the following relevant market in support of his allegations:

> The relevant market is the nationwide market for the labor of Division I football
> student athletes.  In this labor market, student athletes compete for spots on Divi-
> sion I football athletic teams of NCAA member institutions, and NCAA member

---

[2] Mr. Rock's initial complaint was joined by two former Division III student-athletes who chal-
lenged the NCAA's rule prohibiting athletics-based financial aid in Division III athletics.  The
Court ultimately concluded that one of those plaintiffs failed to allege direct antitrust injury, [dkt.
38 at 10-11], and that although the other had standing to challenge the rule, the prohibition on
athletics-based financial aid in Division III athletics was presumptively procompetitive as a mat-
ter of law, [*id.* at 22].

institutions compete for the best Division I football collegiate student athletes by paying in-kind benefits, namely, Division I football scholarships, academic programs, access to training facilities, and instruction from premier coaches.

NCAA Division I football is further divided into two subdivisions, D1-A, now known as FBS (Football Championship Series), and D1-AA, now known as FCS (Football Championship Subdivision).  These subdivisions constitute distinct submarkets within the broader labor market for Division I football student athletes.

[Dkt. 46 at 6 at ¶¶ 16-17 (paragraph numbers removed).]  Mr. Rock contends that the NCAA bylaws he challenges "reduce the overall supply of football scholarships available to student-athletes thereby forcing them to accept far less compensation than they would have received for their labor."  [*Id.* at 21 ¶ 82.]

The NCAA has again moved to dismiss Mr. Rock's claims.  [Dkt. 47.]  In its order granting the NCAA's previous motion to dismiss Mr. Rock's claims, the Court noted that Mr. Rock challenges the two NCAA bylaws that were at issue in *Agnew v. National Collegiate Athletic Association*, 2011 U.S. Dist. LEXIS 98744 (S.D. Ind. 2011), *affirmed by Agnew v. National Collegiate Athletic Association*, 683 F.3d 328 (7th Cir. 2012).  Accordingly, the Court summarized what it believes to be the "key teachings" of the Seventh Circuit Court of Appeals' decision in *Agnew*.  [Dkt. 38 at 5-8.]  The Court will continue to apply *Agnew* in the manner previously interpreted.

### III.
#### DISCUSSION

The NCAA asks the Court to dismiss Mr. Rock's complaint for four reasons, which the Court reorders as follows.  First, it argues that Mr. Rock lacks antitrust standing to challenge the NCAA bylaws at issue.  Second, it contends that Mr. Rock fails to allege commercial activity subject to the Sherman Act.  Third, it alleges that Mr. Rock's proposed relevant market fails as a

matter of law.  Fourth, it argues that Mr. Rock fails to allege an anticompetitive effect on the proposed market.

Mr. Rock opposes all of the NCAA's arguments in his response and asks the Court to disregard certain data that the NCAA relied on to support its arguments.  [Dkt. 50 at 28-31.]  After the NCAA filed its reply brief, Mr. Rock filed a separate motion, asking the Court to exclude portions of that brief or to covert the NCAA's motion into a motion for summary judgment and allow discovery.  [Dkt. 54.]  The NCAA opposes Mr. Rock's motion to exclude.  [Dkt. 56.]

**A.  Motion to Exclude**

The issues raised in Mr. Rock's motion to exclude must be resolved before the Court can turn to the merits of the NCAA's motion to dismiss.  Mr. Rock filed that motion pursuant to Federal Rule of Civil Procedure 12(d), arguing that the NCAA had presented matters outside the pleadings that should be excluded or, alternatively, requesting that the NCAA's motion be converted to a summary judgment motion.  [Dkt. 54.]  Mr. Rock challenges three categories of information relied on by the NCAA:  1) a study that the NCAA attached to its motion to dismiss regarding the probability of student-athletes competing professionally in sports after college; 2) an additional NCAA bylaw not challenged by Mr. Rock's antitrust claims but cited by the NCAA in its briefs; and 3) Internet data from the recruiting website www.rivals.com and select football rosters that the NCAA cites in its briefs.

In response to Mr. Rock's motion, the NCAA contends that it is appropriate to cite to materials that were discussed in Mr. Rock's Second Amended Complaint and that are central to his claims.  [Dkt. 56 at 6.]  Thus, the NCAA argues that because Mr. Rock challenges two of the NCAA Division I bylaws, the rest of the bylaws are also central to his antitrust claims.  [*Id.*]  The NCAA further emphasizes that Mr. Rock cited data from www.rivals.com in his complaint, thus

that data must also be central to his claim and appropriate to cite.  [*Id.* at 7.]  The NCAA also

contends that the Court can consider market realities in ruling on its motion to dismiss, so infor-

mation from various websites is relevant.  [*Id.* at 7-9.]  The NCAA urges the Court not to convert

its motion into a motion for summary judgment and, instead, simply exclude any citations it

deems improper.  [*Id.* at 9-10.]

