UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN ROCK, on behalf of himself and all others similarly situated,<br><br>     Plaintiffs,<br><br>    vs.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>     Defendant. | 1:12-cv-01019-JMS-DKL |

**ENTRY ON PLAINTIFF'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT**

Plaintiff, John Rock, filed this antitrust class action against the Defendant, National Collegiate Athletic Association ("NCAA"), challenging certain regulations instituted by the NCAA. These include: (1) the NCAA's prohibition on multi-year Division 1 football scholarships, and (2) the caps on the number of Division 1 football scholarships that can be awarded by Division 1 member institutions. Plaintiff now moves for leave to file a Third Amended Class Action Complaint ("TAC"). The proposed TAC contains the same claims and substantive allegations as the Second Amended Class Action Complaint ("SAC"). The only difference between the two complaints is the definition of the class. The NCAA objects on grounds that the amendment is filed far beyond the Case Management Plan ("CMP") deadline for the amendment of pleadings, and, if granted, will prejudice the interests of the NCAA. For the reasons set forth below, the court **GRANTS** the Plaintiff's motion.

1

## I. Procedural and Factual Background

An understanding of the procedural background in this case is essential in understanding the court's ruling. Accordingly, the court will begin with the deadlines established in the parties' original Case Management Plan ("CMP"). That CMP, filed on August 22, 2013, established a deadline of November 29, 2013 to file any motions to amend the pleadings, and a fact discovery cut-off date of July 29, 2014. (*See* Filing No. 60 at 4, § III (B) & (C)). In addition, the CMP required that Plaintiff file his motion for class certification on or before July 29, 2014, and that the NCAA "shall depose Plaintiff's experts within 30 days of the filing of [that motion]." (*Id.*, § III (D)(1)). During a telephonic status conference held on April 11, 2014, Plaintiff requested an extension of the discovery deadline from July 29, 2014, to December 29, 2014. (Filing No. 80). Even though the NCAA did not oppose the oral motion, the Magistrate Judge granted the request in part by extending the discovery deadline to October 31, 2014. (*Id.*). The Magistrate Judge also ordered that Plaintiff's motion for class certification, and any expert reports in support of that motion, be filed on or before November 24, 2014. (*Id.*). On August 1, 2014, the Magistrate Judge advised the parties that the CMP was modified to reflect "no further extensions" on the class certification briefing schedule. (Filing No. 88).

Meanwhile, Plaintiff hired Daniel A. Rascher, who has a Ph.D. in Economics, "to opine on whether there exists a class of Division 1 college football athletes for whom common impact could be shown through economic evidence." (Filing No. 126-6 at 4, ¶

2

6). As part of his analysis, Dr. Rascher needed squad lists[1] "laying out the identities and patterns of compensation provided to Division 1 football athletes." (*Id*., ¶ 7). Therefore, in February 2014, Plaintiff specifically requested the NCAA to produce those lists. (Filing No. 126-1, ¶ 2). The NCAA did so on May 16 and May 22, 2014. (*Id*.). Because the squad lists were produced in image-only pdf format, and Dr. Rascher needed the lists in machine-readable format to perform a data analysis, Plaintiff's counsel hired 120 people, mostly law students, to review the squad lists and put them in machine-readable format. (*Id*.; *see also* Filing No. 126-6 at 4-5, ¶¶ 7-8). Dr. Rascher testified that he received three sets of data between mid-September and early October, but in his opinion, the data needed additional work to improve its quality. (Filing No. 126-6 at 5, ¶ 9). That endeavor was not completed until late October 2013. (*Id*.). The final set of data needed for Dr. Rascher's analysis – historical records from the 1970s and 1980s – was produced in Nov. 2014. (*Id*., ¶ 11). According to the Plaintiff, the results of Dr. Rascher's analysis of the economics of college recruiting required an amendment of the class definition, prompting the filing of the present motion.

The differences between the definitions of the classes as defined in the SAC and the proposed TAC are at the heart of the parties' dispute. The SAC defines the class as:

> Any individual who, while enrolled in an NCAA member institution, (1) received a scholarship, grant or tuition discount ("Grant in Aid" or "GIA") based on athletics leadership, ability, participation or performance from an NCAA member institution for at least one year for the purpose of playing Division 1 football, (ii) had their GIA reduced or not renewed and (iii)

---

[1] Squad lists are required by schools who participate in the NCAA; they list all athletes on a particular team and his (or her) level of "Grant-in-Aid" (i.e., scholarship).

3

subsequently paid tuition at a college, university or other institution of higher education.

"Excluded from the proposed Class are individuals whose GIAs were reduced, cancelled or not renewed due to one of the reasons enumerated in Bylaw 15.3.4.2[2] of the NCAA Division 1 Manual." (Filing No. 46 at 22, ¶ 85).

