**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JOHN  ROCK, on behalf of himself and others similarly situated. | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:12-cv-01019-TWP-DKL |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) ) ) | |
| Defendant. | ) ) | |

**ENTRY ON MOTION FOR CLASS CERTIFICATION**

This matter is before the Court on Plaintiff, John Rock's ("Rock") Motion for Class Certification. (Filing No. 104.)  Also before the Court is a Conditional Motion to Intervene filed by Devin Pugh ("Pugh").  (Filing No. 190.)  Rock has brought this anti-trust action, individually and on behalf of thousands of similarly situated student athletes challenging the National Collegiate Athletic Association's ("NCAA") prohibition of multi-year college athletic scholarships.  For the reasons stated below, the Court denies Rock's motion for class certification and denies Pugh's motion to intervene.

**I.  BACKGROUND**

**A.**     **Introduction**

This action challenges the NCAA rules that govern the number and duration of athletics scholarships, otherwise referred to as grants-in-aid ("GIA"), for Division I football players.  To understand this challenge, it is important to first consider Rock's explanation of college football as a "labor market" subject to anti-trust laws.  Rock contends that a "labor market" exists of NCAA Division I football student-athletes.  In this purported labor market, student-athletes compete for

spots on Division I football teams, and NCAA Division I schools compete to recruit student-athletes, "paying" student-athletes in-kind benefits of football scholarships, academic programs, access to training facilities, and coaching instruction.  (Filing No. 111 at 13.)  *See also O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 965-66 (N.D. Cal. 2014).  This "labor market" of Division I schools is further subdivided in to the D1-A, Football Bowl Subdivision ("FBS"), and the D1-AA, Football Championship Subdivision ("FCS").  Rock notes that, according to 2006 statistics, this labor market, as valued by the NCAA estimates, has annual operating  revenues of approximately $7.8 billion.  (Filing No. 106-1 at 17.)

Central to this dispute are two NCAA rules, specifically the One-Year Period rule (the "One-Year Rule") and the Scholarship Cap Rule (the "GIA Cap").  (Filing No. 105-1 at 7; Filing No. 105-6 at 14, 20.)  The One-Year Rule provides, "[i]f a student's athletics ability is considered in any degree in awarding financial aid, such aid shall neither be awarded for a period in excess of one academic year nor for a period less than one academic year."  (Filing No. 105-6 at 14.)  The GIA Cap provides, "[t]here shall  be an annual limit of 25 on the number of initial counters . . . and an annual limit of 85 on the total  number of counters (including initial counters) in football at each institution."  (Filing No. 105-6 at 20.)

According to Rock, by agreeing not to offer multi-year, Division I football scholarships from 1973 to 2012, the NCAA and its member institutions ensured that schools did not have to compete for student-athlete labor by giving more than one-year GIAs.  Similarly, by agreeing to cap the number of GIAs a Division I football team may award, the NCAA ensured that its member institutions did not have to compete on the number of GIAs awarded, ensuring that thousands of student-athletes would receive no scholarships or less than full scholarships to support them.  Rock alleges that the NCAA and its member institutions continue to make agreements not to compete

for student-athlete labor based on GIAs, even after the NCAA formally repealed the One-Year Rule in 2012.  (Filing No. 105-22 at 3-4; Filing No. 105-5 at 37.)  As a result of these rules, Rock argues that "students receiving scholarships were deprived of an expanded choice of schools to attend, often received less than a full scholarship, and always received no more than a one-year scholarship."  (Filing No. 111 at 10.)

**B.      Adoption of the One-Year Rule and the GIA Cap Rule**

Before the introduction of the One-Year Rule and the GIA Cap in 1973, schools and conferences varied in the term and number of their athletic scholarship awards.  Before 1973, the NCAA did not have Bylaws that set the term of scholarships, and  NCAA  member  institutions were  permitted  to  award  multi-year  athletics-related  scholarships.  (Filing No. 106-15 at 3.) However, not all member institutions chose to do so.  Indeed, at least three major conferences chose to award only one-year scholarships in the pre-1973 period.  (Filing No. 105-5 at 16; Filing No. 170-19; Filing No. 170-20.)  In addition, several individual institutions reported that they awarded aid only on a one-year basis.  (Filing No. 170-22; Filing No. 170-23; Filing No. 170-24.)

Before 1973, there were no NCAA rules limiting the number of student-athlete football players who could receive athletics-related scholarships.  (Filing No. 106-16 at 2.)  Despite the fact that NCAA rules did not limit the number of football scholarships, some NCAA member conferences adopted their own rules limiting the  number of football scholarships.  Some of these conferences set their rules at or below the NCAA's current limit of 85 counters on FBS and FCS football teams.  (Filing No. 170-8; Filing No. 170-25 at 629-30; Filing No. 170-26; Filing No. 170-27.)

In an apparent effort to reduce the cost of student-athletics, member institutions requested a uniform restriction on athletic scholarships.  (Filing No. 105-8 at 7.)  Accordingly,

in January 1973, the NCAA enacted the One-Year Rule and the GIA Cap.   (Filing No. 106-15 at 3, 5.)

**C.**     **Repeal of the One-Year Rule**

In 2011, the NCAA Board of Directors adopted a proposal allowing multi-year GIAs. On January 14, 2012, the Board of Directors reaffirmed its decision and, a month later, on February 17, 2012, multi-year GIAs became permissible for the 2012-13 academic year and beyond. (Filing No. 106-24 at 2-3; Filing No. 106-26 at 6; Filing No. 106-30 at 2.)

Rock notes that, since the repeal of the One-Year Rule, many schools now offer multi-year GIAs and the number of schools doing so increases each year. (Filing No. 105-15 at 2; Filing No. 105-16.) On the other hand, the NCAA presents a much more tempered estimate of the repeal's effect on the award of multi-year GIAs. The NCAA contends that, since the 2012 rule change, many member institutions have declined to offer multi-year GIAs, and even those institutions that do make such awards, do not offer them to all student-athletes.

For example, the NCAA notes a 2013 survey by the Pittsburgh Post-Gazette.com of the 120 universities that play FBS football. (Filing No. 170-31.) The results showed substantial variation in the responding schools' practices. For instance, a majority of responding institutions had awarded between 1 and 10 multi-year scholarships through February 2013. *Id*. Further, of the 82 responding institutions, 34 (or about 41%) had not awarded multi-year scholarships to any student-athletes. *Id*. Of these 82 institutions, 32 (about 39%) had only awarded between 1 and 10 multiyear scholarships (in all sports). *Id*.

The NCAA highlights a 2013 report by the Chronicle of Higher Education with reported similar information. The Chronicle surveyed the 56 public universities in the six biggest conferences and found that only 35 (63%) of these elite institutions awarded any multi-year

scholarships in any sport. (Filing No. 170-30.) The Chronicle also reported that most of these institutions had awarded multi-year scholarships only to a fraction of their student-athletes, noting that multi-year awards accounted for less than one-tenth of all athletic scholarships at most of those institutions. *Id.*

The NCAA mentions the results of a 2014 open-records request by CBSSports.com, surveying the scholarship practices of the 43 universities that finished in the top 25 football or basketball teams in 2013-14. (Filing No. 170-32.) That investigation revealed that, even among elite programs, there was substantial variation in the number of multi-year scholarships awarded. For instance, of the 28 institutions responding, 5 (about 18%) awarded no multi-year scholarships in any sport and only 12 (about 43%) awarded between 1 and 10 multi-year scholarships in all sports. *Id.*

The NCAA further notes a survey that was taken pursuant to this litigation to investigate current practices with respect to multi-year scholarships. (Filing No. 170-1.) The survey found that, since 2012, only 24% of the responding FBS schools and 6% of the responding FCS schools had awarded multi-year grants to any incoming football student-athletes. *Id.* at 16-17. In addition, even at schools that offered multi-year scholarships to student-athletes generally, relatively few football student-athletes received them, finding that between 8 and 11 percent of FBS grants and between 6 and 11 percent of FCS grants were multi-year. *Id.* at 18-19.