      If "matters outside the pleadings are presented to and not excluded by the court," the mo-

tion to dismiss "must be treated as one for summary judgment under Rule 56" and all parties

"must be given a reasonable opportunity to present all the material that is pertinent to the mo-

tion."  Fed. R. Civ. Pro. 12(d).  It is well-settled, however, that the Court may consider "docu-

ments attached to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and

are central to his claim."  *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th

Cir. 2012).  If a document is not attached but is "incorporated into the complaint by reference" or

"matters of which a court may take judicial notice," the Court may also consider it when ruling

on a motion to dismiss.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)

(holding that in addition to the allegations in a complaint, the Court may examine "documents

incorporated into the complaint by reference, and matters of which a court may take judicial no-

tice" when evaluating a motion to dismiss).  For instance, if the plaintiff alleges breach of con-

tract without attaching the contract to the complaint, the defendant may properly introduce the

contract or portions thereof as an attachment to a motion to dismiss.  *See, e.g.*, *Chemtall GMBH

v. ZR Energy, Inc.*, 320 F.3d 714, 718 n.4 (7th Cir. 2003).

      It is not acceptable for a defendant to submit documents in support of his motion to dis-

miss that "would require discovery to authenticate or disambiguate."  *Tierney v. Vahle*, 304 F.3d

734, 739 (7th Cir. 2002).  For example, website printouts that are not central to the plaintiff's

claim "are not the type of documents that may properly be considered."  *See, e.g.*, *Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 773 (N.D. Ill. 2011) ("While the nature of Facebook's website and business is likely to play a role in this case, Teachbook has not demonstrated that this particular portion of Facebook's website [that it attaches to its motion to dismiss] is central to Facebook's claim.  Indeed, allowing Teachbook to cherry pick portions of Facebook's website to introduce via a motion to dismiss simply because the complaint implicates the two websites would convert an examination of the complaint into full-blown summary judgment analysis.  This result would vitiate an otherwise narrow exception to the general rule that a motion under Rule 12(b)(6) stands or falls based on the allegations in the complaint.").

First, the Court will not consider the study attached to the NCAA's motion to dismiss regarding the probability of student-athletes competing professionally in sports after college.  [Dkt. 48-1 at 8-10.]  Mr. Rock challenges the impartiality of that study because the NCAA financially supported it.  [Dkt. 50 at 28-29.]  The NCAA does not respond to that argument or defend its citations to the study.  [Dkts. 53; 56.]  The study is not within the category of extraneous information that can properly be considered on a motion to dismiss, so the Court will not consider it in ruling on the NCAA's motion.  [Dkt. 48-1 at 8-10.]

Second, Mr. Rock challenges the NCAA's citation to Bylaw 18.7.2.1.1, which he does not challenge in this litigation and which provides that "[e]ach year, a Football Bowl Subdivision institution may count one victory against a Football Championship Subdivision opponent toward meeting the definition of a 'deserving team,'" for purposes of postseason bowl games.  [Dkt. 53 at 11 n.5.]  Mr. Rock does not challenge the accuracy of the cited rule, but he argues that the NCAA "then offers a conclusion blatantly leaping beyond that extrinsic material" when it asserts that because of that rule, FBS football teams "therefore rarely play more than one FCS team per

- 9 -

season." [Dkt. 54 at 4 (citing dkt. 53 at 11 n.5)).] The Court disagrees with Mr. Rock's implica-

tion that the NCAA should not have cited the rule at all, since the interaction between the FBS

and FCS subdivisions is central to Mr. Rock's claim. The Court agrees with Mr. Rock, however,

that it was improper for the NCAA to then make the unsupported leap that because of that rule,

most FBS teams only play one FCS team per season. Accordingly, while the Court will consider

the cited rule for purposes of supporting a relationship between FBS and FCS football, it will not

consider the NCAA's unsupported conclusion for purposes of the motion to dismiss. [Dkt. 53 at

11 n.5.]

Third, the Court agrees with Mr. Rock that the NCAA's reliance on Internet data from

www.rivals.com and select football rosters is not appropriate to consider on its motion to dis-

miss. While the NCAA points out that Mr. Rock cites data from www.rivals.com in his Second

Amended Complaint, the factual allegations in Mr. Rock's complaint must be taken as true for

purposes of ruling on the NCAA's motion to dismiss. *Iqbal*, 556 U.S. at 678 (holding that "for

the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as

true"). Mr. Rock cites www.rivals.com in his Second Amended Complaint for one principle—

that almost all of the athletes who received a Division I scholarship offer accepted that offer and

that a majority of the rest opted out of playing college football rather than accept a scholarship at

a Division II or an NAIA school. [Dkt. 46 at 9 ¶ 37, 10 ¶ 39.] While the Court must accept that

factual allegation as true for purposes of ruling on the sufficiency of Mr. Rock's operative com-

plaint, the Internet statistics the NCAA cites in its briefs are not entitled to that same presump-

tion. Likewise, the additional Internet statistics on which Mr. Rock relies in his response brief

are not entitled to that presumption. Therefore, while the Court accepts as true the sole factual

assertion Mr. Rock makes in his operative complaint based on the www.rivals.com data, it will

not consider the additional Internet data presented by either of the parties in their briefs.  That data, if authenticated, may be more appropriate on summary judgment.

For these reasons, the Court grants in part Mr. Rock's motion to exclude, [dkt. 54], and will not rely on or further discuss the excluded material detailed in this section.