The proposed TAC splits the class into an "Injunctive Relief Class" and a "Core Issues Class." The Injunctive Relief Class is defined as:

> All individuals who, from December 17, 2007 to the present, have been classified under NCAA rules as an "initial counter[3]" (during their first term on campus or in the spring term prior to their first fall term on campus) on an NCAA Division 1 football team.

The Core Issues Class is defined as:

> All individuals who, from December 17, 2007 to the present, have been classified under NCAA rules as an "initial counter" (during their first fall term on campus or in spring term prior to their first fall term on campus) on an NCAA Division 1 football team, and
>
> (1) were recruited by at least one school that is a member of the NCAA's Division 1 Football Bowl Subdivision ("FBS") (at the time of their recruitment or during their period of NCAA athletics eligibility), and
>
> (2) did not receive their initial year's athletics-related grant-in-aid for the full duration of their undergraduate education or five (5) years, whichever is shorter.

---

[2] Bylaw 15.3.4.2 lists four instances when institutional financial aid may be reduced or canceled during the terms of the award: (a) if a student-athlete renders himself ineligible; (b) if a student-athlete fraudulently misrepresents information; (c) if a student-athlete engages in serious misconduct; or (d) if a student-athlete voluntarily withdraws from the sport. (Filing No. 105-6 at 15).

[3] "Initial counters" are students who are receiving athletics-based financial aid (or GIAs) for the first time.

Dr. Rascher testified that, based on his analysis of the data supplied by the NCAA, "only those athletes who competed in the FBS Recruiting Submarket could be shown as a class to have been denied the multiyear scholarships that they would have received in a competitive market." (Filing No. 126-6 at 5, ¶ 10).

Dr. Rascher signed his expert report on November 23, 2014. (Filing No. 110). Pursuant to the CMP deadlines, on November 24, 2014, Plaintiff filed Dr. Rascher's expert report with his brief in support of his motion for class certification. (Filing Nos. 104-111). Plaintiff's motion for class certification is premised on the classes set forth in Plaintiff's proposed TAC.

## II. Discussion

Plaintiff moves to amend the Second Amended Complaint past the deadline for the amendment of pleadings established by the CMP. Citing *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011) and *Trustmark Ins. Co. v. General & Cologne Life Re of America*, 424 F.3d 542, 553 (7th Cir. 2005), the NCAA contends the Plaintiff must first establish good cause for the amendment under Federal Rule of Civil Procedure 16(b)(4) before turning to the issue of whether the amendment is in the interest of justice under Federal Rule of Civil Procedure 15(a)(2). Plaintiff does not agree. Instead, he argues the Seventh Circuit's recent decision in *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 825 (7th Cir. 2012), which was issued after *Alioto* and *Trustmark*, trumps those cases and "allows Plaintiff to amend his class definition at the class certification stage to conform to the evidence." (Filing No. 127 at 9).

5

The *Messner* Court held that, when a district court is faced with an over-inclusive class or a "fail-safe" class – "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim" – the district court should solve the problem "by refining the class definition rather than by flatly denying class certification on that basis." *Id.* The court finds *Messner* is inapplicable to this motion for two reasons. First, the motion before the court is not one for class certification; it is one to amend the most recent complaint. Second, the type of refinement contemplated by the *Messner* Court is one the court – not the plaintiff – undertakes in its discretion to avoid the problem of an over-inclusive or fail-safe class. *Id.* (citing *Campbell v. First Am. Title Ins. Co.*, 269 F.R.D. 68, 73-74 (D. Me. 2010) ("A court may, in the exercise of its discretion, revise a proposed class definition to avoid the problem of a fail-safe class."); *Lewis v. First Am. Title Ins. Co.*, 265 F.R.D. 536, 551 (D. Idaho 2010) (same). That problem, so to speak, is not before the court. Accordingly, the court finds that Plaintiff must first establish good cause for the amendment. *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). "In making a Rule 16(b) good-cause determination, the primary consideration for district courts is the diligence of the party seeking amendment." *Alioto*, 651 F.3d at 720 (citing *Trustmark*, 424 F.3d at 553).

## A. Good Cause under Rule 16(b)(4)

The NCAA argues the Plaintiff did not act diligently in moving to amend the complaint past the CMP deadline for several reasons. First, it suggests the squad lists relied upon by Dr. Rascher could have been reviewed more expeditiously. As discussed

6

*supra*, the squad lists were not produced in a format from which Dr. Rascher could perform any type of data analysis. The declarations of Plaintiff's counsel and of Dr. Rascher fully address this issue – the hundreds of hours it took to make the data "machine-ready" and the fact that Dr. Rascher did not receive these documents until the fall of 2014. The court finds no reason to discredit their testimony. Equally problematic is the NCAA's suggestion that Dr. Rascher relied only upon a "subset" of the information; thus, any deficiency in the class definition could have been identified without review of the entire squad list production. The NCAA provides no evidence that such an analysis would have been feasible or reliable. Nor would it have been appropriate for Plaintiff to amend his class definition based on a partial analysis.