**D.     "Recruitment" of Rock**

Rock contends that he was "recruited" by a variety of Division I schools, including Eastern Michigan University, Boise State University, and Ball State University. (Filing No. 105-14 at 27-29.) However, the NCAA responds that Rock was not recruited by any FBS school as defined by Bylaw 13.02.13.1.

Under NCAA Bylaw 13.02.13, "recruiting" is defined as,

> any solicitation of a prospective student-athlete or a prospective student athlete's relatives (or legal guardians) by an institutional staff member or by a representative of the institution's athletics interests for the purpose of securing the prospective student-athlete's enrollment and ultimate participation in the institution's intercollegiate athletics program.

(Filing No. 170-11 at 3.) The NCAA points out that, under NCAA Bylaw 13.02.13.1, a student-athlete is a "Recruited Prospective Student-Athlete" only if the staff members or athletics representatives engage in one or more of the following actions,

> (a) Providing the prospective student-athlete with an official visit;
> (b) Having an arranged, in-person, off-campus encounter with the prospective student-athlete or the prospective student-athlete's parents, relatives or legal guardians;
> (c) Initiating or arranging a telephone contact with the prospective student-athlete, the prospective student athlete's relatives or legal guardians on more than one occasion for the purpose of recruitment; or
> (d) Issuing a National Letter of Intent or the institution's written offer of athletically related financial aid to the prospective student-athlete….

*Id*.

The NCAA asserts that Rock has no evidence to meet any of these criteria with regards to Eastern Michigan University, Boise State University, Ball State University, or any other FBS school. (Filing No. 170-11; Filing No. 170-5.) In particular, the NCAA explains that Rock did not receive an official visit offer, (Filing No. 170-5 at 3-4); did not have an arranged, in person, off-campus encounter with any coach or representative, (Filing No. 170-5 at 4-6; Filing No. 170-4 at 312); did not have telephone contact on more than one occasion with any coach, staff member, or athletic representative, (Filing No. 170-5 at Nos. 6-7; Filing No. 170-4 at 310-12); did not receive a written offer of athletically related financial aid, (Filing No. 170-5 at Nos. 7-9); and was not issued a National Letter of Intent, (Filing No. 170-5 at 9-10.), from any of these universities.

Further, the NCAA notes that none of these universities have any recruitment records related to Rock. (Filing No. 170-14.)

Instead, the NCAA points out that the only encounter Rock had with a representative of Eastern Michigan University was a conversation with the offensive coordinator and head coach immediately following the day-long football camp he attended at the university the summer before his senior year of high school. (Filing No. 170-4 at 6-8.) The Eastern Michigan University coaches said they could not offer Rock a scholarship "because [Rock] didn't have any game film." *Id*. Rock stated that he "did not have the resources" but recalls sending the tape "after the season". *Id*. Thereafter, Rock did not have any further contacts with Eastern Michigan University. *Id*. Additionally, Rock testified that his high school football coach had a conversation with the coaching staff from Eastern Michigan University shortly after the day-long camp ended. *Id*. However, the NCAA points out that contacts between a prospective student-athlete's coach and an institution do not make the prospective student-athlete recruited under Bylaw 13.02.13.1. (Filing No. 170-11.)

The NCAA also suggests that Rock had no direct contact with any representative of Boise State University. (Filing No. 170-4 at 9-10.) Rock testified that his high school football coach was contacted by Boise State University "about a week before signing day", who later told Rock that Boise State University was "looking to take one more player for this season's recruiting class" but did not know "whether it [was] going to be an offensive player or a defensive player." *Id*. Rock sent game film to Boise State University, however he never heard from Boise State University after that.

Similarly, the NCAA notes that the only direct encounter Rock had with any Ball State University representative was at a day-long football camp he attended at Ball State's campus the

summer before his senior year of high school.  (Filing No. 170-4 at 6.)  While at the camp, Rock spoke with two Ball State coaches.  Rock admits that his discussions with the coaches were "more on a personal level" and limited to helping him become a better player at the camp.  *Id*.  Indeed, even Rock admits that his discussions with Ball State University's coaches did not involve him "being recruited" or being asked to "com(e) onto campus."  *Id*.  Rock did not speak to any coach or representative of Ball State University after the summer camp.

Ultimately, Rock chose to attend Gardner-Webb University, in part based on conversations with Head Coach Patton, indicating that that he would receive his GIA award for five years.  (Filing No. 105-14 at 60-61, 65-67, 73.)

**E.    "Run Off" of Rock**

Three years later, Rock reports that he was "run off" from Garner-Webb University by new Head Coach Dickerson.  Rock defines a "run off" as a situation where an academically capable athlete loses his scholarship or is pressured to transfer because of his coach's desire to give his GIA to another athlete.  (Filing No. 105-8 at 10; Filing No. 105-12 at 6.)  According to Rock, such a situation is distinguished from the circumstances enumerated in NCAA Bylaw 15.3.5.2 ("the carve-out provision"), which permits an institution to cancel financial aid if the student-athlete either renders himself ineligible or voluntarily withdraws from a sport for personal reasons.  (*See* Filing No. 111 at 11 n.4.)WL

Rock enrolled at Gardner-Webb University in 2008 and participated as a member of the football team during the 2008, 2009 and 2010 seasons.  (Filing No. 170-3 at 36.)  After the 2010 football season, Rock chose to enroll at North Carolina State University to participate in a legislative internship program during the Spring 2011 term.  (Filing No. 170-3 at 42-44.)

The NCAA maintains that before Rock left for his internship, Gardner-Webb University's Registrar told Rock that he would have to apply for readmission if he chose to return and that his scholarship would not pay for transfer credit courses not taken at Gardner-Webb University.   In addition, Rock was also informed by Gardner-Webb University's Assistant Athletic Director for Compliance that withdrawing from Gardner-Webb University would nullify his financial aid agreement, meaning that he would not receive aid for the Spring 2011 term and that his aid, having been canceled, could not be renewed for the 2011-12 academic year.   (Filing No. 170-33 at 5.) Despite this information, the NCAA asserts, that Rock chose to leave Gardner-Webb University. (Filing No. 170-3 at 43.)  In contrast, Rock asserts that, while he received "pushback" on whether his semester at North Carolina State University would be funded by his scholarship, no one said "anything about [his] scholarship for the following year".  (Filing No. 170-3 at 47; Filing No. 105-14 at 101.)

Meanwhile, in December 2010, Gardner-Webb University Coach Patton was fired and replaced by Coach Dickerson.  Rock was not "concerned about the impact of [Coach Patton's] firing on his ability to take the internship and retain [his] scholarship" because of his "impression that [his] scholarship was good for four to five years".  (Filing No. 170-3 at 48.)