### B.  Antitrust Standing

The NCAA challenges Mr. Rock's antitrust standing to bring this action.  [Dkt. 48 at 27-29.]  Specifically, the NCAA argues that Mr. Rock's claims should be dismissed because he "purports to challenge rules that only applied to student-athletes playing football for FBS institutions," but he did not play FBS football and, thus, was not bound by those rules.  [*Id.* at 27, 29.] The NCAA further alleges that Mr. Rock "cannot clear the first hurdle of antitrust standing:  the [Second Amended Complaint] alleges no facts to demonstrate the necessary causal connection between the alleged antitrust violations and his alleged injury."  [*Id.* at 28.]

In response, Mr. Rock points out that he is challenging the same NCAA bylaws that the Court already found he had standing to challenge in ruling on the NCAA's previous motion to dismiss.  [Dkt. 50 at 27-28.]  He further argues that he has standing to challenge the FBS rules, even though they did not apply to him as an FCS student-athlete, because he alleges that FBS and FCS football are submarkets of the larger Division I football market.  [*Id.* at 28.]

15 U.S.C. § 15(a) provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . ."  But "not all persons who have suffered an injury flowing from [an] antitrust violation have standing to sue." *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006).  Instead, "only those parties who can most efficiently vindicate the purposes of the antitrust laws have antitrust standing to maintain a private action." *Id.*

As the Court recognized in rejecting the NCAA's antitrust standing argument in its first motion to dismiss Mr. Rock's claims, the core of Mr. Rock's claim is that without the NCAA bylaws he challenges, he would have received a multi-year scholarship and would not have incurred subsequent expenses when his university did not renew his scholarship. [Dkt. 38 at 9-10.] Mr. Rock alleges that the coach who recruited him at Gardner-Webb promised Mr. Rock that as long as he remained eligible for athletic competition, his athletics-based scholarship would be renewed each year even if the coaching staff left. [Dkt. 46 at 17-18 ¶ 69.] He further alleges that because the NCAA prohibited Gardner-Webb from making a multi-year scholarship offer, his scholarship was later not renewed and he had to pay "thousands of dollars in tuition and room and board out of pocket" to graduate in May 2012 with a degree in political science. [*Id.* at 20 ¶ 80.] The Court concludes that Mr. Rock's allegations are sufficient to establish standing at this stage of the proceedings because he alleges that without the applicable bylaws, he would not have incurred the identified economic expenses.

As for the NCAA's argument that Mr. Rock does not have standing to challenge bylaws governing the FBS because the school for which he played football was an FCS member, the NCAA ignores that Mr. Rock's proposed complaint alleges that FBS and FCS are subdivisions of the relevant market he pleads and that the bylaws at issue affected the supply of scholarships in both divisions.[3] [*See, e.g.*, dkt. 46 at 7 ¶ 17, 10 ¶ 41.] Mr. Rock alleges that without the bylaws he challenges, he would have received more scholarship offers, including from FBS teams. [*Id.* at 10 ¶ 41.] While Mr. Rock may have a difficult time proving that allegation, the Second Amended Complaint identifies FBS schools that expressed an interest in recruiting Mr. Rock, [*id.* at 17 ¶ 69], and the Court will accept his allegation as true at this time. Accordingly, the

---

[3] The Court ultimately finds Mr. Rock's proposed relevant market plausible at this stage of the litigation. *See infra*, Part III.D.

Court concludes that Mr. Rock has alleged sufficient facts showing that he has antitrust standing to challenge the bylaws at issue.

### C.  Commercial Activity

The NCAA argues that Mr. Rock fails to allege commercial activity subject to the Sherman Act in his Second Amended Complaint.  [Dkt. 48 at 9-11.]  Specifically, the NCAA contends that the operative complaint is "bereft of allegations that all Division I financial aid awards—or even the financial aid 'transactions' between Rock and Gardner-Webb University— are the stuff of antitrust inquiry."  [*Id.* at 10.]

In response, Mr. Rock argues that the Second Amended Complaint sufficiently alleges commercial activity subject to the Sherman Act.  [Dkt. 50 at 8.]  He cites language from the Seventh Circuit's opinion in *Agnew* as well as allegations in his complaint alleging the commercial nature of the exchange at issue.  [*Id.* at 8-9 (citing dkt. 46 at ¶¶ 1, 6, 43, 57, 59, 60).]

The Sherman Act "was intended for, and thus only applies to, commercial transactions." *Agnew*, 683 F.3d at 338 (citing *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 492-93 (1940)).  *Agnew* held that "[i]t is undeniable that a market of some sort is at play in this case.  A transaction clearly occurs between a student-athlete and a university: the student-athlete uses his athletic abilities on behalf of the university in exchange for an athletic and academic education, room, and board."  683 F.3d at 338.  In analyzing whether that exchange is commercial in nature, the Seventh Circuit concluded that "[n]o knowledgeable observer could earnestly assert that big-time college football programs competing for highly sought-after high school football players do not anticipate economic gain from a successful recruiting program.  Despite the nonprofit status of NCAA member schools, the transactions those schools make with premier athletes—full scholar-

ships in exchange for athletic services—are not noncommercial, since schools can make millions of dollars as a result of these transactions." *Id.* at 340.