Next, the NCAA criticizes Plaintiff for failing to explain why analysis of the documents it produced in November were "necessary for Plaintiff to become aware of the deficiencies with his operative class definition." (Filing No. 130-1 at 6). Dr. Rascher explained that this information was important to his analysis because it provided additional "evidence that all potential FBS recruits were commonly impacted by the (artificial) reduction in FBS-level demand for athletes." (Filing No. 126-6 at 6, ¶ 11). This further supported the conclusion that the class definition required modification to focus on FBS recruited students.

The CMP deadline provided that Plaintiff's motion for class certification and expert report be filed on November 24, 2014. No extensions of time would be entertained. The discovery issues posed primarily by the squad lists coupled with the CMP deadlines lead the court to conclude that Plaintiff acted with sufficient diligence to

7

move for leave to amend his complaint. The court therefore finds the Plaintiff had good cause to amend the complaint at such a late date.

**B.     Rule 15(a)(2)**

Having established good cause, the court now turns to the second issue: whether justice requires amendment of the pleading under Federal Rule of Civil Procedure 15(a)(2). A court may deny a proposed amendment "if the moving party has unduly delayed in filing the motion, if the opposing party would suffer undue prejudice, or if the pleading is futile." *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008). The NCAA maintains it would suffer undue prejudice if Plaintiff were permitted to amend.

The NCAA argues the proposed TAC's class definitions are substantially different from the proposed class definition in the SAC. According to the NCAA, this is particularly problematic because discovery is now closed; thus, the NCAA is precluded from conducting discovery into the new issues raised by the changes in the class definition.

The court will begin with a comparison of the class definition in the SAC and the Injunctive Relief Class definition in the proposed TAC. As noted previously, the SAC defines the class as:

> Any individual who, while enrolled in an NCAA member institution, (1) received a scholarship, grant or tuition discount ("Grant in Aid" or "GIA") based on athletics leadership, ability, participation or performance from an NCAA member institution for at least one year for the purpose of playing Division 1 football, (ii) had their GIA reduced or not renewed and (iii) subsequently paid tuition at a college, university or other institution of higher education.

8

"Excluded from the proposed Class are individuals whose GIAs were reduced, cancelled or not renewed due to one of the reasons enumerated in Bylaw 15.3.4.2 of the NCAA Division 1 Manual." (Filing No. 46 at 22, ¶ 85). The proposed TAC's Injunctive Relief Class is defined as:

> All individuals who, from December 17, 2007 to the present, have been classified under NCAA rules as an "initial counter" (during their first term on campus or in the spring term prior to their first fall term on campus) on an NCAA Division 1 football team.

The SAC's class definition limits membership to Division 1 football student-athletes who (1) "had their GIA reduced or not renewed," (2) "subsequently paid tuition at a college, university or other institution of higher education," and (3) did not lose their aid for one of the reasons in Bylaw 15.3.4.2. The TAC does not incorporate those limitations. The NCAA observes that the Injunctive Relief Class includes student-athletes who received a full GIA for every year the athlete attended college, and appears to include those who lost aid for one of the reasons enumerated in Bylaw 15.3.4.2. The NCAA thus concludes that the modification to the proposed Injunctive Relief Class is a material change in the class definition that prejudices the NCAA.

On its face, the proposed Injunctive Relief Class imposes a time limitation (December 17, 2007 to present) and includes only "initial counters" on an NCAA Division 1 football team. The modification conformed the injunctive class definition to the scope of affected individuals – *i.e.*, individuals injured by the lack of choice and diminished scholarship supply – as determined by Dr. Rascher's econometric market analysis. (*See e.g.*, Filing No. 116-6, § 9.1 at 206, ¶ 449) (opining "Of course, some

9

attrition is possible for reasons other than the restraints in suit, but as long as a school wishes to maximize its initial counters each year, the agreement to limit total counters to a level below five times the allowed annual limit has a direct downward impact on total consumption, which affects all market participants."); *see also id.* at 209, ¶ 455 ("Even athletes who received a single-year GIA that was renewed for all five years of their eligibility were harmed, in that they attended school fully knowing that they were at risk of being cut if their football prowess and effort was not sufficient to ensure they were among the average 15 athletes per year that retained their GIAs after their current year."). No changes were made to the current complaint's substantive allegations, no new claims were added, and the injunctive relief sought remains the same – "requiring NCAA member institutions to offer multiyear Division 1 football scholarships to remedy their past wrongful conduct and enjoining Defendant from artificially reducing the total supply of scholarships available to NCAA student-athletes." (*Compare* Filing No. 46 at 27, Prayer for Relief, ¶ G, *with* Filing No. 114-1 at 28, Prayer for Relief, ¶ G).