On June 20, 2011, Gardner-Webb University provided Rock with a formal letter notifying him that he would  not be receiving athletics-based financial aid.  (Filing No. 170-15.)  Rock appealed the decision to the Gardner-Webb University Financial Aid Appeals Committee.  The Committee concluded that Rock had "render[ed] [himself] ineligible to compete at Gardner-Webb University by virtue of voluntarily leaving the University and by not being enrolled full-time during the given semester (per NCAA Bylaw 15.3.4.2 …)."  (Filing No. 170-17.)  On the other hand, Rock points to additional language in the Committee's decision, that his "athletic aid for

2011-2012 was not renewed, per the head coach's decision", suggesting, to Rock at least, that he was, instead, "run off" by the new coach.  (Filing No. 170-17.)  As a result of the Committee's decision, Rock lost a year of GIA, worth $33,130.00.  (Filing No. 105-26 at 6.)

## II.  CLASS CERTIFICATION DISCUSSION

Rock asks that the Court certify two classes; an "Injunctive Relief Class" pursuant to Rule 23(a) and (b)(2) and a "Core Issues Class" pursuant to Rule 23(a), (b)(3), and (c)(4). He also request that the Court appoint him as the class representative for both classes and appoint his counsel as counsel for the classes. The Court will first address the legal standard for class certification and then turn to the merits of each request.

## A.  Legal Standard

Class action lawsuits are governed by Federal Rule of Civil Procedure 23.   Pursuant to Rule 23, the named parties of a class of plaintiffs may sue on behalf of all the members of the class if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). The court is required to conduct "a rigorous analysis" to determine whether the prerequisites of Rule 23(a) have been satisfied. *Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003); *General Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 160-61 (1982) ("actual, not presumed, conformance with Rule 23(a) . . . remains indispensable")).

If the Rule 23(a) requirements are met, the plaintiffs must also satisfy at least one subsection of Fed. R. Civ. P. 23(b); *Messner v. Northshore Univ. Health System*, 669 F.3d 802, 811 (7th Cir. 2012). Fed. R. Civ. P. 23(b)(2) applies if the party opposing the class has acted or

refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.  Fed. R. Civ. P. 23(b)(3) applies if the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

The parties seeking class certification bear the burden of proof in establishing each of the requirements under Rule 23.  *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 90 (7th Cir. 1977).  The failure to satisfy any one of these elements precludes certification.  *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 596 (7th Cir. 1993); *Cunningham Charter Corp. v. Learjet, Inc.*, 258 F.R.D. 320, 325 (S.D. Ill. 2009).  Further, the court has broad discretion to determine whether certification is appropriate.  *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008).

In deciding whether to certify a class, the court is not required to accept the allegations in the complaint as true.  *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676-77 (7th Cir. 2001) ("[c]ertifying classes on the basis of incontestable allegations in the complaint moves the court's discretion to the plaintiff's attorneys—who may use it in ways injurious to other class members, as well as ways injurious to defendants.").  While consideration of class certification is not "a dress rehearsal for trial on the merits," the court "must receive evidence and resolve the disputes before deciding whether to certify the class."  *Messner*, 669 F.3d at 811 (quoting *Szabo*, 249 F.3d at 676); *see also Livingston v. Assocs. Fin., Inc.*, 339 F.3d 553, 558 (7th Cir. 2003) ("[c]lass certification requires a *rigorous investigation* into the propriety of proceeding as a class") (emphasis added).

Indeed, the court should make any factual and legal inquiries needed to ensure that the requirements for class certification are satisfied, even if the underlying considerations overlap with the merits of the case.  *Szabo*, 249 F.3d at 677 ("similarities of claims and situations must be

demonstrated rather than assumed"); *Messner*, 669 F.3d at 811; *In re Bromine Antitrust Litig.*, 203 F.R.D. 403, 407 (S.D. Ind. 2001). Therefore, in evaluating class certification, the court must take into consideration the substantive elements of the plaintiff's cause of action, inquire into the proof necessary for the various elements, and envision the form that trial on the issues would take. *Cima v. WellPoint Health Networks, Inc.*, 250 F.R.D. 374, 377 (S.D. Ill. 2008).

**B.**     **"Core Issues" Class**

Rock seeks to certify the following "Core Issues Class" pursuant to Rule 23(a), 23(b)(3), and 23 (c)(4):

> All individuals who, from December 17, 2007 to the present, have been classified under NCAA rules as an "initial counter" (during their first fall term on campus or in spring term prior to their first fall term on campus) on an [sic] NCAA Division I football team, and
>
> (1) were recruited by at least one school that is a member of the NCAA's Division I Football Bowl Subdivision ("FBS") (at the time of their recruitment or during their period of NCAA athletics eligibility), and
>
> (2) did not receive their initial year's athletics-related grant-in-aid for the full duration of their undergraduate education or five (5) years, whichever is shorter.

(Filing No. 111 at 10-11.) Excluded from the proposed class are individuals whose athletics-related GIAs were reduced, cancelled or not renewed due to one of the reasons enumerated in Bylaw 15.3.4.2 of the NCAA Division I Manual.[1] *Id.* at 11 n.4. NCAA Bylaw 15.3.4.2 permits an institution to cancel financial aid if the student-athlete: (a) renders himself or herself ineligible; (b) fraudulently mispresents information on an application, letter of intent, or financial agreement; (c) engages in serious misconduct; or (d) voluntarily withdraws from a sport at any time for personal reasons. (Filing No. 105-6 at 15.)

---

[1] Also excluded from both proposed classes are the employees of the NCAA and their member institutions, employees, class counsel and their employees, and the judicial officers and associated court staff assigned to this case. (Filing No. 111 at 11 n.4.)

1.      <u>**Ascertainability of Class**</u>

To begin, certification of the Core Issues Class is not appropriate because the proposed class is not ascertainable.  "Rule 23 requires that a class be defined . . . based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).  Although the Seventh Circuit characterizes the test for determining ascertainability as "weak", plaintiffs nevertheless "flunk this requirement" when their class is "defined too vaguely," or when the class is "defined by subjective criteria."  *Id*. at 659-61.

Rock contends that the proposed class is defined by objective criteria.  However, both the definition of "recruited" and the "carve out" provision are impermissibly vague and subjective, rendering the proposed class unascertainable, even under the Seventh Circuit's "weak" test.

a.      <u>**Vague Class Definition**</u>

When the relevant criteria for membership are unknown, the class is vague and cannot be certified.  *See Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 495 (7th Cir. 2012) (concluding that a proposed class of disabled students eligible for special education was too vague, noting that identifying such individuals is a "complex, highly individualized task, and cannot be reduced to the application of a set of simple, objective criteria"); *see also Mullins*, 795 F.3d at 660 ("[v]agueness is a problem because a court needs to be able to identify who will receive notice, who will share in any recovery, and who will be bound by a judgment").

First, to meet the class definition, Core Issues Class members must prove that they were "recruited" by at least one FBS school.  However, Rock has presented no class-wide evidence to demonstrate how a student-athlete can be identified as having been "recruited".  Rock does not even attempt to define recruitment under NCAA Bylaw 13.02.13, likely conceding that he personally does not meet the NCAA's definition.  (Filing No. 170-11; Filing No. 170-5.)  Instead,

Rock makes broad assertions to yet unidentified evidence of potential class members and offers a number of evolving definitions to identify "recruited" class members. Rock's repeated attempts to "move the goalposts" further demonstrate the vagueness of his proposed definition of "recruited".