The NCAA argues that *Agnew* limited the commercial nature of the transaction to "big-time college football programs" and "premier athletes," which it contends do not include FCS schools like where Mr. Rock played football. [Dkt. 48 at 10-11.] The Court does not read *Agnew* so narrowly. While the Seventh Circuit provided an example of the extreme commercial nature of the exchange that occurs between "premier athletes" and schools that "can make millions of dollars as a result of these transactions," *Agnew*, 683 F.3d at 340, the NCAA ignores that one of the named plaintiffs in *Agnew* played football at an FCS school in exchange for an athletics-based scholarship, and the Seventh Circuit did not find that transaction to be noncommercial.

In this case, Mr. Rock alleges that he received an athletics-based scholarship to Gardner-Webb in exchange for the opportunity to earn a college scholarship and play football. [Dkt. 46 at 17-18 ¶ 69.] The Court concludes that pursuant to *Agnew*, this is sufficient to allege a commercial transaction subject to the Sherman Act.

### D.  Proposed Relevant Market

The NCAA argues that Mr. Rock's Second Amended Complaint should be dismissed because he failed to allege facts to support his proposed relevant market. [Dkt. 48 at 11-24.] The NCAA's argument contains three parts:  1) that all Division I NCAA football schools are not part of the same relevant market; 2) that Mr. Rock's proposed market ignores substitute opportunities outside of Division I football; and 3) that Mr. Rock has failed to allege a geographic market.

#### i.    *Applicable Case Law*

A successful claim under Section 1 of the Sherman Act requires proof of three elements: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the

relevant market; and (3) an accompanying injury.  *Denny's Marina v. Renfro Prods.*, 8 F.3d 1217, 1220 (7th Cir. 1993).  "Most § 1 cases focus not on whether a relevant market exists, but on the other aspect of the second required showing—whether a restraint of trade in a given market was actually unreasonable."  *Agnew*, 683 F.3d at 335.

*Agnew* teaches that Mr. Rock's complaint must identify a "cognizable market" on which the NCAA's actions could have had anticompetitive effects.  683 F.3d at 337-38.  "[I]t is incumbent on the plaintiff to describe the rough contours of the relevant commercial market in which anticompetitive effects may be felt . . . ."  *Id.* at 345.  A plaintiff may not evade the pleading requirements merely by asserting bare legal conclusions; instead, the facts must outline a violation of the Sherman Act—the plaintiff "'will get nowhere merely by dressing them up in the language of antitrust.'"  *Banks v. National Collegiate Athletic Association*, 977 F.2d 1081, 1093 (7th Cir. 1992) (quoting *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  "In defining a market, one must consider substitution both by buyers and by sellers."  *Blue Cross & Blue Shield Un. of Wisc. v. Marshfield Clinic*, 65 F.3d 1406, 1410 (7th Cir. 1995) (opinion after trial) (citing IIA Phillip E. Areeda, *et al.*, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 530a (1995)).

In *Agnew*, in the context of Division I football, the Seventh Circuit found it "undeniable that a market of some sort is at play in this case.  A transaction clearly occurs between a student-athlete and a university:  the student-athlete uses his athletic abilities on behalf of the university in exchange for an athletic and academic education, room, and board."  683 F.3d at 338.  Therefore, although "nothing resembling a discussion of a relevant market for student-athlete labor" could be found in the complaint at issue in *Agnew*, the Seventh Circuit held that "[t]he *proper*

*identification* of a labor market for student-athletes . . . would meet plaintiffs' burden of describing a cognizable market under the Sherman Act." *Id.* at 346 (emphasis added).

### ii.   Market Including All Division I Football Schools

The NCAA challenges Mr. Rock's decision to plead a relevant market that includes both FBS and FCS schools—the two subdivisions that comprise Division I football.  [Dkt. 48 at 12-18.]   Specifically, it argues that Mr. Rock fails to address how prospective student-athletes "would regard *all* Division I [football] schools to be substitutes for one another."  [*Id.* at 12-13 (original emphasis).]   The NCAA further contends that the Second Amended Complaint acknowledges differences between the team revenue, attendance, and stadium size of average FBS and FCS football teams.  [*Id.* at 14-18 (referencing dkt. 46 at 8-9).]  Thus, the NCAA concludes that Mr. Rock's proposed market is overbroad and fails as a matter of law.

Mr. Rock argues that the NCAA's own structure, which classifies both FBS and FCS football schools as part of Division I, provides support for his proposed market including both of them.  [Dkt. 50 at 12-13.]   He claims that other courts have accepted similarly defined markets at this stage of the litigation, [*id.* at 13-14], and that markets based on quality distinctions are acceptable, [*id.* at 14-19].