The court does not find the proposed TAC's Injunctive Relief Class unfairly broadens the class, or necessarily prejudices the NCAA due to the need for additional discovery. Indeed, it narrows the class from all FBS and FCS student-athletes on scholarship to all FBS and FCS student-athletes who qualify as initial counters. The NCAA's arguments concerning the over-breadth of the Injunctive Relief Class are better asserted in its opposition to Plaintiff's motion for class certification.

The Core Issues Class is defined as:

> All individuals who, from December 17, 2007 to the present, have been classified under NCAA rules as an "initial counter" (during their first fall term on campus or in spring term prior to their first fall term on campus) on an NCAA Division 1 football team, and
>
> (1) were recruited by at least one school that is a member of the NCAA's Division 1 Football Bowl Subdivision ("FBS") (at the time of their recruitment or during their period of NCAA athletics eligibility), and
>
> (2) did not receive their initial year's athletics-related grant-in-aid for the full duration of their undergraduate education or five (5) years, whichever is shorter.

The NCAA argues the Core Issues Class is also broader than the class definition set forth in the SAC because: (1) the new class definition does not require that class members subsequently paid tuition at a college, university or other institution, and (2) the new class definition injects a new factual issue in this case – *i.e.*, that class members demonstrate they were recruited by "at least one" FBS school. The NCAA's arguments are not persuasive. This class definition is actually narrower than the class definition in the SAC because it limits the duration of the class (December 17, 2007 to the present), and includes only FBS Division 1 initial counters who were recruited by FBS schools.

The NCAA's strongest argument concerns Dr. Rascher's admission that he relied on the squad list data he currently has to create "a dataset that is a reasonable proxy for identifying most athletes who were recruited by an FBS program"; the proxy list is identified as Exhibit H to his expert report. (Filing No. 116-6 at 243, ¶ 539; *see also id.*, Ex. H). The NCAA therefore argues that Plaintiff's untimely amendment has unfairly denied the NCAA the ability to gather discovery disproving Plaintiff's claims and highlighting the unreliability of Dr. Rascher's assumptions.

To create the proxy list of FBS-recruited individuals, Dr. Rascher assumed that everyone who received a first-year FBS scholarship was recruited by that FBS school. (*Id*., ¶ 541) ("This is not a proxy – all of these athletes certainly were recruited, and these athletes comprise the vast majority of all Core Issues Class members."). He then included FCS athletes who received 90% or greater scholarships, as his econometric evidence indicated that virtually all of these students would have been recruited by at least one FBS school. Dr. Rascher relied upon this "proxy method" because he did not have in his possession each FBS-school's list of all "Recruited Prospective Student-Athletes," a list required to be kept by each school pursuant to NCAA Bylaw 13.02.13.1, each FBS-school's "Official Site Visit" lists, nor each FBS-school's records reflecting which athletes received formal GIA offers. (*See id*., ¶ 540). Plaintiff states Dr. Rascher did not have this information because Plaintiff did not have time to subpoena each FBS Division 1 school. Plaintiff contends this "proxy method" "is hardly rocket science and does not necessitate any additional discovery." (Filing No. 127 at 3).

Pursuant to the parties' CMP, the NCAA "shall" examine Plaintiff's expert within thirty (30) days of the filing of Plaintiff's motion for class certification; it is required to file its brief in opposition thirty (30) days thereafter. (*See* Filing No. 60 at 4-5, §§ D (3) & (4)). Thus, the NCAA still has the opportunity to discredit Dr. Rascher's econometric analysis and the proposed class definitions that arose out of that analysis. The court finds the proposed amendment is therefore not prejudicial to its interests. Accordingly, the court will grant Plaintiff leave to amend. The NCAA may move to reopen discovery prior to deposing Dr. Rascher.

### III. Conclusion

For the reasons set forth above, the court **GRANTS** Plaintiff leave to file a Third Amended Class Action Complaint (Filing No. 114). Plaintiff is **ORDERED** to file the Third Amended Class Action Complaint within five (5) business days of the date of this Order. The NCAA may move to reopen discovery for the limited purpose of obtaining the information necessary to effectively examine the opinions and assumptions of Plaintiff's expert, Dr. Rascher. If it does so, Plaintiff shall assist the NCAA in obtaining that discovery, and all briefing on Plaintiff's motion for class certification shall remain stayed.

**SO ORDERED** this 23rd day of January 2015.

```
                              _____
                              RICHARD L. YOUNG, CHIEF JUDGE
                              United States District Court
                              Southern District of Indiana
```

Distributed Electronically to Registered Counsel of Record.