For instance, Rock claims that the NCAA maintains "Initial Request Lists" that identify recruited student athletes. (Filing No. 111 at 3). Rock does not explain the importance of these lists, nor did he produce such lists in support of his motion. Similarly, Rock's expert, Daniel A. Rascher ("Rascher"), asserts that "schools keep a running list of all athletes considered [recruited student athletes]". (Filing No. 110 at 242.) Further, in Rock's case at least, the FBS schools, which he contends recruited him, indicated that they do not have evidence that Rock was recruited. (Filing No. 170-14.) As such, even Rock cannot establish that he was "recruited" using this suggested evidentiary source.

Potentially recognizing these evidentiary deficiencies, Rock proposes several alternative tests to define recruitment. For example, Rascher presents a "proxy" method for determining which student-athletes were "recruited", assuming that all FCS student-athletes who received a grant over 90% from an FCS institution were also recruited by FBS institutions. (Filing No. 110 at 242-43.) However, Rock does not contest that Rascher fails to support this assumption with evidence. Such expert opinions, which are unsupported by "data and reasons", do not have value. *See Kenosha Liquor Co. v. Heublein, Inc.*, 895 F.2d 418, 420 (7th Cir. 1990) (calling such unsupported expert opinions "worthless").

Rascher also suggests that a student-athlete is considered "recruited" when a "school show[s] an economic interest in [a student-athlete] and they take some sort of a tangible action to,

you know, activate that interest." (Filing No. 172 at 41.)  However, Rock makes no effort to define

"economic interest" or "tangible action" with objective criteria that can be employed class-wide.

Further, another of Rock's experts, Michael Felder ("Felder"), purports to offer a "real

world" definition of "recruited" that does not have the "impediments" of the NCAA Bylaws. (Filing

No. 185-19 at 4-5.)  This definition would include contact at football camps and unofficial campus

visits and conversations between coaches about student-athletes. (Filing No. 185-19 at 4-9.)  When

asked whether he was aware of "an industry standard definition of recruiting", Felder replied,

> Not a concise one, honestly. . . . it's one of those things that people that are around
> it know it when they see it.  You understand the difference between this kid sent
> his tape in and this coach wants more tape. … And I'm sorry, I can't make it
> concise, but it's one of those things that I really -- I feel like I know it when I see
> it, and I think most people, regarding the industry … they understand it when they
> see it.

(Filing No. 197 at 93-95.)     When asked whether Rock was "recruited" under this definition,

Felder said that he could not opine without first obtaining more information.  *Id.* at 92-93.

Each of these definitions of "recruited" are too vague and do not allow the Court to identify

"who will receive notice, who will share in any recovery, and who will be bound by a judgment"

*Mullins*, 795 F.3d at 660.  Instead, the relevant criteria for defining "recruited" remains unknown,

rendering the proposed class definition too vague to justify certifying the class.  *See Jamie S.*, 668

F.3d at 495.

Second, Core Issues Class members must also prove that they lost their scholarships for

reasons other than those identified in the carve-out provision, NCAA Bylaw 15.3.4.2. (Filing No.

105-6 at 15.)  Rock has presented no class-wide evidence to demonstrate how a student-athlete

can be objectively identified as falling outside of the carve-out provision.  Indeed, even Rascher

admitted that he has no way of identifying student-athletes who are subject to the provision, stating

merely that class members are "identifiable through existing data maintained by the NCAA and

schools". (*See* Filing No. 111 at 26; Filing No. 110 at 240-44.)  Conceding this impediment, Rascher stated that identifying class members would require taking discovery from every potential class member and their universities, and then making a factual determination about each reduction, cancelation or non-renewal.  (Filing No. 170-2 at 25-26; Filing No. 110 at 10 n.10.) This need for detailed, individualized fact-finding, simply to determine class membership, reveals that the proposed class definition is too vague, making the Core Issues Class unsuitable for certification. *See Steimel v. Minott*, No. 1:13-CV-957-JMS-MJD, 2014 WL 1213390, at *12 (S.D. Ind. Mar. 24, 2014) (concluding that a proposed class was not ascertainable when identification would require a "[c]ourt mandated individualized inquiry into the specific needs of each [potential class member]").

### b.   Subjective Class Definition

The Seventh Circuit has "long recognized an implicit requirement under Rule 23 … that membership be defined by objective criteria rather than by, for example, a class member's state of mind." *Mullins*, 795 F.3d at 657; *see also Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981).  For the same reasons Rock's definition of "recruited" is too vague, it is also too subjective.  For instance, at his deposition, Rock stated that whether a student-athlete is recruited depends on the substance of the conversations between a prospective student-athlete and a representative from the school.  (Ex. 4 at 291:7-24.)  Similarly, Rascher testified that being considered recruited depends on a school "showing an economic interest" and taking "some sort of tangible action." (Ex. 2 at 156:7-13.)  However, both definitions require individualized inquiries to determine the substance of the conversations, the actions taken, and the intent behind them. Thus, Rock's proposed class definition is too subjective to be ascertainable.

Likewise, Rock's carve-out definition is also too subjective.  Rock's definition of being "run off", which Rock presents as an exception to the carve-out provision, depends on "an academically capable athlete los[ing] his scholarship or [being] pressured/encouraged to transfer because of his coach's desire to give his (restraint-limited) GIA to another athlete." (Filing No. 110 at 127.)  Under this definition, identifying whether a student athlete falls outside of the carve-out provision would require an individualized determination of both the student-athlete's subjective state of mind (did he or she feel pressured to leave?) and the coach's subjective state of mind (did he or she want to give the scholarship to another athlete?).   Because the Core Issues Class is defined in terms of a subjective state of mind rather than in terms of objectively determined conduct, the proposed class is further unascertainable.  *See Simer*, 661 F.2d at 669-71 (affirming a district court's certification denial of a class of people who felt "discouraged" from applying for government energy assistance).

### c.       Affidavits

Rock attempts to get around the issue of ascertainability by proposing that all class members could submit affidavits to indicate both that they were "recruited" and that they are not subject to the carve-out provision.  *See Mullins*, 795 F.3d at 659, 668-69.  While the Seventh Circuit has refused to deem such affidavits insufficient as a matter of law, at least in low value consumer cases, the vagueness and subjectivity of the proposed class definitions would make it nearly impossible for the NCAA or a case administrator to sort out the self-serving affidavits from the meritorious ones.  *Id*.

Indeed, Rock's case is a perfect example of the difficulties in determining, by affidavit, whether an individual is both recruited and not subject to the carve-out provision.  Rock earnestly believes that he was in fact recruited, at least when applying his experts' "real world" and "I know

it when I see it" definitions of "recruited". However, under the NCAA's definition of "recruited", which is far narrower and is based on NCAA Bylaw 13.02.13, even Rock appears to concede that he would not be considered "recruited". Similarly, the parties vigorously dispute whether Rock was "run-off" by his new coach or voluntarily left his university with knowledge that his athletic scholarship would be canceled as a result. While Rock may honestly believe his version of the facts and would be prepared to attest that he was "run off" by Gardner-Webb University's new head coach, the NCAA contends that Rock made an informed choice to voluntarily forfeit his GIA in favor of a prestigious internship opportunity.

Accordingly, under the proposed Core Issues Class definition, determining whether a student is "recruited" or is subject to the carve-out provision is entirely up to the parties' subjective points of view, likely forcing this Court to resolve an endless stream of competing affidavits, and rendering it next to impossible to objectively and efficiently determine who is actually a class member. Indeed, if the Court cannot even rely on Rock's affidavits to determine whether he is a class member, the Court cannot reasonably certify a class of hundreds or even thousands of potential class members, each presenting their own unique factual circumstances and each attesting that they, too, are members of the purported class. As such, because of Rock's vague and subjective class definition, determining class membership would result in an "arduous individual inquiry" rather than a "ministerial review". *See Selburg v. Virtuoso Sourcing Grp. LLC*, No. 1:11-cv-1458-RLY-MJD, 2012 WL 4514152, at *2 (S.D. Ind. Sept. 29, 2012).