The Court gives limited weight to Mr. Rock's argument that other courts have "accepted" markets similar to the Division I football market he now proposes because the plaintiffs in those cases pled what would be an FBS-only market,[4] not a full Division I football market.  *See White v. National Collegiate Athletic Ass'n*, Case No. 2:06-cv-999-VBF-MAN, dkt. 72 (C.D. Cal. Sept. 2006) (denying the NCAA's motion to dismiss plaintiffs' amended complaint pleading relevant market of Division I-A football, concluding that it was "legally sufficient" and alleged a relevant

---

[4] FBS used to be called Division I-A.  [Dkt. 48 at 17 n. 10.]

product market "on its face" after "assuming all factual allegations to be true"); *In re NCAA I-A Walk-on Football Players Litigation*, 398 F. Supp. 2d 1144 (W.D. Wash. 2005) (denying NCAA's motion to dismiss and holding that "given the procedural posture of this case," plaintiffs "are entitled to the opportunity to prove their allegation that there is a relevant market" of Division I-A football). But as the Seventh Circuit held in the context of Division I football in *Agnew*, it is "undeniable that a market of some sort is at play in this case." 683 F.3d at 346. Thus, the Court must determine whether at this stage in the litigation, Mr. Rock's allegations are at least plausible on their face to plead the rough contours of a relevant market.

The Court agrees with Mr. Rock that the NCAA's own structure classifying both FBS and FCS football as part of the same division supports his argument that those subdivisions could be part of the same overarching market of Division I football. It is undisputed that FBS and FCS teams can, and do, play against each other, [dkt. 53 at 11 n.5 (citing NCAA Bylaw 18.7.2.1.1)], and Mr. Rock alleges that he was recruited by both FBS and FCS schools, [dkt. 46 at 17-18 ¶ 69]. While Mr. Rock does not allege that he received scholarship offers from any FBS schools, an antitrust injury he pleads is that without the restrictions from the bylaws he challenges, he would have received additional scholarship offers including offers from FBS schools. [*Id.* at 10 ¶ 41, 21 ¶ 81.]

As for substitutability by buyers and sellers, the previous market Mr. Rock proposed (all NCAA schools, regardless of distinctions in division, sport offered by gender, or athletic success) was fatally overbroad even at the motion to dismiss stage because, for example, "a male football player is not a substitute for a female gymnast, and they do not compete with each other for an athletics-based scholarship on the same team." [Dkt. 38 at 15.] But Mr. Rock has narrowed his proposed market to one sport in one division of the NCAA. The buyers of labor (the

schools) are all members of NCAA Division I football and are competing for the labor of the sellers (the prospective student-athletes who seek to play Division I football). While there are undoubtedly quality distinctions between the top and bottom buyers as well as the top and bottom sellers that may ultimately reveal that Mr. Rock's proposed market is still overbroad, the Court cannot conclude on this record that it is facially implausible. Accordingly, the Court rejects the NCAA's argument that Mr. Rock's Second Amended Complaint must be dismissed because the proposed relevant market is for Division I football.

   *iii.*  *Non-Division I Substitutes*

  Alternatively, and somewhat contradictorily, the NCAA argues that Mr. Rock's proposed relevant market is impermissibly small because it ignores substitute opportunities outside of Division I football, such as Division II football or NAIA football.[5] [Dkt. 48 at 18-24.] Specifically, the NCAA argues that Mr. Rock has failed to adequately "allege facts to support [his] claim that Division I FBS and FCS football opportunities exist in a 'market' separate from the opportunity to play" football elsewhere. [*Id.* at 19.] The NCAA claims that courts have rejected relevant markets based on price variances or product quality. [*Id.*]

  In response, Mr. Rock argues that courts have accepted relevant markets based on quality distinctions, particularly in sports. [Dkt. 50 at 14-16.] Mr. Rock attempts to distinguish the cas-

---

[5] The NCAA again argues that professional football could be a plausible substitute for Division I football, [dkt. 48 at 18 n. 11], but the Court has previously rejected that argument because there has been no assertion that professional football offers an opportunity for the participant to obtain a bachelor's degree, which is a key part of the market allegations at issue in this litigation, [dkt. 38 at 15 n.6]. Likewise, it does not appear that junior colleges are a plausible substitute because as Mr. Rock alleges, and the NCAA does not dispute, unlike Division I schools, junior colleges cannot award bachelor's degrees. [Dkt. 46 at 8 ¶ 26.] To the extent that the NCAA proposes Division III football as a potential substitute for Division I football, [dkt. 48 at 19], that argument fails because Division III schools abide by an NCAA bylaw, which the Court has already upheld as a matter of law, [dkt. 38 at 19-22], prohibiting them from awarding athletics-based scholarships. That is a material distinction for purposes of this litigation, given that Mr. Rock's lawsuit revolves around obtaining athletics-based scholarships.

es the NCAA cites because of the advanced procedural contexts in which they occurred, where the standard is less favorable to a plaintiff's allegations.  [*Id.* at 19.]  Mr. Rock argues that the Second Amended Complaint adequately distinguishes Division I football from other opportunities because, among other things, he alleges that the revenues in Division I football are higher, the rules permit more scholarships, the quality of competition and the level of institutional support is higher, and the vast majority of athletes prefer Division I football to the other opportunities.  [*Id.* at 19-20.]