Although these issues may be more effectively addressed under the requirements of Rule 23(a) and Rule23(c), the Court considers Rock's Core Issues class definition to be too vague and subjective to even meet the "weak" test of ascertainability, as Rock fails to present a objectively determined class and, instead, defines the Class with subjective, state-of-mind criteria. *See*

*Mullins*, 795 F.3d at 659-60.  As a result, Rock's proposed Core Issues class definition is too vague and subjective to be ascertainable, and class certification is not warranted for this reason.

### 2.   Federal Rule of Civil Procedure 23(a) Requirements

Nevertheless, even if the Court were to find that the Core Issues Class is ascertainable, Rock cannot satisfy all of the requirements of Fed. R. Civ. P. 23(a).

### a.   Numerosity

The first Rule 23(a) requirement, numerosity, requires that the class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  In order to satisfy the numerosity element, a plaintiff is not required to specify the exact number of persons in the class. *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989); *Jackson v. Nat'l Action Fin. Servs.*, 227 F.R.D. 284, 287 (N.D. Ill. 2005) (noting that a class of forty is generally sufficient to satisfy the numerosity requirement).  However, a plaintiff may not rely on "conclusory allegations that joinder is impractical or on speculation as to the size of the class".  *Marcial*, 880 F.2d at 957.

Rock claims that the Core Issues Class numbers in the hundreds and that such class members are "identifiable through NCAA data".  (Filing No. 111 at 18-19; Filing No. 110 at 241-44.)  However, the NCAA criticizes this estimate as speculative, noting that Rock's proposed list of potential class members contains several individuals who are excluded under the carve-out provision of the class definition.  (*See* Filing No. 169 at 24) (discussing NCAA expert Mr. Stiroh's review of Rock's list.)   In response, Rock asserts that he only needs to put forth "good faith estimates" of the number of potential class members.  *See Jagla v. LaSalle Bank*, No. Civ. A. 05 C 6460, 2006 WL 1005728, at *4 (N.D. Ill. Apr. 12, 2006).

Despite the difficulty in determining which class members were actually "recruited" and which class members are not subject to the carve-out provision, the Court is persuaded that Rock's

estimates are sufficient to establish numerosity.  The Court notes that the NCAA admits in parts of its response brief that the proposed class could number in the "hundreds or even thousands". (*See, e.g.*, Filing No. 169 at 28, 37.)  As such, the Rock has met his burden with regards to the numerosity requirement.

> ### b.   __Commonality__

The second Rule 23(a) requirement, commonality, requires that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Courts generally find that there is sufficient commonality among class members if their claims share a "common nucleus of operative fact." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992); *Cunningham Charter Corp.*, 258 F.R.D. at 328.  Some factual variation does not preclude a finding of commonality; there need only be at least one question of law or fact common to the class.  *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998); *Cunningham Charter Corp.*, 258 F.R.D. at 328.

Rock contends that his challenge to the annual limits on the number of football scholarships a member school could award is an issue common to the class.  (Filing No. 111 at 10, 20-21.)  In particular, Rock asserts that determining whether the NCAA and its members conspired to limit the number of GIA awards, in restraint of economic competition and in violation of the Sherman Act, is a common issue.  Rock asserts that the effect that these limits had on depriving class members of the option to negotiate, receive, or maintain multi-year GIA awards is also an issue common to the class.  Further, Rock contends that common issues exist to determine the relevant "labor market" and the NCAA's power with the market.

The Court agrees that the proposed class members' claims derive from a common nucleus of operative fact and share common legal theories.  *See In re NCAA I-A Walk-On Players Litig.*, No. C04-1254C, 2006 WL 1207915, at *5 (W.D. Wash. May 3, 2006) ("Walk-On") (concluding

that the commonality requirement was met and identifying common issues to include: whether the One-Year Rule is "a horizontal restraint on trade in violation of the Sherman Act", whether there is "a relevant market for antitrust purposes", whether the NCAA and its members "improperly monopolized Division I-A college football", and whether "there has been an injury to competition" as a result); *White v. NCAA*, No. CV 06-0999-RGK (MANx), 2006 WL 8066803, at *1-2 (C.D. Cal. Oct. 19, 2006) (concluding that the commonality requirement was met where a class of student-athletes challenged the NCAA's caps on GIAs). As such, the commonality requirement has been met with regards to the Core Issues Class.

### c.   **Typicality**

The third Rule 23(a) requirement, typicality, requires that the claims of the representative party be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A party's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and the class representative's claims are based on the same legal theory. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006); *Bledsoe v. Combs*, No. NA 99-153-C H/G, 2000 WL 681094, *2 (S.D. Ind. Mar. 14, 2000). Even though some factual variations may not defeat typicality, the requirement is meant to ensure that the class representatives' claims "have the same essential characteristics as the claims of the class at large." *Id.* When evaluating typicality, courts generally focus on the conduct of the defendant and the nature of the injuries to the putative class members. *Rosario*, 963 F.2d at 1018; *Cunningham Charter Corp.*, 258 F.R.D. at 328.

Although Rock's antitrust claims are substantively similar to those of the class, Rock faces a number of factual defenses that are unique to him. As already explained, it is not clear whether Rock meets his own definition of a Core Issues Class member. In particular, the NCAA contends

that, under its definition of "recruited", which is defined by Bylaw 13.02.13.1, Rock was not recruited because Rock did not receive an official visit offer, did not have an arranged, in person, off-campus encounter with any coach or representative, did not have telephone contact on more than one occasion with any coach, staff member, or athletic representative, did not receive a written offer of athletically related financial aid, and was not issued a National Letter of Intent, from any FBS University.  (Filing No. 170-11; Filing No. 170-5.)  In contrast, under the purported "real world" definitions of "recruited" that were presented by Rock's experts, Rock contends that he was recruited because he and his high school coaches had informal contact with FBS coaches and staff at football camps.  (Filing No. 185-19 at 4-9; Filing No. 170-4 at 6-10.)

Similarly, the NCAA contends that Rock falls within the carve-out provision of the class definition because he voluntarily left his university and knowingly forfeited his athletic scholarship, thereby meeting two of the criteria listed in Bylaw 15.3.4.2.  (Filing No. 105-6 at 15; Filing No. 170-3 at 42-44; Filing No. 170-18; Filing No. 170-33 at 5; Filing No. 170-15; Filing No. 170-17.)  However, Rock argues that he lost his athletic scholarship because he was "run off" by a new head coach who no longer wanted Rock on the team.  (Filing No. 170-17.)

Without deciding the merits of these opposing arguments, the Court notes that these individual factual issues and defenses are unique to Rock, and Rock's claims are, therefore, atypical of those of other class members.  *See Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619-TWP-TAB, 2015 WL 329013, *4-5 (S.D. Ind. Jan. 22, 2015) (Pratt, J.) (concluding that the plaintiff's claims were not typical because the defendants' defenses against the named plaintiff's claims were not typical of the defenses against the proposed class).  As a result, Rock has not satisfied the typicality requirement with regards to the Core Issues Class.

### d.    <u>Adequacy</u>

The fourth Rule 23(a) requirement, adequacy, requires that the class representative be able to "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Adequacy of representation is composed of two parts: the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the "different, separate, and distinct interest" of the class members.  *Retired Chi. Police Ass'n*, 7 F.3d at 598.