Some courts have upheld relevant markets based on quality distinction in the sports context.  For example, the plaintiff in *Clarett v. National Football League* challenged an NFL bylaw that prevented a player from joining the league until three years after his high school graduation. 306 F. Supp. 2d 379 (S.D.N.Y. 2004), *rev'd on other grounds* 369 F.3d 124 (2d Cir. 2004) (reversing district court based on existence of collective bargaining agreement but not expressing opinion on district court's other legal conclusions).  Mr. Clarett defined the relevant market in his case as the "NFL labor market for player services."  369 F.3d at 401.  In denying the NFL's motion for summary judgment, the district court noted that "[a]lthough there are other professional football leagues in North America—including the Arena Football League, the Arena Football League 2, the National Indoor Football League, and the Canadian Football League—the NFL dominates. . . .  In short, the NFL represents an unparalleled opportunity for an aspiring football player in terms of salary, publicity, endorsement opportunities, and level of competition."  *Id.* at 383-84, 403.  With respect to interchangeability of use and cross-elasticity of demand for potential substitute products, *Clarett* held that "[t]he [NFL's] suggestion that one of the other professional football leagues in North America is a fair substitute for the NFL cannot be

taken seriously . . . [because] no football player would see the Arena League or the Canadian League as a reasonably good substitute for the NFL." *Id.* at 407.

In the context of professional boxing, the United States Supreme Court upheld a lower court's finding after trial that a "separate, identifiable market" existed for "championship boxing contests" because "nonchampionship fights are not reasonably interchangeable for the same purpose as championship contests." *Int'l Boxing Club of N. Y., Inc. v. United States*, 358 U.S. 242, 250-51 (1959). As support, the Supreme Court cited the lower court's findings that the average revenue from the championship fights was higher, the television rights brought in more revenue, the television ratings were higher, and other opportunities (such as full-length motion pictures) were available that were not available for nonchampionship fights. *Id.* at 250.

Neither party directs the Court to a Seventh Circuit case upholding or rejecting a relevant market defined on a quality distinction in the context of amateur or professional sports.[6] But Mr. Rock's assertion that Division I football is distinctly superior to Division II football or the NAIA finds at least some support in case law. The United States Supreme Court noted the superior competition in Division I football, as opposed to Division II and Division III, at least with respect to what is now FBS football. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 118 (1984) (noting that "[t]here is no evidence of any intent to equalize the strength of teams in Division I-A with those in Division II or Division III"). And at least one district court concluded after a trial on the merits that the NAIA "share[s] many of the attrib-

---

[6] In fact, the majority of cases the NCAA cites involve market definition analysis in the context of an injunction, summary judgment, or after trial. The procedural context of those cases does not assume the truth of a plaintiff's factual allegations and, instead, requires a plaintiff to present evidence in support of his claims. *See, e.g.*, *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) ("Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events."). Thus, those cases are of limited use at this stage of the litigation.

utes of Division II and III NCAA schools" but that it "is not a realistic option" to Division I

men's intercollegiate athletics.  *See Ass'n for Intercollegiate Athletics for Women v. Nat'l Colle-*

*giate Athletic Ass'n*, 558 F. Supp. 487, 497 (D.D.C. 1983) *aff'd* 735 F.2d 577 (D.C. Cir. 1984)

("It is only from [the] NCAA that necessary services and benefits for conduct of a Division I

men's intercollegiate athletic program are available to institutions.  The only other organization

offering men's intercollegiate governance, as opposed to open amateur governance, is the NAIA.

NAIA is not a realistic option: it offers neither Division I caliber program[s] nor the direct and

indirect financial rewards of NCAA membership.  It has no network television contracts and its

member schools do not run spectator oriented programs.").[7]

In the Second Amended Complaint, Mr. Rock alleges that Division I football programs

"compete at the highest level of the college sport" and that Division II and NAIA programs are

not in the relevant market because they are not reasonable substitutes.  [Dkt. 46 at 7 ¶ 19, ¶ 21, at

8 ¶ 25.]  In support of that conclusion, Mr. Rock alleges the following facts, which must be ac-

cepted as true for purposes of ruling on the NCAA's motion to dismiss:

- Almost all student-athletes who receive a Division I football scholarship
  offer accept that offer and most of the rest opt out of playing college foot-
  ball rather than accept a scholarship at a Division II or an NAIA football
  school.  [Dkt. 46 at 9 ¶ 37, 10 ¶ 39.]

---

[7] Of course it is possible that the commercial realities of the marketplace have changed since the
statements cited in this paragraph were made, but these post-trial court findings lend plausibility
to Mr. Rock's allegation at this stage of the litigation that neither Division II football nor NAIA
football are adequate substitutes for Division I football.

- Division I football programs generate more revenue compared to Division II or NAIA programs, which allows the Division I programs to provide superior opportunities to its student-athletes.[8]  [*Id.* at 7 ¶ 20, 8 ¶¶ 28-31.]

- Division I football programs get more attendance than Division II or NAIA programs.  [*Id.* at 46-47 ¶¶ 32-35.]

- Division I programs have a higher quality of competition and higher level of institutional support over Division II or NAIA schools.  [*Id.* at 9 ¶ 36.]

- Division I football programs are allowed to award more scholarships than Division II or NAIA programs, so more players receive full scholarships in Division I football programs.  [*Id.* at 7 ¶ 18 (85 scholarships for FBS teams and 63 for FCS teams), 7 ¶ 22 (36 scholarships for Division II), 8 ¶ 25 (24 scholarships for NAIA).]