A class representative is adequate as long as its claims do not conflict with, and are not antagonistic to the claims and interests of the class members it seeks to represent.  *Id.*; *Cunningham Charter Corp.*, 258 F.R.D. at 329.  In order to satisfy the adequacy prerequisite, the class representative must "possess the same interest and suffer the same injury as the class members." *Uhl v. Thoroughbred Tech. & Telecomms., Inc.,* 309 F.3d 978, 985 (7th Cir. 2002); *Cunningham Charter Corp.*, 258 F.R.D. at 329.  Also, counsel for the named plaintiffs must be experienced, qualified, and generally able to conduct the litigation.  *See Eggleston v. Chi. Journeymen Plumbers' Local Union No. 130, U.A.,* 657 F.2d 890, 896 (7th Cir. 1981); *Cunningham Charter Corp.*, 258 F.R.D. at 329 (noting that the adequacy prerequisite requires that the court select counsel that is "best able to represent the interests of the class.").

The NCAA does not challenge the adequacy of Rock's attorneys, and the Court agrees that counsel is adequate.  However, the NCAA vigorously challenges the adequacy of Rock to serve as the class representative. Specifically, the NCAA reasserts that Rock was not "recruited" under Bylaw 13.02.13.1 and that Rock voluntarily forfeited his scholarship and is therefore subject to the carve out provision as defined by Bylaw 15.3.4.2.  As a result, the NCAA contends that Rock is inadequate to serve as a class representative because he is not a member of the class he claims to represent.  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) ("a class

representative must be part of the class and possess the same interest and suffer the same injury as the class members"); *People of State of Ill. ex rel. Bowman v. Home Fed. Sav. & Loan Ass'n*, 521 F.2d 704, 707 (7th Cir. 1975) (dismissing a class action complaint where the plaintiff was not a member of the class he purported to represent).

In this regard, Rock repeats his factual arguments, contending that he is, indeed, a member of the purported class, recruited by several FBS schools and not subject to the carve-out provision but, rather, "run off" from his chosen university. Even if the Court were to assume Rock's versions of the facts for the purpose of this motion, such factual disputes heighten the Court's concerns regarding both the ascertainability of the class and the typicality of Rock's claims.

Certainly, if Rock fails to meet his own Core Issues class definition, he is an inadequate class representative. However, the Court need not decide whether the adequacy requirement of Rule 23(a) is met in this case because Rock cannot demonstrate that his claims are typical of the other class members; and, therefore, Rock cannot satisfy all of the requirements of Fed. R. Civ. P. 23(a).

### 3. **Fed. R. Civ. P. 23(b)(3) Requirements**

Nevertheless, even assuming Rock could satisfy the requirements of Fed. R. Civ. P. 23(a), Rock cannot satisfy Fed. R. Civ. P. 23(b)(3)'s additional requirements of predominance and superiority. In addition to satisfying all four of the Rule 23(a) prerequisites, the party seeking class certification must demonstrate that its proposed class falls within at least one of the enumerated Rule 23(b) categories. *Cunningham Charter Corp.*, 258 F.R.D. at 330. In this case, Rock seeks certification under Fed. R. Civ. P. 23(b)(3).

Fed. R. Civ. P. 23(b)(3) authorizes the certification of a class action if the court finds that the questions of law or fact common to the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and

efficiently adjudicating the controversy. The Supreme Court has explained that the "predominance" and "superiority" requirements of Rule 23(b)(3) serve to limit class certification to cases where "a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997); *Cunningham Charter Corp.*, 258 F.R.D. at 332. Additionally, implicit in Rule 23(b)(3) is the understanding that it was designed "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action . . . by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997); *Cunningham Charter Corp.*, 258 F.R.D. at 332.

The predominance requirement is satisfied when "common questions represent a significant aspect of a case and . . . can be resolved for all members of a class in a single adjudication." *Messner*, 669 F.3d at 815. At the class certification stage, a plaintiff need not prove his legal theory but must, instead, "demonstrate that their legal theory is *capable of proof at trial* through evidence that is common to the class rather than individual to its members." *Messner*, 669 F.3d at 818 (emphasis in original); *see also Blair v. Supportkids, Inc.*, No. 02 C 0632, 2003 WL 1908031, *4 (N.D. Ill. Apr. 18, 2003) ("[i]f liability questions are not subject to class wide proof but, rather, would require both individual and fact intensive determinations, common issues cannot be found to predominate"); *Golon v. Ohio Sav. Bank*, No. 98 C. 7430, 1999 WL 965593, *4 (N.D. Ill. Oct. 15, 1999) (noting that predominance may be found "when there exists generalized evidence that proves or disproves an element on a simultaneous, class-wide basis", thereby "obviat[ing] the need to examine each class member's individual position.").

There is no mathematical or mechanical test for evaluating predominance.  *Messner*, 669 F.3d at 814.  However, the purpose of the predominance requirement is to ensure that a proposed class is sufficiently cohesive to warrant adjudication by representation.  *Golon*, 1999 WL 965593, at *4. "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question."  *Messner*, 669 F.3d at 814.

Rock contends that common issues predominate because "all members of the Core Issues Class were impacted by the restraints because all members actually lost or had their scholarships reduced".  (Filing No. 111 at 36.)  In this regard, Rock's expert, Rascher opines as follows,

> [H]ad the rules in suit never been adopted, the pattern of conduct prior to 1973 (where most schools gave 4-year grants), combined with the rapid re-adoption of multi-year offers, is strong (common) evidence that but for the alleged misconduct, competition would lead to 4-year grants (or longer) becoming the norm in the FBS Recruiting Submarket.

(Filing No. 110 at 235.)  In addition, Rascher opines that "but for the restraints in suit, *all participants in the FBS Recruiting Submarket (including all members of the Core Issues Class) would have received a multi-year Division I GIA*".  *Id*. (emphasis added.)  In support of these opinions, Rascher points to the number of multi-year GIAs awarded before 1973 and after 2012 when the challenged One-Year Rule was not in effect, and asserts that such evidence is useful to demonstrate class-wide, antitrust impact.  Rock also asserts that, absent the restraints, the Core Issues Class members would also "have stronger bargaining positions, better options, and many of them would actually take better offers".  (Filing No. 184 at 16; Filing No. 110 at 14-15.)

However, as the NCAA points out, the facts do not support Rascher's extreme position that all members of the Core Issues Class would have received a multi-year GIA in the absence of the

challenged rules.  Instead, the NCAA points to evidence that, before the challenged rules were enacted, schools and conferences varied in the term and number of their athletic scholarship awards. (Filing No. 105-5 at 16; Filing No. 170-19; Filing No. 170-20; Filing No. 170-22; Filing No. 170-23; Filing No. 170-24; Filing No. 170-8; Filing No. 170-25 at 629-30; Filing No. 170-26; Filing No. 170-27.)  Further, the NCAA notes that, since the repeal of the One-Year Rule, many member institutions have declined to offer multi-year GIAs, and even those institutions that do make such awards, do not offer them to all student-athletes, and identifies a number of studies in support. (Filing No. 170-1; Filing No. 170-30; Filing No. 170-31; Filing No. 170-32.)