The cited case law recognizes that, at least in the context of sports, some courts have accepted a relevant market definition based on a quality distinction of one league over another, particularly where that distinction results in increased revenue and opportunities for the participants. Mr. Rock alleges that Division I football is that type of market, and he provides factual allegations that must be accepted as true regarding the superior competition, institutional support, overall preference, higher revenue, and more scholarship opportunities provided in Division I football, as opposed to Division II or NAIA football.  Accordingly, the Court concludes that Mr. Rock's Second Amended Complaint contains sufficient factual allegations supporting his position that Division II and NAIA football are not adequate substitutes for Division I football and, thus, not part of the same relevant market.

---

[8] The NCAA argues that "there is not a simple bright line dividing FCS and non-Division I football opportunities" based on their respective revenues.  [Dkt. 48 at 16.]  But the Court cannot make that determination as a matter of law on a motion to dismiss.  In other words, even if the NCAA is correct that some FCS teams generate revenue similar to successful Division II schools, [*id.* at 16-17], Mr. Rock alleges that additional benefits come with being part of Division I football, and the Court will accept that allegation as true for purposes of ruling on the pending motion.

### iv. Geographic Market

The NCAA argues that Mr. Rock failed to make any factual allegations to support his conclusion that the geographic market for his proposed relevant market is the United States. [Dkt. 48 at 24-25.]  Specifically, the NCAA contends that "[c]ommon sense suggests that Division I football student-athletes, like most college students, would consider geography in choosing which college to attend."  [*Id.* at 24.]

Mr. Rock points out that his Second Amended Complaint expressly alleges that the "'relevant geographic market is the United States.  All Division I football teams are located in the U.S.  As a uniquely American sport, 99.9% of all Division I football players are from the United States.'"  [Dkt. 50 at 24-25 (quoting dkt. 46 at 10 ¶ 42).]

The Court agrees with Mr. Rock that he has sufficiently alleged a relevant geographic market in the Second Amended Complaint.  Specifically, he alleges that the relevant geographic market is the United States and provides supporting factual allegations to support that legal conclusion, specifically that 99.9% of all Division I football players are from the United States.  Because that factual allegation is facially plausible—the NCAA is, in fact, the *National* Collegiate Athletic Association—it must be assumed as true at this stage of the litigation.  Accordingly, the Court finds that Mr. Rock has pled a relevant geographic market sufficient to survive the NCAA's motion to dismiss.

### v. Conclusion Regarding Mr. Rock's Market Allegations

To summarize, *Agnew* held that it is a plaintiff's burden to plead the "rough contours of the relevant commercial market in which anticompetitive effects may be felt . . . ."  683 F.3d at 345.  And in the context of Division I football, the Seventh Circuit found it "undeniable that a market of some sort is at play in this case."  *Id.* at 346.  Because the complaint at issue in *Agnew*

contained "nothing resembling a discussion of a relevant market for student-athlete labor," *id.* at 347, the Seventh Circuit did not specifically opine on the appropriate relevant market or what allegations would be necessary to plead it.

After accepting the factual allegations of Mr. Rock's Second Amended Complaint as true, which it must do in ruling on the NCAA's motion to dismiss, the Court finds that Mr. Rock has pled the rough contours of a relevant market that is plausible on its face.  Specifically, the NCAA's structure classifying FBS and FCS football as part of the same division, the interaction between the FBS and FCS subdivisions, and Mr. Rock's assertions regarding his recruiting experience and the alleged anticompetitive effects of the challenged rules on both subdivisions persuade the Court that given the procedural posture of the case, the market as plead is facially plausible.  Moreover, Mr. Rock has alleged adequate factual allegations supporting his argument that Division II and NAIA football are not reasonable substitutes for Division I football and, thus, not part of the same relevant market.

The Court emphasizes that these conclusions are not an endorsement that Mr. Rock's market as pled will withstand the higher burdens of proof that accompany summary judgment or trial, where his factual allegations will not be accepted as true without supporting evidence.  Instead, the Court concludes that Mr. Rock has alleged sufficient factual allegations that, when taken as true as the Court must do, plead the rough contours of a relevant market that is plausible on its face.  Whether Mr. Rock can gather enough evidence to prove that the relevant market he pleads is correct is a question for another day.

### E.  Anticompetitive Effect

The NCAA argues that even if Mr. Rock has alleged sufficient facts to plead a relevant market, his claim still fails because the Second Amended Complaint does not allege that the by-

laws at issue have caused injury to competition as a whole in the relevant market.[9] [Dkt. 48 at 25.] The NCAA maintains that Mr. Rock has not changed his anticompetitive effect allegations since his previous complaint, which the Court found to be insufficient, and that "[t]here are simply no factual allegations in the [Second Amended Complaint] sufficient to demonstrate that these bylaws had an adverse, market-wide impact on the price or output of any commercial product." [*Id.* at 26; dkt. 53 at 6-8.]