Rather, it is clear that, in order to determine the actual impact to the individual class members, individual inquires will predominate over common ones.  Indeed, even accepting Rock's more conservative approach that "many of [the class members] would actually take better offers", thereby proving antitrust injury in a general matter (*i.e.*, some players were hurt by the One-Year Rule and the GIA Cap), anti-trust injury as to each member of the class cannot be proven without considering the facts surrounding each class member, including whether each member would have actually received a multi-year GIA or would not have otherwise had their GIA reduced or canceled. *Compare Walk-On*, 2006 WL 1207915, at *12.  As such, with the exception of Rascher's unsubstantiated before-and-after opinion, Rock has offered no other method of proving that the purported class members would have been injured by the restraint.  *Id.* ("[t]he nexus between the number of scholarships available in the 'but for' world and the members of the purported class (*i.e.,* matching scholarships with real players) requires individualized proof").

Accordingly, even if there could be some level of relevant common proof of generalized antitrust injury, the individual issues regarding the critical element of anti-trust liability clearly predominate. Rock also requests certification of his Core Issues Class under Fed. R. Civ. P.

23(b)(4), bifurcating issues of liability from damages.  However, because the Court has already concluded that issues of liability, particularly the impact of the alleged anti-trust violations, cannot be easily established through class-wide proof because individual inquiries predominate, the Court need not consider this additional step.

Consequently, Rock cannot demonstrate that his theory of common antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members.[2]  *See Messner*, 669 F.3d at 818; *Blair*, 2003 WL 1908031 at *4; *Golon*, 1999 WL 965593 at *4.  Therefore, common issues do not predominate.

Further, as already discussed, Rock's proposal to have every potential class member submit affidavits to demonstrate that he or she was "recruited" and not subject to the carve-out provision of NCAA Bylaw 15.3.5.2, would potentially require thousands of individual inquiries into each potential class member's recruitment and loss of scholarship, inquires that are likely to be hotly contested and that will require the Court to make individual determinations of fact, as Rock's own case demonstrates.  *See Bledsoe*, 2000 WL 681094, at *4 (holding that, when "the court [cannot] determine whether an individual was a member of the class without hearing evidence on what would amount to the merits of each person's claim", "the proposed class is unmanageable virtually by definition").  Further, because Rock seeks the difference between a full GIA and the aid he actually received, in his case $33,130.00, and can recover treble damages and attorneys' fees under the

---

[2] Courts frequently deny certification when class-wide legal theories cannot be demonstrated through common evidence. *See, e.g.*, *Cunningham Charter Corp.*, 258 F.R.D. at 334-35 (concluding that individual factual assessments regarding each plaintiff's warranty denial predominated and precluded class certification because the common questions were not susceptible to class-wide proof, creating "intractable manageability problems" and "casting grave doubt on the superiority of the class mechanism" for resolving the plaintiffs' claims); *Blair*, 2003 WL 1908031 at *5 (concluding that individual factual assessments regarding each plaintiff's child support status predominated and precluded class certification); *Bledsoe*, 2000 WL 681094 at *5 (concluding that individual factual assessments regarding each plaintiff's police search predominated and precluded class certification); *Williams v. Ford Motor Co.*, 192 F.R.D. 580, 585 (N.D. Ill 2000) (concluding that individual factual assessments regarding each plaintiff's warranty contracts predominated and precluded class certification).

Sherman Act, this is not a case where a class action must be balanced against no litigation at all. *See Mullins*, 795 F.3d at 664.  As such, a class action is not superior to individual actions.

Because Rock cannot satisfy the predominance and superiority requirements of Fed. R. Civ. P. 23(b)(3), class certification of the Core Issues Class is not appropriate for this reason as well.

## C.    Injunctive Relief Class

Rock also seeks to certify an Injunctive Relief Class.  The NCAA does not appear to argue that the requirements of Fed. R. Civ. P. 23(a) are not met.  Further, the Court finds these requirements to be met.  Specifically, Rock contends: that the number of potential class members numbers in the thousands (satisfying numerosity); and the parties do not dispute that Rock fits the class definition of an "initial counter" on a Division I-A football team and shares the same interests as the proposed class (satisfying typicality, commonality, and adequacy).  Instead, the NCAA contends that Rock does not have standing to represent the class.

### 1.    Class Definition

Rock also seeks to certify the following "Injunctive Relief Class" pursuant to Rule 23(a) and 23(b)(2):

> All individuals who, from December 17, 2007 to the present, have been classified under NCAA rules as an "initial counter" (during their first fall term on campus or in the spring term prior to their first fall term on campus) on an [sic] NCAA Division I football team.

(Filing No. 111 at 10.)

Rock and the Injunctive Relief Class seek to enjoin the NCAA from restraining competition in the labor market for Division I football players, including but not limited to an order prohibiting the following,

1. the implementation or enforcement of any rule capping the number of GIAs a school can offer for each team in a given year;

2. the implementation or enforcement of any rule limiting the term of any GIAs;

3. discussions between the NCAA and/or among its member institutions regarding the number, monetary value, or term of GIAs they may or may not offer.

*Id*. at 12.

### 2.     <u>Fed. R. Civ. P. 23(b)(2) Requirements</u>

Fed. R. Civ. P. 23(b)(2) provides for the certification of an injunctive relief class when a defendant has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole". The NCAA does not challenge whether the proposed class meets the criteria of Rule 23(b)(2).

Rather, the NCAA contends that Rock does not have standing to represent the class. The "irreducible constitutional minimum of standing" requires a showing of (1) injury in fact; (2) causation; and (3) redressability. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-04 (1998); *Scherr, v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073-74 (7th Cir. 2013). The NCAA points out that Rock ended his NCAA eligibility under NCAA Bylaw 12.2.5, when he signed a contract with a professional football team on March 28, 2012. (Filing No. 170-3 at 65-6; Filing No. 170-12 at 3.) From that day forward, about four months before he filed this lawsuit, Rock became ineligible to participate as a student-athlete.

With that backdrop in mind, the NCAA contends that Rock cannot show injury-in-fact or redressability. Showing injury in-fact requires a "real and immediate" threat of future violations of the plaintiff's rights. *Scherr*, 703 F.3d at 1074. However, as the NCAA points out, Rock will never again be subject to NCAA rules as a student-athlete. Further, because the challenged NCAA

rules no longer affect Rock, the NCAA argues that no injunction against the NCAA can redress any injury to him. *See, e.g.*, *Steel Co.*, 523 U.S. at 109.

In response, Rock argues that the "inherently transitory" rule applies to his proposed Injunctive Relief Class, preventing dismissal based on lack of standing. "[T]he relation-back doctrine may apply in Rule 23 cases where it is 'certain that other persons similarly situated' will continue to be subject to the challenged conduct and the claims raised are 'so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.'" *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1530-31 (2013). "The 'inherently transitory' rationale was developed to address circumstances in which the challenged conduct was effectively unreviewable, because no plaintiff possessed a personal stake in the suit long enough for litigation to run its course". *Id.* at 1531 (noting further that the doctrine "has invariably focused on the fleeting nature of the challenged conduct giving rise to the claim, not on the defendant's litigation strategy").

The Court finds this argument to be persuasive, given the fact that student-athletes are limited in their years of eligibility and, as this case demonstrates, class actions are often protracted and drawn out. However, the Court notes that, in Rock's case, he was no longer eligible to compete as a student-athlete *before* he filed his Complaint. As such, this is not a matter of Rock "timing out" of the case. Instead, at no point in the life of this case, did Rock have standing to seek injunctive relief. Accordingly, because Rock lacks standing to serve as a class representative of his proposed Injunctive Relief Class, certification of that class is also not warranted. *See Holmes v. Fisher*, 854 F.2d 229, 233 (7th Cir. 1988) ("[t]o permit the certification of a class headed by a 'representative' who did not have a live controversy with the defendant on the day the suit began would be to jettison the last vestiges of the case-or-controversy requirement in class actions").