Mr. Rock points to various allegations in the Second Amended Complaint that he contends adequately plead a market-wide anticompetitive effect. [Dkt. 50 at 25-26 (citing various paragraphs of dkt. 46).] Specifically, Mr. Rock emphasizes that he alleges that the bylaws at issue limit the number and distribution of Division I football scholarships and that, as a result, the student-athletes in the market received less for their labor than they would have received without the restrictions. [*Id.*]

For a civil litigant to show antitrust injury, he must show injuries that reflect the anticompetitive effect of either the violation or the anticompetitive acts made possible by the violation. *James Cape & Sons Co. v. PCC Const. Co.*, 453 F.3d 396, 399 (7th Cir. 2006). Failure to include sufficient allegations of anticompetitive effects that would result or have resulted from the defendant's actions is ordinarily fatal to an antitrust claim. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984). "Thus, the plaintiff must allege, not only an injury to himself, but an injury to the market as well." *Id.* Conclusory statements must be accompanied by supporting factual allegations in order to survive a motion to dismiss. *Id.*

---

[9] Although the NCAA "respectfully continues to assert" that the bylaws at issue are "presumptively procompetitive," [dkt. 48 at 25 n.22], the Court again rejects that argument based on *Agnew*, [dkt. 38 at 7 n.3 (citing 683 F.3d at 345 (holding that the bylaws at issue "cannot be deemed procompetitive at the motion-to-dismiss stage"))].

The NCAA highlights the Court's conclusion in granting the NCAA's previous motion to dismiss that Mr. Rock's prior complaint "failed to adequately allege anticompetitive effects in their market as pled." [Dkt. 38 at 19.]  The NCAA emphasizes that Mr. Rock's current anticompetitive effect allegations are "almost identical" to the allegations of his previous complaint, thus, the NCAA contends that they still must be insufficient.  [Dkt. 53 at 6-7.]  But even though Mr. Rock's anticompetitive effect allegations are similar to what he previously pled, the relevant market he now pleads (Division I football) is significantly more narrow than the market he previously pled (all NCAA divisions and sports).  Thus, the Court's conclusion that his previous complaint did not adequately allege anticompetitive effects in the "market as pled" is not dispositive because, unlike its previous order, the Court has concluded that the relevant market allegations in Mr. Rock's Second Amended Complaint are sufficient to withstand the NCAA's motion to dismiss.

Ultimately, the Court agrees with Mr. Rock that his Second Amended Complaint adequately pleads anticompetitive effects of the challenged bylaws in the relevant market as pled (Division I football).  Mr. Rock alleges that without the bylaws at issue, he would have received additional scholarship offers, including offers for multi-year scholarships.  [*Id.* at ¶¶ 81, 83.]  As support for his allegations, the Second Amended Complaint sets forth several comments made by representatives from member institutions in favor of maintaining the prohibition on multi-year scholarships in order to prevent "bidding wars" over prospective student-athletes, which would force the schools to "compete" for recruits by "making the best deal . . . [i]n order to be competitive."  [*Id.* at 14-15 ¶ 59.]  As for the cap on the total number of available scholarships, Mr. Rock alleges that the typical NCAA football squad has 100 players but that the bylaws limit the number of full scholarships that FBS and FCS schools can award to a smaller number.  [*Id.* at 7 ¶ 18

(85 full scholarships allowed for FBS teams and 63 allowed for FCS teams), ¶ 22 (typical NCAA college football squad has 100 players).]   Ultimately, Mr. Rock alleges that without those restrictions capping the number of allowable scholarships, the overall supply of scholarships would increase and the prospective student-athletes in the market would receive more financial aid.  [*Id.* at 21 ¶ 82.]

Based on these allegations, which the Court must accept as true at this time, Mr. Rock has sufficiently alleged that the bylaws he challenges resulted in anticompetitive effects that injured his proposed market as a whole.  Accordingly, the Court rejects the NCAA's argument to the contrary.

### IV.
### CONCLUSION

For the reasons stated herein, Mr. Rock's Motion Pursuant to Federal Rule of Civil Procedure 12(d) to Exclude Portion of the NCAA's Reply Brief or Convert to Motion for Summary Judgment and Allow Discovery is **GRANTED IN PART**, [dkt. 54], and the NCAA's Motion to Dismiss is **DENIED**, [dkt. 47].  Because the Court did not feel that oral argument was necessary to reach these conclusions, the NCAA's Motion for Oral Argument is **DENIED**.  [Dkt. 49.]  The Court requests that the Magistrate Judge hold a status conference with the parties at her earliest convenience to establish a case management plan.

08/16/2013

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only**:

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
steve@hbsslaw.com

Gregory L. Curtner
SCHIFF HARDIN, LLP - Michigan
gcurtner@schiffhardin.com

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO, LLP
beth@hbsslaw.com

Kimberly K. Kefalas
SCHIFF HARDIN, LLP - Michigan
kkefalas@schiffhardin.com

Kathy Lynn Osborn
FAEGRE BAKER DANIELS LLP - Indianapolis
kathy.osborn@faegrebd.com

Stuart McKinley Paynter
The Paynter Law Firm PLLC
stuart@smplegal.com

William N. Riley
PRICE WAICUKAUSKI & RILEY
wriley@price-law.com

Jessica A. Sprovstoff
SCHIFF HARDIN, LLP - Michigan
jsprovtsoff@schiffhardin.com

Suzanne L. Wahl
SCHIFF HARDIN, LLP - Michigan
swahl@schiffhardin.com

Robert James Wierenga
SCHIFF HARDIN, LLP - Michigan
rwierenga@schiffhardin.com

Joseph N. Williams
PRICE WAICUKAUSKI & RILEY
jwilliams@price-law.com