**D.**     <u>**Conclusion**</u>

In sum, Rock's Core Issues Class is not ascertainable because it is too vague and subjective. Further, Rock's Core Issues Class cannot meet the Fed. R. Civ. P. 23(a) requirement of typicality or the Fed. R. Civ. P. 23(c) requirements of predominance and superiority.  As a result, certification of his proposed Core Issues Class is not appropriate.  In addition, because Rock lacks standing certification of his Injunctive Relief Class is also not appropriate.  Accordingly, the Court denies Rock's motion for class certification.

### III.  **CONDITIONAL INTERVENTION DISCUSSION**

Recognizing the deficiencies in Rock's class certification motion, Pugh filed his Conditional Motion to Intervene as a class representative.  Because the Court has concluded that Rock's Core Issues Class is not certifiable for reasons beyond the Fed. R. Civ. P. 23(a) requirements, Pugh's intervention would not "save" the Core Issues Class.  Accordingly, at least with regards to the Core Issues Class, Pugh's motion to intervene is denied as moot.

To begin, Pugh is not entitled to mandatory intervention.  Fed. R. Civ. P. 24(a)(2) requires the Court to permit a person to intervene when:  (1) the person claims an interest relating to the property or transaction that is the subject of the action; (2) the disposition of the action may as a practical matter impair or impede the person's ability to protect his interest; and (3) the person's interest is not adequately protected by the existing parties to the action.

Pugh has not established that the denial of Rock's class certification motion would impair or impede his ability to protect his interest.  While Pugh may not be able to proceed as a part of the proposed Core Issues Class, nothing in this Court's order will preclude Pugh from seeking redress in his own, currently-pending action, alleging the same claims as Rock.  *See Southmark Corp. v. Cagan*, 950 F.2d , 419 (7th Cir. 1991) (affirming a district court's conclusion that the impairment prong had not been met by an intervenor who had already sought relief in a separate pending action); *Shea v. Angulo*, 19 F.3d 343, 346 (7th Cir. 1994) (affirming a district court's conclusion that the impairment prong had not been met by an intervenor who "remain[ed] free to initiate his own suit against [the defendant]" regardless of the outcome of the underlying action).

In addition, Pugh is also not entitled to permissive intervention.  Fed. R. Civ. P. 24(b) gives the Court discretion to permit a person to intervene when: (1) the person has a claim or defense

that share with the main action a common question of law or fact, and (2) the intervention would not unduly delay or prejudice the adjudication of the original parties' rights.

This case is nearly four years old, and discovery and briefing on the motion for class certification has lasted almost a year and a half.  Pugh's attorneys, who are the same attorneys that represent Rock, have known, at least since November 2015, of the potential issues facing Rock as a class representative but waited until the briefing on the motion for class certification was completed before filing the motion to intervene.  Further, according the NCAA, Pugh's attorneys knew or should have known about those issues even a year earlier, in November 2014, when the NCAA filed its Statement of Claims and Defenses.  (Filing No. 103 at 5-7.)

While Pugh's attorneys deny this fact, the Court is not persuaded, particularly in light of previous attempts by counsel to add another class representative.  In that circumstance, this Court denied consolidation, noting that it was an improper attempt by Rock to go around the Court's case management plan.  (Filing No. 95 at 5 n.7.)  In so concluding, the Court noted that Rock's case had already "resulted in protracted litigation" and that consolidation would "require the parties to deviate from the already-extended case management deadlines set in Rock's aging litigation".  *Id.*

The only thing that has changed since that ruling is that the case has gotten a year-and-a-half older and the motion for class certification is now, finally, ripe for ruling.  Allowing Pugh to intervene at this very-late stage in the process would not only require this Court to ignore its prior case management orders and would further delay ruling on the pending motion for class certification, as both parties assert additional discovery would be necessary to determine the adequacy of Pugh to serve as a class representative, but it would also prejudice the NCAA which has waited years for a ruling on the motion for class certification. *See Davidson v. Citizens Gas*

34

*& Coke Utility*, No. 1:03-CV-1882-SEB-JPG, 2006 WL 1367430, at *1 (S.D. Ind. May 16, 2006) ("this case has already consumed unjustified amounts of time . . . . Discovery has been tortuous and the class certification process similarly protracted and contentious . . . . The existing parties are clearly prejudiced by further delay").

Accordingly, exercising its discretion and recognizing both undue prejudice and delay, the Court considers Pugh's motion for permissive intervention to be unwarranted. *See Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 827 (7th Cir. 2011) ("[i]ntervention shouldn't be allowed just to give class action lawyers multiple bites at the certification apple, when they have chosen, as should have been obvious from the start, patently inappropriate candidates to be the class representatives"; *Lidie v. State of Cal.*, 478 F.2d 552, 555 (9th Cir. 1973) ("where the original parties were never qualified to represent the class, a motion to intervene represents a back-door attempt to begin the action anew, and need not be granted").

Accordingly, because neither mandatory nor permissive intervention is warranted in this case, the Court denies Pugh's Conditional Motion to Intervene.

## IV.  CONCLUSION

For the aforementioned reasons, the Court **DENIES** Rock's Motion for Class Certification (Filing No. 104).  In addition, the Court **DENIES** Pugh's Conditional Motion to Intervene (Filing No. 190).

**SO ORDERED.**

Date:  3/31/2016

_____

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Daniel E. Pulliam
FAEGRE BAKER DANIELS LLP
(Indianapolis)
daniel.pulliam@faegrebd.com

Kathy Lynn Osborn
FAEGRE BAKER DANIELS LLP
(Indianapolis)
kathy.osborn@faegrebd.com

Daniel J. Kurowski
HAGENS BERMAN SOBOL SHAPIRO
LLP
dank@hbsslaw.com

Jeff D. Friedman
HAGENS BERMAN SOBOL SHAPIRO
LLP
jefff@hbsslaw.com

Jon T. King
HAGENS BERMAN SOBOL SHAPIRO
LLP
jonk@hbsslaw.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO
LLP
steve@hbsslaw.com

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO,
LLP
beth@hbsslaw.com

James Piatt
RILEY WILLIAMS & PIATT, LLC
jpiatt@rwp-law.com

Joseph N. Williams
RILEY WILLIAMS & PIATT, LLC
jwilliams@rwp-law.com

William N. Riley
RILEY WILLIAMS & PIATT, LLC
wriley@rwp-law.com

Jacob K. Danziger
SCHIFF HARDIN, LLP
350 South Main Street, Suite 210
Ann Arbor, Michigan 48104

Gregory L. Curtner
SCHIFF HARDIN, LLP - Michigan
gcurtner@schiffhardin.com

Jessica A. Sprovstoff
SCHIFF HARDIN, LLP - Michigan
jsprovtsoff@schiffhardin.com

Kimberly K. Kefalas
SCHIFF HARDIN, LLP - Michigan
kkefalas@schiffhardin.com

Robert James Wierenga
SCHIFF HARDIN, LLP - Michigan
rwierenga@schiffhardin.com

Suzanne L. Wahl
SCHIFF HARDIN, LLP - Michigan
swahl@schiffhardin.com

Sara Willingham
THE PAYTNER LAW FIRM PLLC
swillingham@paynterlawfirm.com

Stuart McKinley Paynter
The Paynter Law Firm PLLC
stuart@paynterlawfirm.com